1          BEFORE THE POLICE AND FIRE COMMISSION
               CITY OF NORTHLAKE, ILLINOIS

2

3     IN THE MATTER OF:            )
                                   )
4     CITY OF NORTHLAKE,           )
                                   )
5          Complainant,            )
                                   )
6        vs.                       )
                                   )
7     DANIEL RASIC,                )
                                   )
8          Respondent.             )

9              .

10              REPORT OF PROCEEDINGS had at the

11    hearing of the above-entitled matter before the

12    Police and Fire Commission of the City of Northlake,

13    at City Hall, 55 East North Avenue, Northlake,

14    Illinois, on the 27th day of September, A.D. 2007, at

15    the hour of 6:00 o'clock p.m.

16

17

18

19

20

21

22

1    PRESENT:

2          MS. ROBERTA LARSON, Chairperson;

3          MR. MANUEL FERRA, Member;

4          MR. GARY MERCHANT, Member;

5          MR. RICHARD BRUEN, Attorney for Commission
           Law offices of Odelson & Sterk, Ltd.;

6
           CHIEF DENNIS A. KOLETSOS, Chief of Police;

7
           MR. JOHN MURPHEY, Attorney for Chief of Police

8          Law offices of Rosenthal, Murphey & Coblentz;

9          OFFICER DANIEL RASIC, Police Officer;

10         MS. HEIDI PARKER, Attorney for Police Officer;
               Illinois Fraternal Order of Police, Labor

11             Council.

12   ALSO PRESENT:

13         DEPUTY CHIEF NORMAN NISSEN, Deputy Chief of
               Police;

14
           MRS. RASIC, Wife of Police Officer.

15

16

17

18

19

20

21

22

                                              00022

1
<u>I   N   D   E   X</u>

2

Opening Statement of City
3              by Mr. Murphey              Page 11

4    Opening Statement of Officer
               by Ms. Parker              Page 17
5

6    SEAN O'CALLAGHAN
          Direct Exam by Mr. Murphey     Page 23
7          Cross Exam by Ms. Parker       Page 37

8    COLIN SIMPSON
          Direct Exam by Mr. Murphey     Page 40
9          Cross Exam by Ms. Parker       Page 50

10   NORMAN NISSEN
          Direct Exam by Mr. Murphey     Page 54
11         Cross Exam by Ms. Parker       Page 63

12   DANIEL RASIC
          Direct Exam by Mr. Murphey     Page 69
13         Cross Exam by Ms. Parker       Page 113
          Redirect Exam by Mr. Murphey   Page 124
14         Recross Exam by Ms. Parker     Page 136
          Examination by Mr. Bruen       Page 136

15

16

17

18

19

20

21

22

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1

2                              E X H I B I T S

3      Commission Number 1                              Page   6

4

5      Chief's Exhibit Number 11      identified      Page 25
                                      admitted        Page 39
6
       Chief's Exhibit Number 10      identified      Page 32
7                                     admitted        Page 39

8      Chief's Exhibit Number 7       identified      Page 55
                                      admitted        Page 63
9
       Chief's Exhibit Number 9       identified      Page 57
10                                    admitted        Page 63

11

12

13
       Union Exhibit Number 1         identified      Page 114
14

15     Union Exhibit Number 2         identified      Page 116

16

17

18

19

20

21

22                                                    00024

1              MS. LARSON:  Good evening.  My name is

2     Roberta Larson.  I serve as Chairperson of the

3     Northlake Police Commission.  The Commission has two

4     other members:  Commissioner Gary Merchant and

06:11PM  5     Commissioner Manual Ferra.  We are here tonight to

6     consider the Charges and Specifications filed by

7     Chief Koletsos against Daniel Rasic who is employed

8     as a Northlake police officer.

9              The charges were filed by the Chief of

06:11PM  10    Police and are detailed in the Charges and

11    Specifications on file with the Commission.  The

12    matter has been continued on motion of respondent to

13    allow him to obtain discovery and otherwise prepare

14    for this hearing.  Respondent has waived his right to

06:12PM  15    a hearing within 30 days of the charges being filed.

16             Tonight we are prepared to proceed to a

17    hearing on the charges.  Both sides had have had

18    ample time to exchange discovery.  The hearing will

19    proceed as follows:  The Chief having the burden of

06:12PM  20    proof will present his case first followed by Rasic

21    presenting his case.  All parties shall have the

22    right to cross examine witnesses presented by the

1   opposite party.

2          Depending upon the length of the hearing

3   and witnesses put forth from both sides, the

4   Commission may hear closing argument tonight or will

06:12PM  5   ask the parties to file a closing brief with the

6   Commission.  The Commission will issue a written

7   decision hopefully within 14 days of hearing closing

8   arguments or reviewing the closing briefs.

9          At this time I would ask both sides and

06:13PM  10   their attorneys to identify themselves for the

11   record.

12          MR. MURPHEY:  On behalf of Chief Koletsos who

13   is present here, my name is John Murphey,

14   M-u-r-p-h-e-y, 30 North LaSalle, Chicago.

06:13PM  15          MS. PARKER:  Heidi Parker representing

16   Officer Daniel Rasic, and from the Illinois Fraternal

17   Order of Police Labor Council.

18          MS. LARSON:  Thank you.  The Commission has

19   marked the Charges and Specifications against Rasic

06:13PM  20   as Commission Exhibit Number 1 which will be entered

21   into evidence.  Are there any pending motions to be

22   heard?

00026

1        MR. MURPHEY:  None, but I think in terms of

2   one preliminary matter, Counsel and I have had an

3   opportunity to discuss one aspect, and sometimes

4   these hearings are bifurcated in terms of whether

06:14PM   5   there is first a finding of guilt, and then

6   disposition.

7            The documents that are relevant or

8   sometimes relevant for what the ultimate sanction

9   might be include the officer's prior history, both

06:14PM  10   discipline and commendations.  We have done our best

11   to provide that, but we were only able to allow

12   Counsel for the Union to inspect the documents

13   Tuesday I think it was, and we have only obviously

14   with the press of other business, only been able to

06:14PM  15   assemble copies of the whole file for Counsel by this

16   evening, so to the extent the Commission decides to,

17   you know, split the hearing between the fact portion

18   and then if necessary a penalty portion, I want to

19   say up front I don't have any objection to whatever

06:15PM  20   request the Union has to either study that material

21   or after the hearing if they choose, do it in

22   writing, to comment, to take make sure that

00027

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    everything we gave them represents the officer's

2    history, both, you know, good and not so good, and

3    then to have the opportunity to put whatever face on

4    it that the Union believes, so that part, if we

06:15PM   5    finish the facts tonight, I will leave to the Union,

6    and I am not going to have any objection how ever

7    they want to handle it.

8          MS. PARKER:   I would request an opportunity

9    to review the disciplinary/commendation information

06:15PM  10    before we proceed with that portion of the hearing.

11          MR. BRUEN:   That will be allowed.  Anything

12    else?

13          MR. MURPHEY:   The other preliminary matter we

14    have is we filed a motion to suspend the Officer

06:16PM  15    without pay pending the hearing.  When this case was

16    originally filed, the Officer was on leave.  He

17    wasn't in the department.  His leave is scheduled to

18    expire in a couple of days, and it is the Chief's

19    position that pending the outcome of this matter, if

06:16PM  20    it is not resolved at all today or completely today,

21    that pending decision by the Board, that the Officer

22    be suspended without pay which is specifically what

1    the statute authorizes.  The Chief is seeking

2    termination in this case.  Should the Commission not

3    terminate the Officer, the Commission or City will be

4    obligated to make a back pay award, so with that we

06:16PM    5    would move pending final decision of the Board, that

6    the Officer be suspended without pay.

7         MS. PARKER:  I would object to the motion to

8    suspend Officer Rasic.  The allegations and the

9    charges are not sufficiently serious to warrant

06:17PM   10    suspension, and there has been no substantial

11    misconduct proved at this point, and they are merely

12    allegations.  Officer Rasic has been on unpaid status

13    for 10 weeks due to family medical leave, and

14    continuing without pay would put a substantial

06:17PM   15    hardship on his family.

16              Officer Rasic is a 10-year veteran, and

17    he should have a chance to defend himself against

18    these charges before he's suspended.

19         MR. BRUEN:  How much -- did you finish?

06:17PM   20         MS. PARKER:  Yes.

21         MR. BRUEN:  How much family medical leave has

22    he used?  Is it used up that he's coming off?

1          MS. PARKER:  Yes, he'll be coming off of

2    12 weeks.

3          MR. BRUEN:  When does he finish the 12 weeks?

4          OFFICER RASIC:  The 28th.

06:18PM   5          MR. MURPHEY:  Just brief reply to this.  In

6    terms of the charges not being serious, we think they

7    are very serious.  In terms of their not being

8    proved, that is the case anytime there is a

9    suspension pending the hearing, so that is a non

06:18PM  10    factor.  In terms of the Officer having taken an

11    F.M.L.A. leave, that's his choice, that it was a

12    voluntary choice of his, so had he not been on leave,

13    we would have -- this motion to suspend would have

14    been advanced at the initial date of the hearing, so

06:18PM  15    this is a normal -- this is a normal procedure.

16          The statute specifically recognizes that

17    this is the procedure that is offered to the

18    Commission, and we have asked that the Commission

19    grant the motion.

06:18PM  20          MR. BRUEN:  Okay, short recess.

21              (Recess had.)

22          MR. BRUEN:  The Commission made a decision on

1    the motion.  The motion will be granted and the

2    Officer will be suspended for up to 30 days.  If

3    there is a ruling in less than 30 days, that

4    suspension will be revisited at that time, but

06:23PM    5    otherwise the suspension is good for 30 days, and if

6    the City wishes to renew it, they have to file

7    another motion, and of course to clarify that, the

8    suspension will begin after September 28th, after the

9    expiration of the Family Medical Leave Act time.

06:23PM   10                    Any other pretrial matter?

11                    MR. MURPHEY:  Ready to proceed.

12                    MS PARKER:  No.

13                    MR. BRUEN:  Proceed with opening commencing

14    with the City.

06:23PM   15                    MR. MURPHEY:  Good evening members of the

16    Commission and Counsel for the Union.  As mentioned,

17    my name is John Murphey.  I am a lawyer.  I represent

18    Chief Koletsos.  We are here this evening to seek the

19    termination of Officer Rasic's employment as a police

06:24PM   20    Officer in the City of Northlake.  I believe the

21    facts of the case will be relatively undisputed, and

22    I would like to briefly review those before beginning

1    our case and presentation of witnesses.

2              It is of course simplistic to say that

3    the job of a police officer and a police department

4    is to fight crime and make the streets of Northlake

06:24PM    5    safer for the citizens, but of course that's true,

6    and the only way, the only way a police department

7    can efficiently operate is by officers adhering to

8    the rules, showing respect for their supervisors,

9    obeying directives of their supervisors, not being

06:25PM   10    insubordinate, and adhering to orders of court to

11    testify as a witness in matters in which they have

12    knowledge arising from an arrest decision.

13              The centerpiece of this case involves a

14    D.U.I. arrest and a conversation that this Officer

06:25PM   15    had with the Police Chief on July 24, 2007.  It was a

16    D.U.I. arrest that that Officer made back in the

17    summer of 2006.  The Officer, of course, was a key

18    witness to the case for the obvious reason that the

19    Officer not simply arrested him, but was the eyeball

06:25PM   20    witness to the individual being behind the wheel.

21    The case worked its normal way as it does through the

22    Circuit Court of Cook County, and it was set to go

1    once in the beginning of July.  The case was

2    continued.

3              In the meantime, this Officer embarked

4    upon a leave, but at the same time, the Officer was

06:26PM   5    under subpoena to testify on behalf of the people of

6    the State of Illinois.  As this Commission is aware,

7    just like an administrative subpoena is not an order

8    of the Police Chief, it is an order of this body, a

9    court subpoena is an order of the Circuit Court of

06:26PM  10    Cook County.

11              On July 24, 2007, there was a telephone

12    conversation between this Officer and Chief Koletsos.

13    There will not be any dispute, I don't believe,

14    regarding the content of this telephone conversation,

06:26PM  15    because it was tape recorded, and this Commission

16    will hear the tape recording this evening.  Officer

17    Rasic was trying to get out of his duty to testify in

18    this case.

19              He called the Chief.  He said to the

06:27PM  20    Chief -- excuse me, he said to the Chief that he

21    didn't want to testify because of his Family Medical

22    Leave Act.  The Chief said, well you know, this is an

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    order of court.  You have to be there.  The case has

2    been continued before.  We don't want to give up the

3    case.  It is a D.U.I.  It is important for the

4    streets of Northlake, so I am ordering -- I am

06:27PM    5    ordering you to adhere to the order of court.  This

6    Officer then began to argue with the Chief.

7                You will hear irrelevancies raised by

8    this Officer indicating that he didn't think this

9    matter was any sort of a big deal.  You will hear

06:27PM    10   that the Officer continued to emphasize to the Chief

11   in the tone that is, you will find, I believe, to be

12   arrogant and disrespectful, no different than the

13   pose he's making this evening, and the scowl he is

14   showing toward me.  You will hear that as well from

06:28PM    15   July 24th as well as you are seeing it tonight.

16               You will hear this Officer being

17   arrogant to the Chief, cyclical to the Chief, and

18   disrespectful of the Chief's orders.  At one point

19   you will hear the Officer say, okay, king, an act of

06:28PM    20   insubordination.  You will hear the Chief clearly

21   direct this Officer you are not to contact the

22   state's attorney about going to court, and you are to

1    go to court.  You are not to try to wiggle your way

2    out of it.  You will hear, okay, king, in clear,

3    unmistakable tones aimed at the Chief, an obvious

4    statement of insubordination and disrespect;

06:29PM    5    something that can't be tolerated in a para military

6    atmosphere.

7                You will hear the Officer then attempt

8    to wiggle out of that insult by saying he was

9    speaking to his child.  You will hear from the tape

06:29PM   10    recording the tone of voice, and you will be able to

11    decide whether those remarks were intended to his son

12    or for his superior.

13                You will also hear the Officer say words

14    to the effect:  God, you are out of control.  Another

06:29PM   15    act of insubordination, disrespect toward his Chief

16    of Police.  You will then hear the testimony -- you

17    will hear the testimony from the state's attorneys

18    involved in this case.  The gentleman who is our

19    first witness is the state's attorney who was

06:29PM   20    actually in charge of the prosecution of this case.

21                He will testify as to the Officer's

22    specific disobedience of the directive of the Chief.

1   Hardly had he gotten off the phone with the Chief, he

2   immediately began to call the state's attorney to try

3   to get out of his duty to testify in court.  You will

4   also hear that a couple days later, on or about July

06:30PM   5   27th, so intent was he on disobeying the directive of

6   the court and directive of his Chief, this Officer

7   called Colin Simpson.  Colin Simpson is no simple

8   lawyer.  He's the Chief of the Fourth District

9   State's Attorney's office and has been for a long

06:30PM   10   time.

11          You will hear what the Officer attempted

12   to do with Colin Simpson.  You will hear, I believe,

13   State's Attorney Simpson say that he explained to the

14   Officer that the subpoena is an order of court, and

06:30PM   15   that the county was about the business of

16   accommodating, if there was any way to accommodate

17   the need for this Officer to have babysitting

18   services, related services like that, but the case

19   has got to go.

06:31PM   20          The state's attorney, Mr. O'Callaghan

21   here, was able to get the case continued one more

22   time in August so that the case could be put over

1   until September with the hope that that Officer would

2   do his duty.  Once again the Officer failed to do his

3   duty even though under subpoena.  He failed to appear

4   in court in September, and finally the case was --

06:31PM   5   Latin phrase, nolled, n-o-l-l-e-d, which is a fancy

6   way of, Latin way of saying that the state had to

7   drop the case because the key witness was a multiple

8   no show in spite of subpoenas.

9          The evidence in this case will show an

06:31PM   10   officer hell bent on disobeying the directive of his

11   chief, hell bent on being insubordinate and

12   disrespectful and failing to abide by his duties.

13   Finally you will see that this occurrence by this

14   Officer did not take place in a vacuum, and when the

06:32PM   15   hearing is over, we will ask you whether based on

16   this incident itself or this incident in the context

17   of prior discipline this Officer has undergone, that

18   the best interest of this community will be served by

19   an order terminating the employment of Officer Rasic.

06:32PM   20   Thank you.

21          MS. PARKER:  The charges in this case arise

22   out of miscommunication between Chief Koletsos and

.00037

MARIE L. ROGERS, C.S.R. (708) 430-2520

1   Officer Rasic, and Officer Rasic's sense of

2   responsibility to his family and his desire to do the

3   right thing and try and perform the job in the best

4   way that he could under the circumstances.  During

06:33PM   5   the period in question where the events took place,

6   Officer Rasic was on family medical leave.  The leave

7   was approved by Chief Koletsos.  He was entitled to

8   12 weeks off leave and that period of time ran from

9   July 6th through September 29th.

06:33PM   10   Officer Rasic took the leave and Chief

11   Koletsos was aware of the reasons why Officer Rasic

12   was taking leave.  Officer Rasic's wife Tracy had

13   just given birth to a newborn, and she almost died

14   giving birth, or the baby did, and they have a three-

06:33PM   15   year old toddler as well, and Officer Rasic felt it

16   was his responsibility to be home and care for his

17   family.  Several, a couple weeks into the leave,

18   Officer Rasic learned that his father was going to

19   require surgery, and due to his advanced age, there

06:34PM   20   was a serious risk that his father would die during

21   the surgery.

22   Those events precipitated or came before

00038

MARIE L. ROGERS, C.S.R. (708) 430-2520

1   the events that took place having to do with the

2   telephone conversation with the Chief.  Officer Rasic

3   is a family man, but he's also a dedicated and

4   professional officer and has been for the past 10

06:34PM   5   years.

6              He's received positive performance

7   evaluations, and has received multiple commendations

8   by the Chief acknowledging his dedication and

9   professionalism.  The beginning of the conversations

06:34PM   10   between Chief Koletsos and Officer Rasic started on

11   July 23rd.  Despite Officer Rasic's requirement to

12   call in -- under F.M.L.A., the Officer was required

13   to call in each week and update the department about

14   his status, F.M.L.A. status.  He did so, but despite

06:35PM   15   his frequent contact with the department, Chief

16   Koletsos called Officer Rasic and was attempting --

17   you will hear the evidence -- he was attempting to

18   urge Officer Rasic to return to work stating that his

19   job was more important than his family.

06:35PM   20              The end of the conversation was a

21   frustrated Chief and Officer Rasic conflicted and

22   upset that the Chief didn't understand his situation

00039

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    and his family responsibilities and obligations. The

2    very next day on July 24th, Officer Rasic was

3    informed that he had received a subpoena at the

4    department, and that he was required to go to court.

06:36PM    5    His response, of course, was that he's on family

6    medical leave. He can't. He was not able to attend

7    the court date because of his family obligations and

8    he knew, Officer Rasic knew it is common practice

9    that arresting officers often have to call and get

06:36PM    10    their court date continued.

11        There is a department order, 13-10, that

12    allows an officer to call a state's attorney and call

13    the department and advise them that they are unable

14    to attend. What frequently happens is that the court

06:37PM    15    date is continued, or sometimes the cases are

16    disposed of. The witnesses are not needed, and that

17    was Officer Rasic's understanding when he called and

18    tried to get these court dates continued. That was

19    his intent. That was his understanding of the

06:37PM    20    situation.

21        On July 24th, he talked to the Chief and

22    advised the Chief that he was on F.M.L.A. leave and

00040

MARIE L. ROGERS, C.S.R. (708) 430-2520

1    he would call the state's attorney, perform his

2    obligation, and take care of the subpoena.  He was

3    surprised to learn that the Chief was ordering him to

4    go to court despite his situation and ordering him

06:37PM    5    not to call the state's attorney despite the risk of

6    being held in contempt of court.

7               It was during that moment in the

8    conversation that Officer Rasic's three-year old son

9    was crawling around on the floor by his feet and

06:38PM    10   Officer Rasic stated:  Okay, king.  The Chief

11   immediately thought that Officer Rasic was talking to

12   him and said:  What did you say?  Officer Rasic

13   immediately tried to explain that he was talking to

14   his son, but the Chief wasn't having it.  He wasn't

06:38PM    15   listening.

16              You will hear evidence that Officer

17   Rasic in fact does refer to his son as king and that

18   his E-mail address is King Rasic 1 at Hotmail.com and

19   has been prior to this time.  At that point, the

06:38PM    20   Chief threatened a charge of insubordination and

21   Officer Rasic's response was one of defensiveness.

22   He was under a lot of stress, a lot of emotional

00041

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1   strain in his family.  He felt that his family

2   medical leave rights were being violated, and now he

3   is being threatened with discipline.

4              The two, Officer Rasic and the Chief had

5   some words back and forth.  Officer Rasic did not

6   swear at him.  He didn't call him names.  He engaged

7   in a heated exchange due to the high level of

8   emotions that were going on at the time.

9              In the days following the conversation,

10  the department mailed subpoenas to Officer Rasic's

11  home, and as Officer Rasic had done in the past when

12  he's received subpoenas and been unable to attend, he

13  called the state's attorney to advise them that he

14  was on F.M.L.A. leave and would be unable to attend.

15  He feared being held in contempt of court which is

16  stated right on the subpoena and that is why he

17  called.

18             Officer Rasic is a valuable officer and

19  he has great respect for authority.  He has great

20  respect for the Chief.  He's never had any problems

21  with the Chief in the past, and the Commission should

22  find that there is insufficient cause for termination

00042

MARIE L. ROGERS, C.S.R.  (708) 430-2520

 1   in this case.

 2          MR. BRUEN:  Okay.

 3          MR. MURPHEY:  Chief calls Sean O'Callaghan.

 4   Witnesses generally sit here.

06:40PM   5          THE WITNESS:  Sure.

 6                   (Witness sworn.)

 7          MR. MURPHEY:  The way we have it set up here

 8   is a little awkward.  I am not going to feel offended

 9   if you don't look at me directly.  Whatever is more

06:41PM  10   comfortable.  The Commission is more interested in

11   hearing and looking at you.

12          S E A N   O ' C A L L A G H A N

13   called as a witness by the City, having been duly

14   sworn, was examined and testified as follows:

15          D I R E C T   E X A M I N A T I O N

16   BY MR. MURPHEY:

17          Q.    Please state your name.

18          A.    My name is Sean O'Callaghan,

19   O-'-C-a-l-l-a-g-h-a-n.

06:41PM  20          Q.    What do you do for a living?

21          A.    I am a Cook County State's Attorney.

22          Q.    How long have you been so employed?

                                          00043

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1          A.    A little over two years.

2          Q.    What is your current assignment?

3          A.    I am currently on a temporary assignment

4     to our felony room at the Fourth District courthouse

06:41PM    5     in Maybrook.

6          Q.    Calling your attention to the period of

7     time from July to early September of this year, what

8     was your assignment?

9          A.    Misdemeanor assistant.

06:41PM   10          Q.    Tell the Commission a little bit about

11     your educational and professional background?

12          A.    Sure, I attended University of San

13     Diego.  Went to University of Iowa, received my law

14     degree.  I have been employed as an attorney for a

06:42PM   15     little over two years.

16          Q.    And what is a subpoena?

17          A.    A subpoena is, I guess a court order or

18     summons directing an individual who receives a

19     subpoena to appear before court for the purposes of

06:42PM   20     testifying.

21          Q.    And is it correct that a failure to

22     respond to a subpoena is punishable by contempt of

00044

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    court?

2              A.    It is.

3              Q.    Are you familiar with a case involving a

4    person's last name G-a-l-v-e-z?

06:42PM    5              A.    Yes, I am.

6              Q.    What was the nature of that case?

7              A.    John Paul Galvez was driving under the

8    influence of alcohol.

9              Q.    Where did that occur?

06:42PM    10             A.    Northlake.

11             Q.    Is it correct the Fourth Municipal

12   District includes the City of Northlake within its

13   jurisdiction?

14             A.    Yes, that's true.

06:42PM    15             Q.    Who is the arresting officer in this

16   case?

17             A.    Officer Rasic.

18             Q.    Calling your attention to what has been

19   marked as the Chief's Exhibit 11, let me reach over

06:43PM    20   there, and for the Commission I usually bundle them

21   up, but there is not that many of them.  I didn't

22   bundle them up.  I have got individual packets for

00045

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1       each of the Commissioners.  I furnished them to

2       Counsel.

3                  Calling your attention to what has been

4       marked as Chief's Exhibit 11 which is the very last

06:43PM   5       one in the packet, do you recognize that document?

6            A.    Yes, I do.

7            Q.    A document consisting of three pages; is

8       that correct?

9            A.    That's correct.

06:43PM   10            Q.    What is the document?

11            A.    This document is a print out of the Cook

12       County Clerk's system for John Paul Galvez driving

13       under the influence case.

14            Q.    Is this something maintained by the

06:44PM   15       Clerk of Court in the usual course of business?

16            A.    Yes, it is.

17            Q.    Turn to the second page.  You see there

18       is a series of dates there that says disposition/

19       activity, and then description.  What is that, sir?

06:44PM   20            A.    This is the annotated schedule of the

21       dates that this case was in court.

22            Q.    And just so we can understand this, it

00046

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    says in the middle column, it says continue P.R.O.S.

2    that means prosecution request?

3         A.    Yes.

4         Q.    Continue agreement is an agreement of

06:44PM  5    the parties, and then there is a continue defendant?

6         A.    That is correct.

7         Q.    So I guess, is that kind of like the

8    running history of this case in terms of process?

9         A.    That is correct.

06:44PM  10        Q.    Calling your attention to July 10, 2007,

11   did you commence the trial of the case -- how do you

12   pronounce the name?

13        A.    Galvez.

14        Q.    Galvez?

06:45PM  15        A.    That's correct.  The trial began July

16   10, 2007.

17        Q.    Was the Officer present in court that

18   day?

19        A.    No, he was not.

06:45PM  20        Q.    Was he subpoenaed to appear in court

21   that date?

22        A.    Yes, he was.

C0047

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1      Q.    Did you have any conversation with

2    Officer Rasic prior to July 10, 2007?

3      A.    No, not that I recall.

4      Q.    What happened to the case on that day?

06:45PM    5      A.    The case was set for trial.

6      Q.    That day scheduled to go?

7      A.    There were several civilian witnesses

8    called on that case, and in essence I had to begin

9    the case on that day, so I started my trial without

06:45PM   10    my officer and proceeded to put on one of my civilian

11    witnesses.

12      Q.    Was the officer important to that case?

13      A.    Yes, one of the elements of driving

14    under the influence is proving driving or controlling

06:45PM   15    of an automobile.  In this case, Officer Rasic was

16    the responding officer.  He was the only person that

17    saw the defendant in this case behind the wheel, at

18    least that was my understanding from his reports, so

19    I needed him to put the defendant in this case behind

06:46PM   20    the wheel of an automobile.

21      Q.    After July 10th, what contact if any --

22    what was the next contact if any which you had with

00048

1    this Officer?

2         A.    After July 10th, I received a phone call

3    from Officer Rasic.

4         Q.    Approximately when did that occur?

06:46PM  5         A.    By my best estimate, probably one week

6    or two weeks after the court date.  I really don't --

7    I can't pinpoint the date.

8         Q.    What was the next court dated scheduled

9    for?

06:46PM  10        A.    The case had been given roughly a one-

11   month continuance.  The next court day was August 7,

12   2007.

13        Q.    Is that reflected on the third page of

14   the exhibit?

06:46PM  15        A.    Yes, it is.

16        Q.    In relation to August 7, 2007, can you

17   estimate when you next spoke to the Officer?

18        A.    Are we talking about the first phone

19   call?

06:46PM  20        Q.    Yes, sir.

21        A.    It was before that court date.

22        Q.    And this was a telephone call?

00049

1          A.    Yes, it was.

2          Q.    Best you can recall, what did you say to

3     him?   What did he say to you?

4          A.    Best I can recall, we discussed three

06:47PM   5     things in this phone call:   The first was Officer

6     Rasic contacted me and said that -- asked if he could

7     be released from his subpoena.   I explained that I

8     could not release him.   I explained the case had

9     begun.   I needed him on the next court date.   I got a

06:47PM  10     continuance for him to be in court on the next date.

11     I could not release him from his subpoena.

12          The next thing that we discussed is

13     Officer Rasic explained to me he was on family leave.

14     He asked at that point if I could explain to the

06:47PM  15     people at the department what the Family Leave Act

16     was.   I am not a civil attorney.   I explained I am

17     not familiar with the Family Leave Act.   I am

18     uncomfortable doing that, and I had no reason to do

19     that, so I declined to get involved; and the third

06:47PM  20     thing that we discussed was that I explained to

21     Officer Rasic if I did not have him on, in all

22     likelihood I would have to dismiss the case.   I

00050

1   needed him for the next court date for my case.

2           Q.    What did he say?

3           A.    To be honest, I don't think that he said

4   anything with regard to that statement.  I believe

06:48PM   5   that our phone conversation just ended.  If he said

6   anything it was to the extent of okay.

7           Q.    What was the next contact you had with

8   anything referencing Officer Rasic?

9           A.    After receiving that phone call, I

06:48PM  10   immediately went to speak with my Supervisor Colin

11   Simpson.

12           Q.    Why did you do that?

13           A.    One, to be in honest, I was

14   uncomfortable.  I wasn't sure if I had given Officer

06:48PM  15   Rasic the correct explanation of a subpoena.  I

16   wasn't sure if he was released because of the Family

17   Leave Act.  I wanted to make -- I didn't want to do

18   anything wrong.  I went and spoke with my supervisor

19   who explained to me, of course not.  A subpoena is a

06:48PM  20   court order.  I was also advised by my supervisor not

21   to have any further conversation with Officer Rasic.

22           Q.    What was the next -- and did you ever

00051

1    have any further conversation with Rasic?

2         A.    No further conversation with Officer

3    Rasic.

4         Q.    Is it correct the next court date was

06:49PM    5    August 7, 2007?

6         A.    That's correct.

7         Q.    And were you expecting the Officer to be

8    in court that date?

9         A.    I did.

06:49PM    10        Q.    What happened?

11        A.    The Officer was not there.

12        Q.    And let me have you flip back to Chief's

13    Exhibit 10, and you will see there is a series of

14    documents about halfway through them.  Let me grab it

06:49PM    15    for you.  Calling your attention to Chief's 10, the

16    page that has got handwriting in the upper right-hand

17    corner says subpoena.  Do you recognize that

18    document?

19        A.    Yes, I do.

06:49PM    20        Q.    What is that?

21        A.    Appears to be copy of the subpoena that

22    I would have issued to Officer Rasic with regard to

00052

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    this case asking him to be in Court August 7, 2007.

2              Q.    You issued that?

3              A.    Yes, I did.

4              Q.    Based on issuing that subpoena, was it

06:50PM   5    your expectation that the Officer would appear in

6    court?

7              A.    Yes, it was.

8              Q.    Did he appear in court?

9              A.    No, he did not.

06:50PM   10             Q.    Did he advise you that he wasn't going

11   to appear in court?

12             A.    Only per that phone call that we had

13   prior to August 7th.

14             Q.    That would have been shortly after the

06:50PM   15   July date?

16             A.    That is correct.

17             Q.    What happened on August 7th?

18             A.    On August 7th, when the Officer wasn't

19   there, I considered dismissing the case on that date

06:50PM   20   because it is very unusual to get a second

21   continuance, but I had a civilian witness there that

22   had not testified yet, and I was able to put that

00053

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1   civilian witness on.  I believe if my memory serves

2   me, Deputy Chief Nissen was at that court date and

3   asked me to do my best to get a continuance.  I put

4   on my civilian witness, and I asked for one further

06:50PM   5   continuance because my officer was not present.

6          Q.    Was that granted?

7          A.    It was.

8          Q.    Having been in your position several

9   times, is it fair to say you were scrambling to get

06:51PM   10   your officer present in court?

11          A.    It is fair to say that.

12          Q.    Again referencing Chief's Exhibit, Group

13   Exhibit 10, this is a subpoena issued to Officer

14   Rasic for the next court date; is that correct?

06:51PM   15          A.    That is correct.

16          Q.    And was that subpoena issued by you or

17   at your direction?

18          A.    Yes, it was.

19          Q.    And why did you do that?

06:51PM   20          A.    Again the trial had received one final

21   continuance to commence and finish and complete the

22   trial.

00054

1          Q.    And were you present in room 106 at 1:30

2     on September 4th?

3          A.    Yes, I was.

4          Q.    Was this case called?

06:51PM  5          A.    Yes, it was.

6          Q.    Was the defendant there?

7          A.    No, he was not.

8          Q.    Was the Officer there?

9          A.    I apologize.

06:52PM 10          Q.    Was the defendant there?

11          A.    The defendant in the D.U.I. case was

12     present.

13          Q.    And was this Officer present?

14          A.    No, the Officer was not present.

06:52PM 15          Q.    Had you had any communication with the

16     Officer between the date of subpoena and the date of

17     the trial?

18          A.    Yes.

19          Q.    And what was the nature of that

06:52PM 20     communication?

21          A.    A few days before the date of this

22     trial, I received a voice mail message.

00055

1          Q.    And it was a voice mail message from the

2     Officer?

3          A.    Yes, it was.

4          Q.    What did it indicate?

06:52PM   5          A.    It indicated that he was not going to be

6     in court; indicated that his father was having

7     surgery, and for that reason he would not be in

8     court.

9          Q.    And what day did you receive that

06:52PM  10     communication?

11          A.    I can't pinpoint with certainty, but I

12     believe somewhere around August 30th.

13          Q.    And what happened with the case?

14          A.    I nolle pros'd the case.

06:53PM  15          Q.    What does that mean in English?

16          A.    The state dismissed charges.  The

17     defendant was free to leave, and the case was over.

18          Q.    The D.U.I. defendant walked?

19          A.    Yes, he did walk.

06:53PM  20          MR. MURPHEY:  No further questions.  Thank

21     you.

22          MR. BRUEN:  Are you going to move both these

00056

MARIE L. ROGERS, C.S.R. (708) 430-2520

1    in evidence?

2         MR. MURPHEY:   I was going to wait until after

3    cross examination.

4         MR. BRUEN:  Go ahead.

5          C R O S S   E X A M I N A T I O N

6    BY MS. PARKER:

7         Q.    You testified that Officer Rasic would

8    be in court on August 7th; correct?

9         A.    Yes.

06:53PM    10    Q.    But he had previously told you he

11    wouldn't be in court; is that correct?

12        A.    In the phone conversation we had, yes.

13        Q.    And when you talked to him, did you --

14    you didn't inquire when he would be off his family

06:53PM    15    medical leave?

16        A.    I did not ask that.

17        Q.    If you had, you could have -- couldn't

18    you have scheduled the court date for a date after he

19    was returned from his leave?

06:53PM    20    A.    I could have asked.

21        Q.    But you didn't ask?

22        A.    I did not ask.

                                              00057

1    Q.    It is a frequent occurrence that

2  officers are unable to attend their court date; isn't

3  it?

4    A.    Yes.

06:54PM    5    Q.    And in those instances, you are often

6  able to get a continuance; is that correct?

7    A.    A continuance.  That is correct.

8    Q.    And sometimes it turns out that an

9  officer will go to court, and they won't be needed as

06:54PM    10  a witness after all; is that correct?

11    A.    That sometimes happens; that is correct.

12    Q.    Sometimes defendants will plead guilty,

13  or there is other witnesses available; correct?

14    A.    Sometimes, yes, that is correct.

06:54PM    15    Q.    Officer Rasic didn't receive a subpoena

16  for July 10th; did he?

17    A.    He should have.

18    Q.    But you don't know for sure?

19    A.    I can't say for certain.  I didn't see

06:55PM    20  it put in his hand, no.

21    Q.    You don't have any other evidence to

22  show that he received it?

00053

MARIE L. ROGERS, C.S.R. (708) 430-2520