06:55PM

1          A.    Well, to be honest, I did subpoena two

2    other officers in this case.  They were present on

3    that day, on the 10th, because I was trying to see if

4    there was somebody else I could use for my case.

5    Unfortunately those officers couldn't testify to what

6    I needed them to testify to.

7          MS. PARKER:  Okay, I have nothing further.

8          MR. MURPHEY:  Okay, I have nothing further

9    either.  No redirect.  We would offer Chief's 10 and

10   11, 10 being the subpoena records of this case, and

11   11 being the state's attorney's print out of the

12   procedural history of the case.

13         MR. BRUEN:  Objection?

14         MS. PARKER:  No objection.

15         MR. BRUEN:  Those exhibits will be so

16   admitted.

17         MR. MURPHEY:  Next witness is State's

18   Attorney Simpson.

19         THE WITNESS:  May I be dismissed from the

20   process or --

21         MR. BRUEN:  You are done.

22                    (Witness sworn.)

00059

1               C O L I N    S I M P S O N

2    called as a witness by the City, having been duly

3    sworn, was examined and testified as follows:

4               D I R E C T    E X A M I N A T I O N

06:56PM    5    BY MR. MURPHEY:

6          Q.    Please state your name and spell your

7    last name?

8          A.    My name is Colin, C-o-l-i-n Simpson,

9    S-i-m-p-s-o-n.

06:57PM    10         Q.    What do you do for a living?

11         A.    I am a licensed attorney in the State of

12   Illinois; moreover, I am an Assistant State's

13   Attorney for the County of Cook.

14         Q.    Tell this Board a little bit about your

06:57PM    15   professional background with the state's attorney's

16   office?

17         A.    I have been an assistant state's

18   attorney since July 16, 1970.  My first two years

19   were involved in civil litigation.  I did complex tax

06:57PM    20   litigation for the Cook County State's Attorney's

21   office.  I did eminent domain condemnation

22   proceedings.  I spent two years on complex financial

00060

1    crimes investigations.  I spent the next three years

2    or two years doing misdemeanor prosecutions.  I spent

3    three years doing felony criminal trials at District

4    3 which was headquartered to Des Plaines, and then we

06:58PM   5    had two felony courtrooms -- initially headquartered

6    in Niles and two felony courtrooms built in Des

7    Plaines.

8              In October of 1979, I was assigned as a

9    senior trial attorney to the Fourth Municipal

06:58PM   10   District which encompasses Northlake, Illinois, and

11   from 1979 until about 1982 or 1983, I was senior

12   felony trial attorney in charge of felony courtrooms

13   prosecuting murder cases and death penalty cases.

14             In about 1983 or 1984, I became

06:58PM   15   supervisor of the Fourth Municipal District.  As

16   such, my responsibilities were to oversee and train

17   the assistant state's attorneys assigned to the

18   municipal division, assigned to preliminary hearing

19   courts, assigned to the felony review functions, and

06:59PM   20   assigned to the felony trial courts.  At the same

21   time I was also trying cases including murder cases.

22             I also have spent a significant portion

00061

MARIE L. ROGERS, C.S.R. (708) 430-2520

1   of time providing training to police officers on a

2   monthly basis.  We have been doing this for a

3   significant number of years and every month we

4   provide it free of cost to all the police officers in

06:59PM   5   this district.  Officers come from other districts

6   too, three hours of training in various areas of law

7   that the officers could use assistance on, and we

8   have two more training sessions to go this year, and

9   the last one would be to keep the officers up to date

06:59PM   10   on the changing aspects of the criminal law and

11   traffic law as it applies to them conducting their

12   jobs.

13          Q.    And Mr. Simpson, the City of Northlake

14   with within the Fourth Municipal District?

07:00PM   15          A.    Yes, sir.

16          Q.    Calling your attention to July 27th of

17   2007, did you have a conversation with Officer Daniel

18   Rasic from the Northlake Police Department?

19          A.    I had a conversation on or about that

07:00PM   20   date with somebody who identified himself as Daniel

21   Rasic.

22          Q.    Was that a face to face or telephone

00062

MARIE L. ROGERS, C.S.R. (708) 430-2520

1    conversation?

2        A.    No, sir, it was phone conversation.  I

3    believe he called, got through to my desk extension,

4    left a phone message.  I think I played phone tag

07:00PM  5    with him back and forth, but he ultimately called me,

6    sir.

7        Q.    Prior to this, did you know this Officer

8    at all?

9        A.    No, sir.

07:00PM  10        Q.    As best you can recall, during this

11    first conversation what did he say to you and what

12    did you say to him?

13        A.    Told me he had a subpoena for a D.U.I.

14    case.  I said you are going to have to go to court.

07:00PM  15    It is a lawful document issued by a judge to come to

16    court.  You don't want to violate that.  It has

17    consequences.  The judge could hold you in contempt.

18    He said can't you get a continuance.  I said the case

19    is already underway.  It is on trial, because I knew

07:01PM  20    something about the case.  I said it has been

21    continued for you to appear, and I said you are

22    necessary, Officer.  We need you to complete this

MARIE L. ROGERS, C.S.R. (708) 430-2520

1    case, otherwise it is going to end up in a not

2    guilty.

3                He said I am on some family leave.  I

4    said that's between you and the Northlake Police

07:01PM   5    Department.  You have got a subpoena.  You have got

6    to come to court.  If you have family issues there is

7    a child care center on the second floor of the

8    courthouse staffed by Loyola Hospital.  If it is a

9    question of babysitting, you know, we can give you

07:01PM  10    help on that.  We provide occasionally costs to cover

11    babysitting in urgent situations.  If a witness has

12    child care issues, or if the child is four, five,

13    six, there is an area in the office where there is

14    some games and crayons and books, and you know, the

07:02PM  15    secretary will keep an eye on them while the witness

16    is downstairs.

17          Q.    What if anything did Rasic say in

18    response to that?

19          A.    Didn't have any response to that at all.

07:02PM  20          Q.    Is there anything else you recall about

21    the conversation?

22          A.    That's about it.  After that I walked

00064

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    back and talked to Sean O'Callaghan and told him that

2    I got a phone call from a person identifying himself

3    as Officer Rasic from the Northlake Police Department

4    and had a subpoena, and I told Sean, I showed him

07:02PM    5    that he's got a subpoena.  I can't excuse him from

6    court.  He's got to come to court.  He's got to

7    testify, and told him that I explained there is child

8    care facilities at the building, or if he had some

9    other issue, to let us know, and then I found out

07:02PM    10    later that he did not appear on the next scheduled

11    date.

12              We were able to secure one more

13    continuance, and he failed to appear on that court

14    date, and the case ultimately was a not guilty.

07:02PM    15         Q.    Mr. Simpson, was that phone conversation

16    the only contact you had with Officer Rasic?

17         A.    Yes.

18         Q.    Is it fair to say that during the

19    ensuing six weeks or so, he never contacted you to

07:03PM    20    take advantage of the accommodations that you have

21    offered?

22         A.    No, sir, I never had any further

00065

1    communication.

2         Q.    Did he ever advise you during that first

3    communication that his Chief of Police had ordered

4    him not to contact your office?

07:03PM    5         A.    No, sir.

6         Q.    Did he ever notify you during that

7    telephone conversation that he was directed by his

8    Chief of Police to obey the command of the court?

9         A.    No, sir.

07:03PM    10         Q.    What is a subpoena?

11         A.    A subpoena is essentially the same

12    process that brings me here today.  It is a document

13    commanding that I appear.  This is an administrative

14    hearing.  Subpoenas are issued by the court

07:03PM    15    compelling you attend the court.  They may be a

16    subpoena for you to come in person or maybe a

17    subpoena duces tecum which requires you to come to

18    court and bring certain documents to court, but it is

19    a lawful order that is punishable by, at the low end,

07:04PM    20    a contempt citation.

21              I have seen situations where judges have

22    directed the sheriff to go out and arrest the party

00065

MARIE L. ROGERS, C.S.R. (708) 430-2520

|    |    |
|----|----|
| 1  | and bring that party to come to court.  That's called |
| 2  | a body attachment.  That happened a couple days ago |
| 3  | on a murder trial in the building.  Witness failed to |
| 4  | appear.  Body attachments were issued to go out and |
| 5  | arrest that party, and that I explained in this |
| 6  | conversation that it is not a good situation for law |
| 7  | enforcement officers to run the risk of being held in |
| 8  | contempt of court. |

07:04PM (line 5)

Q.   In terms of your office's ability to do
its job, what importance if any is it that police
officers do the best they can to comply with
subpoenas?

07:04PM (lines 10)

A.   It is absolutely critical.  Police
officers are the first line of protection in the
community.  You look at the squad cars driving around
and on the side it says we serve and protect, and
they do.  They are the people that risk their lives
and go out and arrest the people that are committing
crimes in our communities.  That is a tremendous
responsibility and tremendous job, but merely
apprehending somebody and not following through by
coming to court to give the necessary testimony does

07:05PM (line 20)

48

1   not serve the community, does not protect the

2   community.  People who have committed crimes, and

3   they show up in court, they are either coming to

4   court, they are still in custody or they are in court

07:05PM   5   because they are on bond.  They are following

6   directions, but when the witnesses don't come to

7   court, the state can't prove the case, because we

8   need live testimony.

9           This is not a civil proceeding where

07:05PM   10   sometimes you can get away with depositions or

11   affidavits or something like that.  In a criminal

12   court, an accused has a right to confront his

13   accuser, and for many cases the police Officer making

14   the arrest, they are, in fact, the only witness.

07:05PM   15   Their testimony is absolutely pivotal and critical to

16   secure a conviction, so if a police officer does not

17   appear in court, and the defendant is just

18   discharged, we have not served our community.  We

19   have, in fact, put our community at jeopardy, because

07:06PM   20   we let somebody out there with the ability to go out

21   and commit another crime with somewhat of impunity by

22   feeling the officer is not going to show up, he will

00063

1    go out and do it again.

2         MR. MURPHEY:  We will take a short break

3    while the Chairwoman gets a drink of water.

4                        (Recess had.)

07:06PM   5    BY MR. MURPHEY:

6         Q.    Mr. Simpson, what was the effect or the

7    result of this Officer not having complied with the

8    multiple subpoenas issued in this case?

9         A.    State was unable to prove the defendant

07:10PM  10    guilty of the charge.  The defendant was released

11    back into the community.

12         Q.    Of course, there are occasions where a

13    police officer is sick or on vacation, or he's got a

14    court conflict.  What does your office do to

07:10PM  15    accommodate that?

16         A.    Prior to setting the case for trial, we

17    try to determine whether or not the officer's got

18    furlough coming up; if he's got furlough and he's

19    going to be in the area, won't be that big of an

07:10PM  20    issue.  If he's going to be out of state, two week

21    military leave in the summer, we will try and get a

22    date past that point in time.

                                        00069

07:10PM

1    In emergency situations, you know, the

2    officer is injured on duty, happens periodically, we

3    will try and get a continuance for that, but my

4    recollection is this case had been continued a number

5    of times, and we were already in the middle of a

6    trial at that point, and the Officer, as far as I

7    could determine, was local and in the area.

8    Q.    Are there occasions when a trial is in

9    process and an officer is even on vacation or

07:11PM    10   furlough, and he is called to testify?

11   A.    Yes, and in some situations we commence

12   and continue trials.  Many times we will start a

13   trial and just go straight through and conclude it,

14   but there are situations in misdemeanor court or

07:11PM    15   felony court, especially with a bench trial where you

16   can continue a trial, but a judge is going to put a

17   limit on how far he is going to let you go with that.

18   MR. MURPHEY:  All right, no further

19   questions.  Thank you, Mr. Simpson.

20   C R O S S   E X A M I N A T I O N

21   BY MS. PARKER:

22   Q.    Isn't it true that that case had been

00070

MARIE L. ROGERS, C.S.R. (708) 430-2520

1    continued many times prior to July 10th?

2         A.    I believe it had.

3         Q.    And Officer Rasic appeared on those

4    occasions; did he not?

07:11PM 5         A.    I have no personal knowledge of him

6    appearing on the prior occasions.  I was not the

7    assistant handling the case.  O'Callaghan was the

8    assistant handling the case.  It did not come to my

9    attention until after he had failed to appear for the

07:12PM 10   trial date when the subpoena had been issued.

11   Officers come to court many times when the case is

12   pending, but they are not under subpoena.

13        Q.    Okay, on those times that they were

14   continued, they weren't continued for Officer Rasic

07:12PM 15   not being there though?

16        MR. MURPHEY:  Objection.  Foundation.  The

17   witness has no firsthand knowledge.

18        MS. PARKER:  Withdrawn.

19   BY MS. PARKER:

07:12PM 20        Q.    I am sorry, what date did you say that

21   you spoke to Officer Rasic on the phone?

22        A.    My best recollection would have been

1   toward the end of July, either the 26th or 27th,

2   because I recall either after having that

3   conversation or the next day calling the police

4   administration and leaving a message that, you know,

07:12PM   5   this is the case that's up, and the officer called me

6   and pretty much said to either Norm Nissen or Dennis

7   Koletsos, whoever I spoke to, I explained he's got a

8   subpoena.  He's got to be there.  I can't excuse him.

9   If he's got issues we can try to accommodate him, but

07:13PM   10   this case is on trial, and we are in the middle of

11   trial, and he's got to be there.

12       Q.   And Officer Rasic informed you he was on

13   family medical leave?

14       A.   He informed me he was on some type of

07:13PM   15   family leave.

16       Q.   Did you inquire why he was on leave?

17       A.   No, ma'am.

18       Q.   Did you try and find out when he would

19   be back from his leave so that the case could be

07:13PM   20   continued to a time after that date?

21       A.   He told me to the best of my

22   recollection that he would be off that leave within a

53

1   couple of days of the date of this phone

2   conversation.  That's my recollection, so I said you

3   have got to come to court.  He was going to be off

4   either a couple days before then, before the second

07:14PM   5   trial date, or it would be a couple days after the

6   second trial date, and I said, you know, that is an

7   issue you have to discuss with the Chief.  You have

8   got a subpoena to be in court.  You have got a court

9   order to be in court.  I can't excuse you.

07:14PM   10   Q.    Do you have any knowledge of whether it

11   was explained to the judge that the witness was on

12   family medical leave?

13   MR. MURPHEY:  Objection.  No firsthand

14   knowledge.  Hearsay.

07:14PM   15   MS. PARKER:  That was my question.

16   THE WITNESS:  I was not in --

17   MR. MURPHEY:  No foundation.  The question

18   is:  Were you present in court.  The witness already

19   said he has never been in court on this case.

07:14PM   20   MR. BRUEN:  He can answer the question.

21   THE WITNESS:  No.  I do go to court to watch

22   assistants try cases, but in this particular case, I

00073

1    personally was not in court to the best of my

2    knowledge on the day when this case was set for

3    trial.

4        MS. PARKER:  Okay, I have nothing further.

07:14PM  5        MR. MURPHEY:  No redirect.  Thank you,

6    Mr. Simpson.

7        MS. LARSON:  Thank you.

8        MR. MURPHEY:  Call the Deputy Chief next.

9            (Witness sworn.)

10            N O R M A N    N I S S E N

11    called as a witness by the City, having been duly

12    sworn, was examined and testified as follows:

13        D I R E C T   E X A M I N A T I O N

14    BY MR. MURPHEY:

07:15PM  15        Q.    Please state your name spell your last

16    name?

17        A.    Norman N-o-r-m-a-n, Nissen, N-i-s-s-e-n,

18    Junior.

19        Q.    What do you do for a living?

07:15PM  20        A.    I am a police officer.

21        Q.    By whom are you employed?

22        A.    City of Northlake.                00074

MARIE L. ROGERS, C.S.R. (708) 430-2520

1       Q.    Current rank?

2       A.    Deputy Chief.

3       Q.    How long as Deputy Chief?

4       A.    It will be 18 years approximately.

07:15PM    5       Q.    How long with the department?

6       A.    Almost 25.

7       Q.    Seems like only yesterday?

8       A.    Yes.

9       Q.    What responsibilities if any do you have

07:15PM   10   with respect to internal investigations of police

11   officers?

12       A.    I gather information, gather witnesses,

13   coordinate interrogations.

14       Q.    Did you become involved in the internal

07:15PM   15   investigation of Officer Rasic that brings us here?

16       A.    Yes.

17       Q.    Let me ask you with respect to Chief's

18   Exhibit Number 7 -- calling your attention to what

19   has been marked as Chief's Exhibit Number 7, do you

07:16PM   20   recognize that document?

21       A.    No, sir.

22       Q.    Have you ever seen that one before?

1          A.     No.

2          Q.     What responsibility if any did you have

3    with respect to securing a tape recording of a

4    conversation between Officer Rasic and Chief Koletsos

07:16PM  5    that occurred on July 24, 2007?

6          A.     Chief had informed me he had a telephone

7    conversation on a department telephone line with

8    Officer Rasic, and the Chief instructed me to try to

9    retrieve that conversation.

07:16PM  10         Q.     What did you do?

11         A.     I went through the Dictaphone system and

12   was able to retrieve it and make a copy of it.

13         Q.     Do you have a copy of that recording

14   here today?

07:17PM  15         A.     Yes.

16         Q.     Where is it?

17         A.     It is in the tape recorder there.

18         Q.     Is it queued up and ready to go?

19         A.     Yes, I believe there is a portion in

07:17PM  20   front where I explain what it is, and then it is the

21   conversation.

22         MR. MURPHEY:   Okay, with the Board's

00076

MARIE L. ROGERS, C.S.R. (708) 430-2520

1    permission -- strike that.

2                I think that the court reporter here has

3    previously transcribed this conversation.  I don't

4    know if you need to do it again.  You are welcome to

07:17PM  5    as long as you are here.  With the Board's

6    permission, we ask that the Deputy Chief turn on the

7    tape recording so we can hear the July 24, 2007,

8    conversation.

9                          (Whereupon the tape recording

10                           marked as Chief's Exhibit

11                           Number 9 was played.)

12    BY MR. MURPHEY:

13         Q.    All right, Deputy Chief, calling your

14    attention to subsequent to July 24th, did you have

07:21PM  15    any conversation with the state's attorney's office

16    relative to this case -- strike that -- the

17    underlying case involving Galvez?

18         A.    Yes, sir, after this tape I did.

19         Q.    And when was that conversation?

07:21PM  20         A.    I don't recall the exact date, but I

21    went and spoke to State's Attorney O'Callaghan.

22         Q.    And where did that conversation take

1    place?

2              A.    In his office.

3              Q.    And what did you say to each other?

4              A.    Well, my primary concern is I wanted to

07:22PM    5    try to get the case continued -- seemed like a

6    serious matter.  It is person involved that we have

7    had some contact with, and it seemed important to me

8    to try to get a continuance.

9              Q.    The person you are referring to is the

07:22PM   10    criminal defendant, not the Officer?

11              A.    Yes, sir.

12              Q.    And what did you say to Mr. O'Callaghan?

13              A.    Well, he told me about receiving the

14    telephone call from Officer Rasic, and he thought he

07:22PM   15    might be able to get another continuance, but it was

16    up to the judge.  He described to me the trial had

17    already started, and that he gave me the impression

18    it was really in the hands of the judge whether or

19    not there would be another continuance.

07:22PM   20              Q.    And did you subsequently discover that a

21    continuance had been granted?

22              A.    Well, I knew after this conversation or

1 after listening to this conversation that Dan was

2 ordered to be in court, so I expected him to be

3 there, and I believe on August 7th I went to court.

4 I needed to know if it was going to proceed, if Dan

07:23PM 5 was going to be there, and he was not in court.

6    Q. At any time during the period between

7 July 24, 2007, until August 7, 2007, did Officer

8 Rasic have any contact with you with respect to any

9 attempt to obtain any accommodation for his schedule

07:23PM 10 or anything of that nature?

11    A. No.

12    Q. What time was the court trial?

13    A. It is a 1:30 call, p.m.

14    Q. And did Officer Rasic appear at all that

07:23PM 15 day?

16    A. No, sir.

17    Q. What is the next contact if any you had

18 with this matter?

19    A. Well, I guess the record should reflect

07:23PM 20 Dan was instructed to call in and check into the

21 office on Mondays, so he was continuing to do that,

22 and let me know that he was still on leave, and after

1    that there was another continuance to September.

2         Q.    And did you have any conversation with

3    Officer Rasic between the August 7th date and the

4    September date with respect to this matter?

07:24PM    5         A.    No.

6         Q.    Again during this period of time, did he

7    attempt to -- did he ask you for any sort of

8    accommodation to help coordinate his personal

9    situation with his obligation to go to court?

07:24PM   10         A.    No, sir.

11         Q.    And how frequently was he calling in at

12    this time?

13         A.    He called in every Monday.

14         Q.    And did you speak with him every Monday?

07:24PM   15         A.    No.

16         Q.    So I take it then that to the best of

17    your knowledge he never spoke to anybody in a

18    position of authority with respect to seeking some

19    sort of accommodation to help him deal with his

07:24PM   20    responsibilities; is that correct?

21         A.    In regard to the reason he had his

22    leave?

00080

|   |   |
|---|---|
| 1 | Q.   Or his obligation to testify in court? |
| 2 | A.   Well, sometime before then he called and |
| 3 | asked -- he gave me the impression he spoke to |
| 4 | Sergeant Tzinis.  Sergeant Tzinis told him he needed |
| 5 | to go to court.  He did contact with me, and I did |
| 6 | have a conversation sometime before the 24th where I |
| 7 | instructed him that was the Chief's order.  He needed |
| 8 | to attend court, and I wasn't going to supercede the |
| 9 | Chief's order.  He needed to talk to the Chief if he |
| 10 | wanted that to happen, but after that conversation I |
| 11 | never spoke to him again in regard to his court |
| 12 | appearances. |
| 13 | Q.   Did you appear in court on the September |
| 14 | date for this Galvez case? |
| 15 | A.   Yes, I did. |
| 16 | Q.   And why did you go to court? |
| 17 | A.   Well, again because Dan didn't appear |
| 18 | the first time, I felt that he may not appear the |
| 19 | second time, and I wanted to try to get another |
| 20 | continuance.  I knew there was some witnesses that |
| 21 | were put on, and I wanted to talk to O'Callaghan and |
| 22 | see if we could get one more date, and O'Callaghan |

07:25PM (lines 5)
07:25PM (lines 10)
07:25PM (lines 15)
07:25PM (lines 20)

00081

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1      left it up to the judge to decide, and I know there

2      was some conversation at the bench.  I wasn't up

3      there.  I wasn't a witness to the actual incident so

4      I couldn't stand up there, and the case was nolled.

07:26PM    5      It was dropped.

6          Q.    Was it important to you in your

7      department, that the department, to the best it

8      could, obtain a conviction in this case?

9          A.    Yes.

07:26PM   10          Q.    Why?

11          A.    It was a car accident D.U.I.  It seemed

12     like a young person that we had quite or several

13     contacts with where he lives, and I thought that if

14     he didn't -- if this person who was arrested didn't

07:26PM   15     learn his lesson through this, it may turn into a

16     worse situation with some of his cohorts in that

17     neighborhood.  They got off easy on a D.U.I., and I

18     personally felt that that was the wrong message we

19     wanted to send to this driver.

07:27PM   20          MR. MURPHEY:  Okay, no further questions.

21     Members of the Commission, opposing Counsel,

22     obviously we will be offering the tape recording.  I

00082

1    am requesting a stipulation as the Chief's 7 which is

2    the transcript; otherwise I will have to put the

3    court reporter on to authenticate the transcript, and

4    she is going to have to type and talk at the same

07:27PM   5    time.  Is there any objection to 7 being a transcript

6    of proceedings of the telephone call which is Chief's

7    Exhibit 9?

8              MS. PARKER:  No, no objection.

9              MR. MURPHEY:  We offer 7 and 9.

07:27PM   10             MR. BRUEN:  7 and 9 will be admitted in

11   evidence.

12             C R O S S   E X A M I N A T I O N

13   BY MS. PARKER:

14        Q.    You testified that Officer Rasic called

07:27PM   15   in every Monday?

16        A.    Yes, ma'am.

17        Q.    Did you ever call him back, return phone

18   calls?

19        A.    No, the way -- we have had this before.

07:27PM   20   They call in and check in and let us know that leave

21   is continuing.  In Dan's case, originally he said it

22   was going to be three weeks.  It was an extension

00083

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1   approved.  I was on vacation.  He extended the time

2   period, and part of the extension, he had to call in

3   and just let us know what his status was, and he

4   usually called in at 6:00 in the morning.  It wasn't

07:28PM   5   times I was normally at my desk.

6               Q.    But you knew that Officer Rasic had not

7   appeared on the August 7th court date; correct?

8               A.    Yes, ma'am.

9               Q.    And did you know the reason why he

07:28PM   10  didn't appear is because of his family medical leave

11  status?

12              A.    No, I didn't know that.  What I know is

13  what I had on the tape.  I had no idea why he didn't

14  show up August 7th.

07:28PM   15              Q.    Okay, did you -- you didn't contact him

16  after August 7th to find out why he didn't appear?

17              A.    No.

18              Q.    And you knew that a court date had been

19  continued to September; correct?

07:29PM   20              A.    Yes, ma'am.

21              Q.    You didn't try and contact Officer Rasic

22  to find out if he was going to appear on that date?

00084

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1          A.    The police department did.

2          Q.    After the charges were filed against

3    Officer Rasic, you called him to find out when he was

4    coming back to work; didn't you?

07:29PM   5          A.    I sent him a memo, because I wasn't sure

6    if the leave was still continuing as far as his

7    daughter or his son that was born, or because his

8    father, because when he left these messages, he was

9    bringing up his father also.

07:30PM   10         Q.    Have you ever E-mailed Officer Rasic?

11         A.    Have I E-mailed him?

12         Q.    On his personal E-mail?

13         A.    I think -- I don't know if it was --

14   sorry, I don't know if it was a boy or girl that was

07:30PM   15   born.  He sent an E-mail of the pictures.  I think

16   so.  I don't know if I responded or not.

17         Q.    Are you aware whether his E-mail address

18   is King Rasic One at Hotmail.com?

19         A.    I have no idea what his E-mail address

07:30PM   20   is.

21         MS. PARKER:  I have no further questions.

22         MR. MURPHEY:  No redirect.  Call Officer

00085

1    Rasic next.

2                        (Witness sworn.)

3             MS. PARKER:   I am going to object to calling

4    Officer Rasic as an adverse witness without advising

07:30PM   5    him that his answers may be used -- may not be used

6    as evidence in a subsequent criminal proceeding.

7             MR. MURPHEY:   Well, I am not interrogating

8    him.   I am not compelling him to testify if he

9    chooses not to testify.   Let me make a record on

07:31PM  10    this.   This is not an interrogation.   We are not

11    interrogating him under the Law Enforcement Officers'

12    Bill of Rights' Act.   I am not seeking to compel his

13    testimony.   If this Officer doesn't want to testify,

14    he will tell me.   I want to be very clear, the Chief

07:31PM  15    is not ordering him to testify.   If he chooses not to

16    testify, that is up to him, and the Commission will

17    draw whatever inference they choose.

18             OFFICER RASIC:   I am willing to testify as

19    long as everything is under the Family Medical Leave

07:31PM  20    Act, that we are understanding it.   I am letting the

21    record show that anything you ask me, if it does go

22    which it will go to Federal Court, you can ask me

                                                        00086

1     anything you want, but the record will be stated

2     through the Labor Department and the Federal Courts

3     which I was advised through the Labor Department, so

4     you can go ahead and ask me questions if you want,

07:32PM   5     but this will be continued to another court.

6           MS. PARKER: I am going to object to having

7     him testify as an adverse witness. You can cross

8     examine him when I question him on direct.

9           MR. MURPHEY: This is an administrative

07:32PM  10     proceeding. The party is entitled to call Chief

11     Koletsos in your case. He's here. He's a witness.

12     I told you a week ago, two weeks ago who I was going

13     to call.

14           MR. BRUEN: Are you willing to testify?

07:32PM  15           OFFICER RASIC: I am willing to testify now

16     until my Counsel says not to.

17           MS. PARKER: No.

18           OFFICER RASIC: Then I am not going to

19     testify at this time.

07:33PM  20           MR. MURPHEY: Well, if he's not going to

21     testify at this time, he can't testify when she wants

22     him to. He's here. The hearing is on. It is my

|  |  |  |
|---|---|---|
|  | 1 | burden.  I need him as part of my burden of proof. |
|  | 2 | He's here as a witness.  If he refuses to testify on |
|  | 3 | the advice of Counsel, let's have the lawyer say it |
|  | 4 | directly, and then I want an adverse inference that |
| 07:33PM | 5 | anything -- that his failure to testify can be |
|  | 6 | construed adversely to him.  That's the rule.  That's |
|  | 7 | the Rules of Evidence, so I need to know.  I don't |
|  | 8 | want to sit down and rest my case, and then all of a |
|  | 9 | sudden she stands up and puts him on.  It's not fair. |
| 07:33PM | 10 | We have done this before in other cases --who was the |
|  | 11 | officer?  Officer White we did the same thing, same |
|  | 12 | Union representing him.  That case was upheld by the |
|  | 13 | Appellate Court.  That happens every day of the week |
|  | 14 | in Fire and Police Commissions. |
| 07:33PM | 15 | MS. PARKER:  I can call him as my witness and |
|  | 16 | you can cross examine. |
|  | 17 | MR. MURPHEY:  You can put on your case the |
|  | 18 | way you want.  My case involves him.  If you are |
|  | 19 | telling this Board you are not going to permit him to |
| 07:34PM | 20 | answer, just say it. |
|  | 21 | MS. PARKER:  Okay, go ahead. |
|  | 22 | OFFICER RASIC:  Okay. |

1          MR. BRUEN:  Counsel says go ahead, go ahead.

2                  D A N I E L    R A S I C

3     called as a witness by the City, having been duly

4     sworn, was examined and testified as follows:

5                  D I R E C T    E X A M I N A T I O N

6     BY MR. MURPHEY:

7          Q.    State your name?

8          A.    Officer Daniel Rasic, R-a-s-i-c.

9          Q.    You are employed by the Northlake Police

07:34PM   10   Department?

11         A.    Yes.

12         Q.    You are a police officer?

13         A.    Yes.

14         Q.    What is your date of hire?

07:34PM   15        A.    Date of hire is 12/30 of '99.

16         Q.    You have been employed approximately,

17    not quite eight years?

18         A.    Correct.

19         Q.    Not the 10 years your lawyer said in the

07:34PM   20   opening statement?

21         A.    10 years altogether.  I was part time.

22         Q.    Eight years as a full timer?

1          A.   Yes.

2          Q.   You are currently a sworn uniformed

3    officer?

4          A.   Yes, I am.

07:35PM   5          Q.   And you are a patrol officer?

6          A.   Yes.

7          Q.   Your obligation is to make arrests?

8          A.   Yes, it is.

9          Q.   Your obligation includes attending

07:35PM  10    court?

11          A.   Yes.

12          Q.   And you understand what a subpoena is?

13          A.   Yes.

14          Q.   You are sworn to prevent crime; isn't

07:35PM  15    that correct?

16          A.   Yes.

17          Q.   And you are sworn to pursue offenders;

18    isn't that correct?

19          A.   Yes.

07:35PM  20          Q.   And part of the essence of that job is

21    to appear in court to obtain convictions and to give

22    evidence; isn't that correct?

1          A.    Yes.

2          Q.    Because when a police officer arrests

3     somebody, if he doesn't testify against that person,

4     that persons walks; isn't that correct?

07:35PM    5          A.    Well, there could be other

6     circumstances, but in general, yes, but there could

7     be other circumstances in courts.

8          Q.    If your lawyer wants to know the other

9     circumstances, she will ask you.  Have you ever heard

07:36PM   10     the term para military organization?

11          A.    Yes, I have.

12          Q.    What is a para military organization?

13          A.    It is supposed to copy military rule.

14          Q.    And it is supposed to copy military

07:36PM   15     rule, among other things in terms of the need for

16     subordinates to obey the orders and directives of

17     their superior; isn't that correct?

18          A.    Yes.

19          Q.    And a para miliary organization also

07:36PM   20     involves subordinate officers not being insubordinate

21     to their superiors; isn't that correct?

22          A.    Yes.

                                          00031

1          Q.    And it involves subordinate officers not

2    being disrespectful to their superiors; isn't that

3    correct?

4          A.    Yes.

07:36PM   5          Q.    And it involves subordinate officers not

6    being flippant to their superior officers; isn't that

7    correct?

8          A.    Can you -- flippant, what do you mean by

9    that?

07:36PM   10          Q.    Being a smart ass?

11          A.    A smart ass?

12          Q.    You understand that term?

13          A.    Yes, I do.

14          Q.    And is it is correct that part of being

07:37PM   15    in a para military organization is not to be a smart

16    ass to your superior; isn't that correct?

17          A.    Yes.

18          Q.    And as an police officer, you are bound

19    to understand the rules of conduct of the police

07:37PM   20    department; isn't that correct?

21          A.    Yes.

22          Q.    And part of the job as a police officer

1          is to display respect to your superiors; isn't that

2          true?

3                    A.    Yes.

4                    Q.    And a para military organization in

07:37PM  5          order to function needs to have that respect

6          displayed by people to their commanders; isn't that

7          true?

8                    A.    Yes.

9                    Q.    And you take that seriously; do you not?

07:37PM  10                   A.    Yes, I do.

11                   Q.    Calling your attention to August of

12         2006, you arrested an individual named Galvez?

13                   A.    Yes, I did.

14                   Q.    And that was a D.U.I. arrest; isn't that

07:37PM  15         correct?

16                   A.    Yes.

17                   Q.    And you understood that you were an

18         important witness in this case?

19                   A.    Yes.

07:38PM  20                   Q.    You understood you were an essential

21         witness in that case; isn't that correct?

22                   A.    Yes.

                                             00093

1          Q.    And typically in a D.U.I. case, the

2     arresting officer is really the critical witness;

3     isn't that true?

4          A.    In a D.U.I. case, in most cases, yes, I

07:38PM    5     am a critical witness, yes.

6          Q.    And in fact, the department has given

7     you D.U.I. training; isn't that true?

8          A.    Yes, somewhat, yes.

9          Q.    Now you have commenced a leave of

07:38PM   10     absence under the Family and Medical Leave Act in the

11     beginning of July of 2007; is that correct?

12          A.    Yes, I did.

13          Q.    What was the first date of the leave?

14          A.    First date was July 6th.

07:38PM   15          Q.    And you have requested the leave from

16     the Chief; is that correct?

17          A.    Yes.

18          Q.    And the Chief granted it?

19          A.    Yes.

07:38PM   20          Q.    Now of course you knew at the time you

21     took the leave that you had one or more pending

22     cases; isn't that true?

00004

1    A. Pending, yes.

2    Q. And when I say pending, I mean cases

3 that are in the stage between the date of arrest and

4 the date of conviction?

07:39PM 5    A. Correct, yes.

6    Q. And you understood that on the pending

7 cases your testimony might be important to that case?

8    A. Yes, I did.

9    Q. And you take all your cases seriously;

07:39PM 10 do you not?

11    A. Yes, I do.

12    Q. Now calling your attention to July 16th

13 of 2007, you had a conversation with the sergeant,

14 how do you pronounce T-z-i-n-i-s?

07:39PM 15    A. Tzinis.

16    Q. And as of July 16, 2007, you understood

17 that the Galvez case was still pending; didn't you?

18    A. I need to correct something.  It wasn't

19 July 16th.  It was July 24th that I first had a

07:40PM 20 conversation with Sergeant Tzinis.

21    Q. Okay.

22    A. Sometime in the morning.

00005

1         Q.   And on July 24th you knew that the

2   Galvez case was still pending; isn't that correct?

3         A.   Pending, yes.

4         Q.   And you knew that it had a court date

07:40PM  5   coming up; isn't that correct?

6         A.   The court date I was not sure of.

7         Q.   Did you receive a subpoena to testify in

8   court with respect to the Galvez case for an August

9   date?

07:40PM  10         A.   Prior to the conversation I never

11   received a subpoena at any time.

12         Q.   At any time?

13         A.   Yes, after the 24th I received a

14   subpoena.

07:40PM  15         Q.   Calling your attention to what has been

16   marked as the Chief's Exhibit Number 10, about

17   halfway through it, do you see a subpoena with a date

18   of July 16, 2007?

19         A.   Yes.

07:40PM  20         Q.   That's directed to you, of course?

21         A.   Yes.

22         Q.   You are star 152?

00096

```
 1              A.    Yes, I am.

 2              Q.    And it directs you to appear in court on

 3      August 7th at 1:30 p.m.?

 4              A.    Ah-ha.

 5              Q.    And you signed for it?

 6              A.    I signed for it.

 7              Q.    You signed July 24th.  Is that your

 8      signature there?

 9              A.    July 24th, not prior to.

10              Q.    So as of July 24th, of course you knew

11      that you were bound by subpoena to testify in this

12      case?

13              A.    Correct.  By the subpoena, yes.

14              Q.    Now you initiated a telephone call with

15      the Chief at about 12:42 p.m.; isn't that correct?

16              A.    Yes.

17              Q.    And let me get you Exhibit 7, because I

18      want to go through that conversation with you.

19      Calling your attention to Chief's 7, you had a chance

20      to read that before today; haven't you, Officer?

21              A.    Yes, I have.

22              Q.    Please turn to page 2 of the transcript.
```

07:41PM (line 5)
07:41PM (line 10)
07:41PM (line 15)
07:42PM (line 20)

00097

Case 1:08-cv-00104    Document 20-4    Filed 02/15/2008    Page 40 of 64

1    Do you see it there?

2            A.    Ah-ha, yes.

3            Q.    And you recall the Chief saying to you

4    that he is ordering you to go to court on August 7th;

07:42PM    5    isn't that correct?

6            A.    Yes.

7            Q.    You understood that that was an order?

8            A.    I understood it was an order, yes.

9            Q.    And no question in your mind that was an

07:42PM    10    order?

11            A.    No question in my mind that was an

12    order, but I perceived it was an unlawful order with

13    Federal Rule rights.

14            Q.    She will ask you all those questions.

07:42PM    15    Just answer the question I ask you, and we will get

16    out of here.

17            A.    I have got time.

18            Q.    The question is:  Did you understand

19    that to be an order of the Chief?

07:43PM    20            A.    Yes.

21            Q.    And did you disobey that order?

22            A.    Yes.

                                            00098

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    Q. Now did you consider the Galvez case to

2 be a matter of importance?

3    A. Yes, it is.

4    Q. Then you started in about this Maywood

07:43PM 5 situation; isn't that correct?

6    A. Maywood?

7    Q. Right.  Didn't you then start asking the

8 Chief about the police officer who was killed in

9 Maywood?

07:43PM 10    A. Yes.

11    Q. Now we are all aware, I think it was

12 late spring, early summer where a Maywood officer was

13 shot execution style; isn't that correct?

14    A. Yes.

07:43PM 15    MS. PARKER:  I am going to object to the

16 relevance of this.

17    MR. BRUEN:  Objection overruled.

18 BY MR. MURPHEY:

19    Q. And you then started to talk to the

07:43PM 20 Chief about the Maywood case; isn't that correct?

21    A. Yes, I did.

22    Q. And the Maywood case, of course, had

00039

1   nothing to do with this case; did it?

2          A.    Had nothing to do with it, but since I

3   was talking to him, I wanted to know what happened

4   with that case.

07:44PM   5          Q.    The question is:  Isn't it true that the

6   Maywood case had nothing to do with this case?

7          A.    Yes, it had nothing to do with it.

8          Q.    Isn't it true that what you were trying

9   to do is diminish the importance of your obligation

07:44PM  10   under the subpoena in this case by comparing it to

11   the murder, or as you put it, the brutal slaying of a

12   Maywood officer?

13          A.    No, that wasn't my intentions at all.

14          Q.    Isn't it true that your intent was to

07:44PM  15   downplay the importance of this subpoena with the

16   hopes that the Chief would say you didn't have to go

17   to court?

18          A.    No.

19          Q.    Now please turn to the next page, page 3

07:44PM  20   where you say, you know, we are making a big deal

21   about all this other stuff.  Do you recall saying

22   that, Officer?

00100

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1          A.    Yes.

2          Q.    And when you were saying I know we were

3     making a big deal about all this other stuff, you

4     were referring to the fact that you thought the Chief

07:45PM  5     was making a big deal about you having to show up in

6     court on the Galvez case; isn't that correct?

7          A.    A big deal, I couldn't tell you what was

8     in his mind.  I perceived it to be that way.

9          Q.    But that's what you were talking about?

07:45PM  10         A.    Yes, you heard it on the tape, yes.

11         Q.    You thought he was making too big of a

12    deal?

13         A.    That is what I said at the time, but you

14    can use the definition of a big deal -- I mean, I

07:45PM  15    don't know what you are trying to get at, big deal.

16         Q.    I am trying to get to the route of your

17    mouth.  Isn't it a fact you said you thought the

18    Chief was trying to exaggerate the importance of

19    attending court?

07:45PM  20         A.    I never said exaggerate.

21         Q.    Isn't that what is ordinarily meant when

22    you are saying you are trying to make a big deal?

1          A.     It could mean a lot of things.

2          Q.     What did you mean?

3          A.     I meant that he was trying to force the

4     issue that I go to court at that time, but I knew

07:45PM  5     that I was on family medical leave.

6          Q.     And you didn't think going to court at

7     that time was a big deal?

8          A.     No, I didn't think of this that way, no.

9          Q.     Isn't that what you said?

07:46PM  10         A.     I said before to you I consider court

11    and everything to be very serious, so that statement

12    right there, I wouldn't just see it as what you are

13    saying.

14         Q.     Please let me finish the question.

07:46PM  15         A.     Yes, go ahead.

16         Q.     So when you say I know we are making a

17    big deal about this, and the Chief asked you what

18    other stuff, and you said about the subpoena, isn't

19    it a fact you were trying to communicate to the Chief

07:46PM  20    of Police that your appearance in court on the Galvez

21    D.U.I. matter that you made an arrest on was not a

22    matter of importance?  He was exaggerating it?

1          A.    I didn't believe it that way.

2          Q.    Isn't that what you told him?

3          A.    That was just emotions coming out.  I

4     didn't mean it that way, no.

07:46PM    5          Q.    But you admit that you said it, and you

6     admit you intended that at the time?

7          A.    I didn't intend it at the time.  I just

8     said it, but the inference or definition --

9          MS. PARKER:  Objection.  I have an objection.

07:46PM    10    It is argumentative.  He asked the question, and he

11    answered the question.

12         MR. BRUEN:  You made -- the objection is

13    sustained.  You made your point on that.

14    BY MR. MURPHEY:

07:47PM    15         Q.    You said this, but you didn't intend to

16    say it?

17         A.    Not that I didn't intend to say it.  I

18    said it is on the tape.  I am trying to explain that

19    the definition that you are trying to come up with is

07:47PM    20    different from my mind.

21         Q.    The definition of big deal?

22         A.    Exactly.

1      MS. PARKER:  I just objected to this line of

2  questioning, and it was sustained.

3      MR. BRUEN:  Move onto the next question.

4  BY MR. MURPHEY:

07:47PM  5      Q.    Now the Chief then asked you when you

6  get a subpoena, Dan, why is that a big deal.  You

7  understood that he was kind of surprised at the fact

8  you wouldn't think that getting a subpoena and

9  complying was very important?

07:47PM  10      MS. PARKER:  Objection.

11  BY MR. MURPHEY:

12      Q.    Isn't that correct?

13      MR. MURPHEY:  Basis?

14      MS. PARKER:  Asked and answered.

07:47PM  15      MR. BRUEN:  That objection is overruled.  You

16  can answer the question.

17  BY MR. MURPHEY:

18      Q.    Looking at page 3, line 13 and 14.

19      A.    I stated I know that it is of

07:48PM  20  importance.  I said I know.

21      Q.    Then the Chief asked you why is that a

22  big deal, as if he couldn't understand your response,

MARIE L. ROGERS, C.S.R.  (708) 430-2520

00104

1    and you go:  Well, they should be charged with that.

2    I think that is a big deal, Chief.  Then you are

3    referring to the Maywood matter; weren't you?

4         A.   Yes, I was.

07:48PM  5         Q.   So it is true that you were trying to

6    compare your obligation in the Galvez case to the

7    Maywood situation?

8         A.   I wasn't trying to compare it.  No, we

9    were talking about two different things at the time.

07:48PM  10         Q.   But you will agree will you not that

11   your conversation with the Chief had nothing to do

12   with the shooting of the Maywood police officer;

13   isn't that correct?

14         A.   Had nothing to do?  What do you mean?

07:48PM  15   Can you clarify that again?

16         Q.   Yes.  You were speaking to the Chief

17   regarding your obligation to appear in court on a

18   subpoena; isn't that correct?

19         A.   Yes.

07:48PM  20         Q.   That is why you called him?

21         A.   Yes.

22         Q.   That had nothing to do with any

1    Northlake, with any Northlake investigation of the

2    Maywood Police Department; isn't that correct?

3              A.    It had nothing to do with it.  Since I

4    had him on the phone I was asking about my personal

07:49PM    5    safety when I did return to the police department.  I

6    figured I would talk to him at that time about that.

7              Q.    You were concerned about your personal

8    safety, and you wanted to know about the shooting of

9    the Maywood officer?

07:49PM   10              A.    Yes.

11              Q.    Is that correct?

12              A.    Yes.

13              Q.    Now then you were not trying to compare

14    your situation to the Maywood situation; is that

15    correct?

16              A.    In my mind, no, I wasn't comparing it.

17              Q.    Then when the Chief asked you how does

18    that, meaning the Maywood situation, play into your

19    situation, why did you respond:  Well, you are making

07:49PM   20    a big deal about the subpoena.  Isn't it a fact that

21    you are trying to compare yourself to the Maywood

22    case and downplay the significance of your

1    obligation?

2         A.    No, it was just in a matter of our

3    conversation.  It was going back and forth.  It

4    doesn't mean I wanted to in any way put a negative

07:50PM  5    notion on the subpoena at all.

6         Q.    Well, you said to the Chief:  Well, you

7    are making a big deal about the subpoena?

8         A.    Right.

9         Q.    On line 23 and 24 I am talking now at

07:50PM  10   the bottom of the page; isn't that correct, Officer?

11        A.    Yes, I did say that about the subpoena.

12        Q.    So you thought that it was not a big

13   deal to you; didn't you?

14        A.    No, I didn't think that at the time just

07:50PM  15   because I said you are making a big deal about it.

16   That is a broad definition of big deal.

17        Q.    Did you think it was a big deal?

18        A.    I thought was an important issue, yes.

19        Q.    And is that what you mean when you say

07:50PM  20   big deal?  Is that what you mean, important issue?

21        A.    Not necessarily all the time, no.

22        Q.    So when -- let's try to figure it out.

1    When you were saying to the Chief:  Well, you are

2    making a big deal about the subpoena, were you

3    agreeing with him, yes, this is a matter of

4    significance that I should appear in court on the

07:50PM    5    subpoena, or were you really trying to downplay the

6    importance of it to try to get out of it?

7         A.    I was downplaying the subpoena.  I was

8    also mentioning my rights on the Family Medical Leave

9    Act that I would not have to attend court at this

07:51PM    10   time.

11        Q.    So when you said you are always making a

12   big deal out of it, weren't you really trying to get

13   out of that obligation?

14        A.    I wasn't trying to get out of any

07:51PM    15   obligation.  As far as I know, I didn't have an

16   obligation at the time under Federal law.

17        Q.    You were articulating your rights under

18   Federal law?

19        A.    I was articulating my rights under

07:51PM    20   Federal law.

21        Q.    You were not trying to get out of the

22   subpoena?

1          A.    No, I attended many times prior.

2          Q.    I am referring to this time?

3          A.    Sir, this time I didn't attend because

4     of family medical leave.

07:51PM  5          Q.    Your point of this conversation, you

6     were trying to get out of your obligation to attend

7     court under the subpoena; yes or no?

8          A.    I was trying to get out of no

9     obligation.  I couldn't make it because of my family

07:51PM  10    medical leave.

11         Q.    The question was:  Were you trying to

12    convince the Chief to let you out from under your

13    obligation to appear in court?

14         A.    Was I trying to?

07:51PM  15         Q.    Sure.

16         A.    He didn't have the authority to tell me.

17         Q.    Well, leave that for another day, but

18    the question is:  Were you trying to get out from

19    under your obligation?

07:52PM  20         MS. PARKER:  Objection.  He answered the

21    question.

22         MR. BRUEN:  Sustained.

1    BY MR. MURPHEY:

2          Q.   Please turn to page 4.   The Chief

3    thought you were being out of line.   You remember him

4    saying that to you?

07:52PM    5          A.   Which number?

6          Q.   Page 4, lines 1 and 2.

7          A.   Yes.

8          Q.   You said:  Of course, I am always out of

9    line.

07:52PM   10          A.   Yes.

11          Q.   Did you mean that you were agreeing with

12    him that you are always out of line?

13          A.   No, I didn't agree with him.   I was

14    saying it sarcastically.

07:52PM   15          Q.   You were giving your superior a

16    cyclical, sarcastic response to his statement about

17    your behavior over the phone conversation; isn't that

18    correct?

19          MS. PARKER:  Objection.  Misstates his

07:52PM   20    testimony.

21          MR. BRUEN:  Overruled.

22          THE WITNESS:  Can you repeat that again.

1             MR. MURPHEY:  Sure, she will read it back.

2                    (Question read.)

3             MR. MURPHEY:  That's a yes or no question.

4             THE WITNESS:  Yes.

07:53PM   5   BY MR. MURPHEY:

6             Q.   Now let's go down to -- let's go down to

7   when you told him, looking at line 16, you said:  I

8   will call the court.  You see that?

9             A.   Yes.

07:53PM  10          Q.   All right, when you say:  I will call

11   the court, obviously you weren't going to call the

12   judge; right?

13            A.   No, I was going to call --

14            Q.   State's attorney?

07:53PM  15         A.   State's attorney.

16            Q.   Sure, and then you understood the Chief

17   to immediately tell you you are not going to call the

18   court; right?  Immediately after that; isn't that

19   correct?

07:53PM  20         A.   Yes.

21            Q.   And you understood what the Chief was

22   telling you:  You are not going to call the state's

00111

1   attorney.  You understood that?

2         A.   Yes.

3         Q.   And you disobeyed that order whether you

4   think it is lawful or not.  You disobeyed that order

07:54PM   5   on multiple occasions; did you not?

6         A.   Yes.

7         Q.   And then when he said I am ordering you

8   to go to court, you said:  That is fine, and of

9   course you didn't mean you were agreeing with him;

07:54PM   10   did you?

11         A.   When I said that is fine?

12         Q.   Yes.

13         A.   I don't know what I meant at the time.

14   I just said that's fine because the conversation was

07:54PM   15   heated.

16         Q.   But of course you certainly understood

17   what the directions were?

18         A.   Yes, I understood the directions.

19         Q.   At this time are you getting a little

07:54PM   20   hot?

21         A.   A little hot.

22         Q.   You getting upset?

1         A.    Yes, a little bit.

2         Q.    Getting angered?

3         A.    Yes.

4         Q.    And temper was getting the best of you a

07:54PM   5   little bit?

6         A.    I don't think the temper was getting the

7   best of me.  I was getting a little angered.  It is

8   not against the law.

9         Q.    And then when the Chief once again on

07:55PM   10  page 5 said:  I am ordering you, and you said okay,

11  then you immediately after said:  Okay, king?

12        A.    Yes.

13        Q.    Are you yourself referring to yourself

14  as king?

07:55PM   15        A.    I have an E-mail stating king, and my

16  son, I call him king.

17        Q.    And isn't it a fact that when you

18  immediately said:  Okay, king, you were referring to

19  what you considered to be an inappropriate order by

07:55PM   20  your Chief; isn't that correct?

21        A.    No.

22        Q.    Are you telling this Commission that

```
 1        when you immediately said:  Okay, king, after he said
 2        I am ordering you, you were talking to your little
 3        kid?
 4                  A.    Yes.
 5                  Q.    You would agree that using words to a
 6        superior officer of that nature intended for that
 7        officer, it would be insubordination?
 8                  A.    To use king?
 9                  Q.    Yes.
10                  A.    Yes.
11                  Q.    Especially with the tone of voice that
12        sounded, that was portrayed on that tape recording;
13        isn't that correct?
14                  A.    Tone of voice?  Can you --
15                  Q.    You want to hear it again?  Sure.
16                  A.    Not to hear it again.  What are you
17        trying to say with the tone of voice?  Prior to
18        saying king?
19                  Q.    Queue it up, okay.  We will listen to
20        the okay, king, part again.
21                  A.    You are trying to get into my mind.  I
22        told you I said it about my son.
```

07:55PM (line 5)
07:55PM (line 10)
07:56PM (line 15)
07:56PM (line 20)

1       MS. PARKER:  Officer Rasic said he doesn't

2   need to hear it again.

3       THE WITNESS:  I don't have to hear it again.

4       MR. BRUEN:  You don't have to listen.  I want

07:56PM  5   them to listen.

6       THE WITNESS:  You are trying to get into my

7   mind as to why I said it.  I told you it was because

8   of my child.

9       MR. BRUEN:  I am going to overrule the

07:56PM  10   objection now.  I am going to overrule, and the tape

11   can be played.  Thank you.

12                           (Whereupon a portion of the

13                            tape recording which is marked

14                            Chief's Exhibit Number 9 was

15                            played.)

16       MS. PARKER:  Stop the tape.  The tape was

17   brought in to hear the king reference, and we are

18   hearing a bunch of conversation prior to that.  Could

19   we -- if you want to hear that again --

07:57PM  20       MR. MURPHEY:  You know, it is not an I-POD.

21   It's not digital.  We got to get to it.

22       MR. BRUEN:  I am going to overrule the

1    objection.  The tape is in evidence.  The content is

2    in evidence.  The few more minutes it takes to go

3    through the tape instead of spending more time trying

4    to get to the exact point would be pointless.  You

07:58PM    5    can proceed.

6                              (Whereupon a portion of the

7                               tape recording which is marked

8                               Chief's Exhibit Number 9 was

9                               played.)

07:58PM   10    BY MR. MURPHEY:

11          Q.    So your testimony to this Commission is

12    that in the midst of this conversation, you would

13    agree at that point it was kind of a rapid fire

14    conversation; wasn't it?

07:59PM   15          A.    Yes.

16          Q.    Bang, bang, bang; right?

17          A.    Yes.

18          Q.    And at that second, between him ordering

19    you while you are hot, your son distracted you, or

07:59PM   20    you saw your son, and then you immediately said:

21    Okay, king, referring to your son; is that right?

22          A.    There was a pause too in between there.


MARIE L. ROGERS, C.S.R.  (708) 430-2520    00116

1   My son was on my leg.  You are implying like you were

2   there.  That's not true.

3          Q.   You want to hear it again?

4          A.   Trying to get psychologically in my

07:59PM   5   head.  That is not true.

6          Q.   You want to time the pause?

7          A.   You want to time the pause?  That's

8   going to be -- you want to time the pause?  It is

9   going to be revalent to the case.

07:59PM   10          Q.   I think it will be very revalent.

11          A.   It sure will in Federal court the time

12   of the pause.

13          Q.   Not much of a pause.

14          A.   There is a little pause.  You are saying

08:00PM   15   a heated conversation.  Were you there?

16          Q.   Let's continue on, Officer.

17          A.   Okay, Lawyer.

18          Q.   Let's continue on, Officer.

19          A.   Okay, Attorney.

08:00PM   20          Q.   Now let's look at line 20 when you say:

21   God, you are out of control.

22          A.   Okay.

1          Q.    Were you speaking to your child then?

2          A.    God, you are out of control?

3          Q.    Yes.   That one you were referring to the

4     Chief?

08:00PM   5          A.    Yes.

6          Q.    And you would agree that's an

7     insubordinate remark; wouldn't you?

8          A.    Insubordinate, God, you are out of

9     control?

08:01PM   10          Q.    Yes.

11          A.    I am not sure about that one.

12          Q.    All right, and you would agree that

13     that's not a respectful remark that an officer gives

14     to his superior; is it?

08:01PM   15          A.    Depending on the content.   I mean, the

16     conversation was very heated.   You are making it

17     sound like if you told someone:   God, you are out of

18     control, that for everybody anytime you say it, it is

19     insubordinate.

08:01PM   20          Q.    Well?

21          A.    So you can't say anything after a while.

22          Q.    On that occasion you were angry at him,

MARIE L. ROGERS, C.S.R. (708) 430-2520

1    and those were words unleashed in anger; were they

2    not?

3          A.    Wasn't necessarily anger.  It is what I

4    heard from what he was saying.

08:01PM   5          Q.    You were hot at the time; correct?

6          A.    At the time back and forth, yes.

7          Q.    And you understand that is the Chief of

8    Police who you are supposed to give respect to?

9          A.    Yes.

08:01PM   10          Q.    You understand you were given a number

11    of orders?

12          A.    Yes.

13          Q.    And then you accused your superior of

14    being out of control; is that correct in this

08:01PM   15    conversation, this particular conversation?

16          A.    Yes.

17          Q.    And by this time you had already planned

18    on your Federal court case; is that correct?

19          A.    Yes.

08:02PM   20          Q.    So you never really had any intention

21    whatsoever of making any kind of an effort to show up

22    at any of these court hearings?

1          A.    Did I have any intention of never

2     showing up?

3          Q.    Of ever showing up responding to the

4     subpoena?

08:02PM    5          A.    My rights cannot be restricted under

6     Federal law.

7          Q.    The question is:  Did you have any

8     intention from July 24, 2007, going forward, that you

9     were going to abide by any of these court orders?

08:02PM   10          A.    I couldn't, no.

11          Q.    The question is:  Isn't this true, you

12     had obviously no intention to abide by any of these

13     subpoenas that you received?

14          A.    Yes, no.

08:02PM   15          Q.    Now do you have Chief's 10 in front of

16     you, Officer?  Deputy Chief will provide it for you.

17          A.    Yes, I do now.

18          Q.    Please take a look at the first page of

19     Chief's 10.  Now this is not one that we have talked

08:03PM   20     about with State's Attorney Simpson and O'Callaghan.

21     This relates to a juvenile proceeding.  Are you

22     familiar with that case?

1          A.     Yes.

2          Q.     And you were a witness to that juvenile

3     proceeding involving Darrell Thomas?

4          A.     A witness?  I didn't witness it, no.

08:03PM  5          Q.     You were subpoenaed to appear in court

6     on August 1, 2007, at 9:00 a.m.; isn't that correct?

7          A.     Yes.

8          Q.     You received the subpoena; didn't you?

9          A.     Yes.

08:03PM  10          Q.     You received it on or about what date?

11          A.     I can't recall, but it was before August

12     1st.

13          Q.     How many days before?

14          A.     I can't recall exactly.

08:03PM  15          Q.     You intentionally did not appear in

16     response to that subpoena; isn't that correct?

17          A.     Intentionally as far as what?  Can you

18     explain intentionally?

19          Q.     Well, you weren't -- you made a decision

08:04PM  20     not to go to court that day; isn't that correct?

21          A.     Yes.

22          Q.     Now similarly with respect to the

1    subpoena we have talked about a little bit earlier

2    dated July 16th for the August date, you did not

3    appear on that date; did you?

4         A.    July 16th?

08:04PM   5    Q.    No, the subpoena you received July 16th

6    commanding your presence on August 7th, you did not

7    appear in court that date; did you?

8         A.    No.

9         Q.    And you chose not to?

08:04PM   10   A.    July 16th I never received anything in

11   the mail.

12        Q.    But you received this one on July 24th;

13   isn't that correct?  We went through that, where you

14   signed for the green card?

08:04PM   15   A.    Yes, I signed for the green.  Yes, the

16   24th, not the 16th.

17        Q.    You received it the 24th.  It was for

18   August 7th, and you chose not to appear; isn't that

19   correct?

08:05PM   20   A.    Yes.

21        Q.    Now after the Chief told you not to --

22   ordered you not to contact the state's attorney, you