1                BEFORE THE POLICE AND FIRE COMMISSION
                     CITY OF NORTHLAKE, ILLINOIS
2

3      IN THE MATTER OF:              )
                                      )
4      CITY OF NORTHLAKE,             )
                                      )
5              Complainant,           )
                                      )
6          vs.                        )
                                      )
7      DANIEL RASIC,                  )
                                      )
8              Respondent.            )

9

10                    REPORT OF PROCEEDINGS had at the

11     continued hearing of the above-entitled matter before

12     the Police and Fire Commission of the City of

13     Northlake, at City Hall, 55 East North Avenue,

14     Northlake, Illinois, on the 4th day of October, A.D.

15     2007, at the hour of 6:00 o'clock p.m.

16

17

18

19

20

21

22

                                                      00174

1    PRESENT:

2        MS. ROBERTA LARSON, Chairperson;

3        MR. MANUEL FERRA, Member;

4        MR. GARY MERCHANT, Member;

5        MR. MICHAEL R. McGRATH, Attorney for Commission
         Law offices of Odelson & Sterk, Ltd.;

6
         CHIEF DENNIS A. KOLETSOS, Chief of Police;

7
         MR. JOHN MURPHEY, Attorney for Chief of Police

8        Law offices of Rosenthal, Murphey & Coblentz;

9        OFFICER DANIEL RASIC, Police Officer;

10       MS. HEIDI PARKER, Attorney for Police Officer;
             Illinois Fraternal Order of Police, Labor

11           Council.

12   ALSO PRESENT:

13       DEPUTY CHIEF NORMAN NISSEN, Deputy Chief of
             Police;

14
         MRS. RASIC, Wife of Police Officer.

15

16

17

18

19

20

21

22                                                    00175

1                              I   N   D   E X

2    DENNIS KOLETSOS
           Direct by Mr. Murphey              Page 146
3          Cross by Ms. Parker                Page 184

4
     DANIEL RASIC
5          Direct by Ms. Parker               Page 212
           Cross by Mr. Murphey               Page 231
6          Redirect by Ms. Parker             Page 236

7
     NORMAN NISSEN (in rebuttal)
8          Direct by Mr. Murphey              Page 239
           Cross by Ms. Parker                Page 242
9          Redirect by Mr. Murphey            Page 246

10
     Chief's Exhibit 12          identified   Page 149
11                               admitted     Page 211
     Chief's Exhibit 13          identified   Page 150
12                               admitted     Page 211
     Chief's Exhibit 14          identified   Page 154
13                               admitted     Page 211
     Chief's Exhibit 15          identified   Page 156
14                               admitted     Page 211
     Chief's Exhibit 16          identified   Page 158
15                               admitted     Page 211
     Chief's Exhibit 17          identified   Page 166
16                               admitted     Page 211
     Chief's Exhibit 18          identified   Page 240
17                               admitted     Page 242
     Chief's Exhibit 19          identified   Page 248
18                               admitted     Page 249

19   Union Exhibit 1             admitted     Page 238
     Union Exhibit 2             admitted     Page 238
20   Union Exhibit 5             identified   Page 218
                                 admitted     Page 238
21   Union Exhibit 7             identified   Page 225
                                 admitted     Page 238
22   Union Exhibit 9             identified   Page 202
                                 admitted     Page 250

00173

1      MR. McGRATH:  I am Mike McGrath.  We have

2  never met before.  The other Commissioner is running

3  late, but we will have this transcribed, and

4  typically the Commission reviews the transcript

06:07PM    5  before making a decision.  He will get here shortly.

6      MS. PARKER:  Is the Commission going to make

7  a decision tonight before we go into the penalty

8  phase?

9      MR. McGRATH:  It depends how far we go, and

06:07PM   10  if we have it completed, and they may.  In other

11  hearings, I know they have ordered the transcript and

12  have read the transcript before coming to a decision.

13      MS. PARKER:  Okay.

14                 (Witness sworn.)

15          D E N N I S    K O L E T S O S

16  called as a witness by the City, having been duly

17  sworn, was examined and testified as follows:

18          D I R E C T    E X A M I N A T I O N

19  BY MR. MURPHEY:

06:07PM   20      Q.    Please state your name?

21      A.    Dennis Koletsos, K-o-l-e-t-s-o-s.

22      Q.    How are you employed?

00177

1        A.    The Chief of Police for the Northlake

2    Police Department.

3        Q.    How long have you been employed as Chief

4    of Police?

06:08PM   5        A.    Nine and a half years here.

6        Q.    Briefly describe your background in

7    police work?

8        A.    Currently have 35 years as law

9    enforcement.  Approximately 14 as a chief of police,

06:08PM  10    about another 12 as deputy chief of police and

11    commander.  Before that, sergeant and so forth.

12        Q.    Describe generally the make up of the

13    Northlake Police Department in terms of rank,

14    structure, and number of sworn officers?

06:08PM  15        A.    We have approximately 37 sworn officers

16    or 38 officers.  At full strength currently have

17    approximately, I think, 35.  We have a chief of

18    police, a deputy chief, three commanders, four

19    sergeants and the rest of the sworn officers are

06:08PM  20    patrol officers, some assigned to various positions

21    in the department; however, they are still patrol

22    officers.                                     00178

1      Q.    What is your expectation when an officer

2   of yours receives a subpoena?

3      A.    My expectation is that they honor the

4   subpoena, and they go to court accordingly as ordered

06:09PM   5   by the subpoena.

6      Q.    Specifically what is your expectation

7   when an officer receives a subpoena with respect to

8   an arrest that he made?

9      A.    Well, that certainly is a time that

06:09PM   10   officer should be there, because that officer's

11   testimony is paramount to trying the case and having

12   a successful outcome.

13      Q.    What is your expectation of your

14   officers when you issue an order?

06:09PM   15      A.    I expect the officers to obey their

16   order.

17      Q.    Is it important to you that police

18   officers obey orders which you issue?

19      A.    Absolutely.

06:09PM   20      Q.    Why?

21      A.    Well, in any department it creates chaos

22   inside the organization, and once this ensues, the

00179

1    effectiveness of the department comes into question,

2    and basically ceases to function the way it should

3    function.

4         Q.   Chief, calling your attention to what

06:10PM   5    has been marked as Chief's Exhibit Number 12 now --

6    that is in the little packet, the smaller packet

7    right in front of you.

8         A.   Okay.

9         Q.   Do you recognize that document?

06:10PM   10   A.   Yes, I do.

11        Q.   What is that document?

12        A.   That is a memo that I issued.  It is a

13   memo that was issued to all sworn personnel that I

14   wrote on March 11, 2002, regarding court appearances.

06:10PM   15       Q.   Over the years have you had problems

16   with officers and court appearances?

17        A.   Yes, we have.

18        Q.   Describe the problems that you have had?

19        A.   Apparently this was during that time

06:10PM   20   officers had decided they would go to court when they

21   felt like going to court.  Sometimes would blow court

22   off.  Other times wouldn't go to court even if they

05150

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1   got subpoenas.  Because of the operations of the

2   department and other pressing issues, I wasn't aware

3   of that occurring as much as it had been occurring.

4   I was made aware of that at that time that officers

06:11PM   5   had periodically almost routinely not attended court,

6   and that is what prompted me to issue this memo on

7   March 11th of 2002.

8           Q.   And specifically the second sentence of

9   the order which reads:  All officers will honor all

06:11PM   10  subpoenas received unless directed to do so otherwise

11  by the state's attorney, chief of police, or his

12  designee.  Was that order disseminated throughout the

13  department?

14          A.   Yes, it was.

06:11PM   15          Q.   On or about March 11, 2002?

16          A.   Yes, it was.

17          Q.   Please turn to Exhibit 13.  What is

18  Exhibit 13?

19          A.   Exhibit 13 is a memo I sent out on July

06:12PM   20  25, 2003, to all sworn personnel regarding court

21  attendance once again.

22          Q.   And what was the purpose of that

1    memorandum?

2        A.    This was to reaffirm the past memo, and

3    apparently after the past memo from March 11th of

4    2002, officers at this time failed to go to court

06:12PM    5    once again, and I issued this memo as my final

6    warning to everybody that there would be disciplinary

7    action and so forth for anybody that missed court

8    outside of normal policies and procedures of the

9    department to miss court.

06:12PM    10        Q.    There was testimony at the last session

11    from the Chief of the Fourth District Cook County

12    State's Attorney's office, Mr. Simpson.  Were you

13    present for that testimony?

14        A.    Yes, I was.

06:12PM    15        Q.    Describe your professional relationship

16    with the state's attorney's office in terms of your

17    desire, if any, in insuring that Northlake police

18    officers cooperate with the state's attorney's

19    office?

06:13PM    20        A.    We have had several conversations in

21    person and on the phone.  I have had several

22    conversations with Mr. Simpson.  The Chief of Police

| | |
|---|---|
| 1 | being the chief executive officer for the department |
| 2 | is responsible for the officers' conduct in court, |
| 3 | appearing in court, preparing for testimony.  We had |
| 4 | several instances as those memos attested to of |
| 06:13PM   5 | officers shirking their responsibility and taking |
| 6 | lightly their responsibility of attending court and |
| 7 | lack of testimony and so forth. |
| 8 | It was one of the areas that when I took |
| 9 | over as Chief here that had to be corrected.  I spent |
| 06:13PM  10 | a great deal of time assuring the state's attorney's |
| 11 | office that we were working on these and correcting |
| 12 | these issues and taking disciplinary action against |
| 13 | officers that did not appear in court. |
| 14 | I had asked Mr. Simpson through his |
| 06:14PM  15 | various assistants if there was problems in court to |
| 16 | make sure they call me direct.  They have my direct |
| 17 | line.  They have my home phone number to be able to |
| 18 | do that.  Our relationship is a professional |
| 19 | relationship as a Chief, and the Fourth District and |
| 06:14PM  20 | him being the Chief of the state's attorney's office |
| 21 | for that state's attorney office. |
| 22 | Q.    You of course are acquainted with |

00183

1    Officer Rasic?

2         A.    Yes.

3         Q.    Approximately how long has he been a

4    full time officer with the police department?

06:14PM    5         A.    Approximately nine years.

6         Q.    Calling your attention to May of 2007,

7    did you become aware that Officer Rasic had made

8    application for what is commonly referred to as an

9    F.M.L.A. leave?

06:14PM    10        A.    Yes, I did.

11        Q.    How did you become aware of that?

12        A.    I believe Deputy Chief Nissen had told

13   me that Dan had called or Officer Rasic had called

14   requesting a family medical leave for the upcoming --

06:15PM    15   that he would be requesting it for the birth of his

16   child -- the soon to be birth of his child.

17        Q.    Recognizing you are not an H.R. director

18   or employment lawyer, what is your understanding of

19   the F.M.L.A., Family and Medical Leave Act in terms

06:15PM    20   of an obligation to grant unpaid leave?

21        A.    It is our obligation under the F.M.L.A.

22   statute to, if the Officer qualified for it and if

1    the situation qualified for it, that we would grant

2    the leave.  We have granted leave.  In fact, we

3    granted a leave for the birth of Officer Rasic's

4    first child, same circumstances, and it certainly is

06:15PM    5    our duty to provide that leave to him under the

6    statute.

7         Q.    Chief, calling your attention to what

8    has been marked as Chief's Exhibit Number 14, turn to

9    the inside pages first.  Do you recognize that

06:15PM   10    document?

11         A.    Yes, I do.

12         Q.    What is the form?

13         A.    The form is the request for family

14    medical leave.

06:16PM   15         Q.    Is that a form that is employed or

16    utilized by the City of Northlake?

17         A.    Yes, it is.

18         Q.    And did you receive this completed form

19    from Officer Rasic on behalf of Officer Rasic on or

06:16PM   20    about the date it bears, May 15, 2007?

21         A.    Yes, actually I received this from

22    Deputy Chief Nissen.  I believe he made in out for

1    Officer Rasic at the time per his request.

2            Q.    When you received the F.M.L.A. request,

3    what did you do with it?

4            A.    Well, once Officer Rasic went on leave,

06:16PM  5    we processed that and let the human resource

6    department of the City know that he would be on his

7    leave and per the requirements that we did make on

8    here, that we elected which was our choice, to pay

9    Officer Rasic as much time as he had accrued, benefit

06:16PM  10   time accrued on the books, so he wouldn't suffer any

11   unnecessary financial loss when he was off on his

12   leave which we did.

13           Q.    Looking at the first page of Exhibit 14,

14   what is that document?

06:17PM  15           A.    The first page of the document or the

16   actual memo?

17           Q.    The memo that has May 22, 2007?

18           A.    Right.  This is a memo I prepared to

19   Bill Kabler, our financial director, and who also

06:17PM  20   handles the human resources functions for the City

21   alerting him to the fact that Officer Rasic would be

22   going on family medical leave, and that we would

                                                    00186

1    notify him of the exact date when it occurred.

2         Q.    And was an F.M.L.A. leave granted for

3    Officer Rasic?

4         A.    Yes, it was.

06:17PM    5         Q.    And do you know when it was initially

6    granted approximately?

7         A.    That I don't know.  I would have to go

8    back into the notes here.  Upon the birth of his

9    daughter, I believe.  Maybe before, a couple days

06:18PM    10   before that or whatever, but shortly after this time.

11        Q.    Calling your attention now to

12   Exhibit 15, do you recognize that document?

13        A.    Yes, I do.

14        Q.    What is that document?

06:18PM    15        A.    It is a memo that I issued to the record

16   supervisor regarding Officer Rasic's family medical

17   leave.

18        Q.    Let me back up and ask you to look at

19   the second page which appears to be a memo to

06:18PM    20   yourself?

21        A.    Okay, yes.

22        Q.    What happened on July 13, 2007,

00187

1    reference Officer Rasic?

2          A.    I received a voice mail from Officer

3    Rasic advising me that he was requesting an extension

4    of his family medical leave because of continuing

06:18PM   5    family medical problems.

6          Q.    And Chief, as best you can, say it in

7    your own words rather than reading the document.

8          A.    Basically this was a note that I made to

9    the file, because these things sometimes have a

06:19PM   10   tendency to expand regarding the conversation or the

11   voice mail that I received from him asking for an

12   extension of his leave.

13         Q.    Did you have a conversation with Officer

14   Rasic on or about July 13th?

06:19PM   15         A.    Let me see if that was the exact date.

16   Yes.

17         Q.    That was a telephone conversation?

18         A.    Yes.

19         Q.    As best you can recall, what did he say

06:19PM   20   to you, and what did you say to him?

21         A.    You know, the exact words, I don't know,

22   but I advised him that I would certainly grant the

                                                  05158

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    extension he was requesting at the time.

2         Q.    And was the extension granted?

3         A.    Yes, it was.

4         Q.    And again calling your attention to the

06:19PM   5    first page of Exhibit 15 which is a memorandum from

6    you to somebody named Debi Rail, D-e-b-i R-a-i-l, who

7    is Debi?

8         A.    She is our records supervisor.  She

9    handles the payroll, in-house payroll and records,

06:20PM  10    all accrued time, benefit time, and so forth.

11         Q.    What was your purpose in sending this

12    memo to Ms. Rail?

13         A.    Well, on some of the conversations that

14    I had with Officer Rasic, I advised him that his

06:20PM  15    accrued time, I believe, was expired at that time.  I

16    thought it was expired at that time, so I wanted to

17    make sure that there wouldn't be a problem with the

18    payroll that he would no longer be paid out of his

19    accrued time.

06:20PM  20         Q.    Now take a look at Chief's Exhibit 16.

21    Do you recognize that document?

22         A.    Yes.

MARIE L. ROGERS, C.S.R. (708) 430-2520

1          Q.    What is that document now?  For the

2     record, it is a to/from memo from you to Officer

3     Rasic dated July 13, 2007?

4          A.    Yes, it basically recapped the

06:20PM   5     conversation that we had previous so there would be

6     no misunderstanding, and to lay out all of the

7     requirements that were still in effect for his family

8     medical leave.

9          Q.    And in the first paragraph, there is a

06:21PM   10    reference that his leave was scheduled to end on

11    August 11th?

12         A.    Yes.

13         Q.    And what was your source of information

14    for that?

06:21PM   15         A.    That was information that Officer Rasic

16    had left with us on an on going basis.  One of his

17    requirements for the family medical leave was that he

18    would call in on Mondays to continually give us his

19    status which he did.  Unfortunately, every time he

06:21PM   20    called it was early in the morning, and no one was

21    ever able to take his call, so there was always very

22    brief messages.  Most of them said this is Officer

1    Rasic.  I want to let you know I am still on family

2    medical leave, and then he would hang up.  Sometimes

3    when he needed an extension, that he would request

4    the extension, but it was very basic, very cryptic,

06:22PM    5    for the most part basic information and then hang up.

6              Q.    In any event, the extension was granted?

7              A.    Yes, it was.

8              Q.    Let's now move to July 23, 2007.  At

9    this time, at the middle or end of July, what was the

06:22PM    10   staffing situation at the Northlake Police

11   Department?

12             A.    Well, summer is always a busy time.  The

13   whole department wants to take off during three

14   months of summer.  We are currently down three

06:22PM    15   officers.  We have three officers that are in

16   training, so that's basically six officers that are

17   not on the regular rotating shifts.

18             With Officer Rasic being on family

19   medical leave, that's 7 officers.  For a small

06:22PM    20   department of our size with 20 people in the patrol

21   division, that really puts a damper on the

22   scheduling.  All of the days off, almost all of the

1    days off that Officer Rasic was off have to be

2    covered somewhere along the line here which was

3    covered by other officers on the shift, officers

4    brought in from other shifts.  We shorted other

06:23PM    5    shifts in order to cover the time, and then as that

6    began to wear on, as that leave began to wear on,

7    officers couldn't get off because of the restrictions

8    that we have per the collective bargaining agreement,

9    and also our own policies, so they started to call in

06:23PM    10    sick, and that had a double effect on that, that they

11    were paying time and a half to cover the shift, and

12    time and a half to again to cover the sick call, and

13    that was the only way anybody could get off for the

14    majority of the summer.

06:23PM    15        Q.    Who does the scheduling for your

16    department?

17        A.    The scheduling is done by the Deputy

18    Chief, and in his absence, the patrol commander for

19    the most part, but almost exclusively the Deputy

06:23PM    20    Chief.

21        Q.    During the middle or end of July, did

22    you have any responsibility or any responsibilities

1    put on you with respect to scheduling?

2            A.    Right at January 23rd --

3            Q.    You said January?

4            A.    I am sorry, July 23rd. I had just come

06:24PM    5    back from a short vacation, and the Deputy Chief was

6    leaving.  Actually we weren't -- didn't even see each

7    other.  That time I was coming back, and he was

8    already gone for a -- he was gone for approximately a

9    two-week vacation.

06:24PM    10            Our conversation that we had via

11    telephone before I got back in was that Officer Rasic

12    had asked for another continuance of family medical

13    leave.

14            Q.    Before we get to that, I want to know as

06:24PM    15    a result of Deputy Chief Nissen's vacation, did you

16    have to assume certain scheduling responsibilities?

17            A.    Yes, I did, because our patrol commander

18    was also filling in time and so forth and so forth,

19    and it would have left it up to my responsibility

06:24PM    20    then to make the schedule, the needed schedule

21    adjustments.  During this time we were only adjusting

22    the schedule from the time that Officer Rasic called

00193

1  us.  He would ask for an extension.  We granted that

2  extension, and then we redid the schedule at this

3  time, and we were coming up to the end of another

4  extension period that he had requested, and at that

06:25PM  5  time we had to make some scheduling changes again.

6  One of the problems we have is our schedule software

7  is locked in Deputy Chief's computer which makes it

8  even that much more difficult to go back in.

9          For myself coming back from a vacation

06:25PM  10  myself, it took quite a bit of time to get caught up

11  a far as that goes.

12          Q.    Certainly creates job security for the

13  Deputy Chief?

14          A.    Sure does.  I told him that when he took

06:25PM  15  over scheduling.

16          Q.    At some time, did the Deputy Chief

17  advise you with respect to Officer Rasic and his

18  intent with respect to his F.M.L.A. leave?

19          A.    Yes, he had told me and left a message

06:25PM  20  for me, and I did call him when I was coming back and

21  he was on vacation, that we'd have to do something on

22  the schedule.  We didn't schedule out past that.  We

1    felt that -- we were fairly certain that he was going

2    to come back at that time.

3           Q.    Calling your attention to then July 23,

4    2007, did you have a phone conversation with Officer

06:26PM    5    Rasic?

6           A.    Yes, I did.

7           Q.    And it was in person or on the phone?

8           A.    No, it was on the phone.

9           Q.    Who initiated it?

06:26PM    10           A.    I believe I did.  I think we did some

11    phone tag back and forth at the beginning.  That was

12    when I just came back, and I had to find out what the

13    intentions were, and what the situation was with

14    that, because I was going to go back in, and we were

06:26PM    15    going to have to rework the schedule again for

16    whatever extension time that he was looking for,

17    because we hadn't nailed that down yet.  He hadn't

18    nailed that down with the Deputy Chief yet.  We were

19    unsure exactly how long he wanted out, so I needed to

06:26PM    20    find that out.

21           Q.    I believe Counsel for Officer Rasic will

22    be playing that tape, so let me rather than go

1    through it in detail, in essence, what did you

2    discover, or what did Officer Rasic indicate to you

3    with respect to his intent to return back from

4    F.M.L.A. leave?

06:27PM    5        A.    He advised me in that conversation that

6    he wasn't planning on returning until at least

7    September 1st.

8        Q.    What was your reaction to that?

9        A.    I was somewhat startled by that, because

06:27PM    10   we had been granting extensions as it went out.  I

11   was also startled of the fact we also had two

12   officers during that time have children and were off

13   for a very short amount of time.

14            He also made mention of the fact that in

06:27PM    15   addition, that his father was sick, and he made those

16   cryptic messages without really explaining too much

17   in some of the voice mails that he would leave on

18   Monday and so forth, and when I found out September

19   1st, that would have run the entire summer out, our

06:27PM    20   entire summer schedule.  I was somewhat shocked when

21   he told me that.

22       Q.    Do you recall how you concluded your

1    conversation with Officer Rasic?

2         A.   At the end of our conversation I told

3    him to do the best he could to get back, and he

4    assured me that he would throughout that

06:28PM    5    conversation.  I did during that conversation explain

6    to him that all the officers were covering.  They

7    were counting on him to get back.  At the end of the

8    conversation I asked him to do the best he could, and

9    he said he will get back when he could, and he

06:28PM   10    assured me he would.

11         Q.   At any time, did you rescind Officer

12    Rasic's F.M.L.A. leave?

13         A.   No, I did not.

14         Q.   At any time, did you order Officer Rasic

06:28PM   15    back to regular duty?

16         A.   No, I did not.

17         Q.   Please take a look at the first page of

18    Chief's Exhibit 17.  What is that document?

19         A.   That is just a little note that I put

06:28PM   20    into the file that I had a conversation with him on

21    July 23rd at the approximate time that the note is

22    12:10; that I advised him to do the best he can to

1    come back, and I just threw that back into his file

2    at that time.

3            Q.    Now Chief, take a look at the other two

4    pages of Exhibit 17 and tell us what is that print

06:29PM    5    out?

6            A.    This is a print out of the accrued

7    benefit time that Officer Rasic has on the, or had on

8    the books at that time.

9            Q.    And did you print that out on or about

06:29PM    10    July 16th?

11            A.    No, at that time I had the records

12    supervisor print that out.

13            Q.    What why did you do that?

14            A.    I was unsure of exactly how much time he

06:29PM    15    did have, and when I originally thought that he was

16    out of time, it turns out, I think, he still had some

17    time on the books.

18            Q.    When you say time, are you referring to

19    paid time?

06:29PM    20            A.    Paid time, so we kept him on paid time

21    and ran during his extended leave, or leave as we

22    were extending it, we continually paid him until he

1   no longer had any time off.  I think the last week

2   and a half of his leave he didn't have any time left.

3   It is kind of hard to keep track of everybody's time

4   on the department, and it is difficult, so I was

06:30PM   5   under the impression when we did calculations earlier

6   when he did this, that he had whatever time off he

7   had, but I asked again to rerun it to make sure that

8   we weren't causing any type of financial harm to him

9   which turned out that he did have some other time on

06:30PM   10   the books, so then I advised the records supervisor

11   at that time not in writing, because I was there when

12   we were talking about it, to just keep paying him

13   until his time ran out which we did.

14            Q.    Why did you do that?

06:30PM   15            A.    Well, I don't want to a see an officer,

16   you know, that is out on leave or anything like that

17   have a financial problem.  I mean, he's got the time

18   on the books.  He wouldn't have had any time coming

19   back for quite some time, but I figure that he would

06:30PM   20   know that as an officer, as an experienced officer,

21   and it would be the least burden for him especially

22   with a new baby.  I know it is a tough situation with

1    a new baby.  Been there before many, many years ago,

2    but I guess I didn't have to, but I did.

3        Q.    Now let's turn to July 24th.  Of course

4    we listened to the transcript or the tape of the

06:31PM    5    encounter between you and Rasic and the transcript,

6    that is itself in evidence, so we are not going to do

7    a line by line on this.  Let me just ask you a few

8    questions with respect to that conversation.  Why did

9    you order Officer Rasic to abide by the subpoenas?

06:31PM    10        A.    Well, there were a couple reasons why.

11    First of all, the sergeant had talked to him earlier

12    in the day or the day before or somewhere along the

13    line.  Sergeant Tzinis came and told me Officer Rasic

14    was trying to not appear in court per the subpoena.

06:31PM    15    I know that we had made arrangements with the state's

16    attorney's office prior to that with him being on

17    leave to try to get court continuances.  We actually

18    did that on a couple situations.  We knew that the

19    subpoena was there.

06:32PM    20            The subpoena is a court order.  I didn't

21    want to see Officer Rasic arrested at his house and

22    dragged before the court.  That would be even more

1    embarrassing than the situation is now that we have

2    with this Officer, but I knew what he was attempting.

3    Knowing Dan's history, Dan sometimes fishes for an

4    answer.  He'll go up and down the chain looking for

06:32PM    5    somebody to give him the answer that he's looking

6    for, so I knew what he was looking for when he

7    contacted me not to go to court.

8          Now this was already several -- I think

9    he had already missed court twice on that subpoena,

06:32PM    10    and I told him right away that I am ordering him to

11    go.  It is a court order, you know.  I am ordering

12    him to go.  If he violates the court order, he's

13    going to get arrested, and even if he didn't, it

14    makes the department look terrible before the judge.

06:33PM    15    It was an important case, and he needed to be there.

16    He was the arresting officer.

17          Q.    Were you aware of the nature of this

18    particular case?

19          A.    Yes, I was.

06:33PM    20          Q.    What was the nature of the case?

21          A.    It was a D.U.I.  He was the arresting

22    officer, and it was not just a normal D.U.I.  This

1   particular individual that was the defendant in the

2   case had many contacts with the police department in

3   the past out on the street and so forth.  He also had

4   some history of other problems, and it would send a

06:33PM   5   terrible message to the people that that particular

6   individual hung around with other gang members and so

7   forth to not have our officer show up to court and

8   arrest him and have him walk out the door.

9        Q.   Based on that, was it a matter of

06:33PM   10  importance to your police department in your view

11  that that individual or that the department do the

12  best it can to see a conviction for this person?

13       A.   Absolutely.

14       Q.   Now do you recall shortly after you

06:34PM   15  initially issued the order, Officer Rasic kind of

16  turning the conversation to a shooting of a Maywood

17  officer?

18       A.   Yes.

19       Q.   What did you make of that?

06:34PM   20       A.   I didn't know what to make of that, but

21  it is common, because I don't know what to make of a

22  lot of conversations I had with Officer Rasic.

<table>
<tr><td>1</td><td>Q.    Let's stick to this one.</td></tr>
<tr><td>2</td><td>A.    That kind of floored me a little bit.  I</td></tr>
<tr><td>3</td><td>am the Chairman of the Major Crimes Task Force, West</td></tr>
<tr><td>4</td><td>Suburban Major Crimes Task Force.  I am the Chairman</td></tr>
<tr><td>5</td><td>that is investigating that.  I am also the Chairman</td></tr>
<tr><td>6</td><td>of the Illinois Chief's of Police awards ceremony,</td></tr>
<tr><td>7</td><td>and I was actually presenting an award to that</td></tr>
<tr><td>8</td><td>officer's wife a couple weeks after that.</td></tr>
<tr><td>9</td><td>Q.    What relationship if any did you see</td></tr>
<tr><td>10</td><td>between the ongoing investigation of a murder of a</td></tr>
<tr><td>11</td><td>police officer in Maywood and the duty of Officer</td></tr>
<tr><td>12</td><td>Rasic to honor a subpoena and your order?</td></tr>
<tr><td>13</td><td>A.    There is absolutely no correlation</td></tr>
<tr><td>14</td><td>between them.  It made absolutely no sense at all.</td></tr>
<tr><td>15</td><td>Q.    Chief, do you recall ordering Officer</td></tr>
<tr><td>16</td><td>Rasic not to contact the state's attorney to try to</td></tr>
<tr><td>17</td><td>get out of the subpoena?</td></tr>
<tr><td>18</td><td>A.    Yes, I did.</td></tr>
<tr><td>19</td><td>Q.    Why did you issue that order?</td></tr>
<tr><td>20</td><td>A.    Well, previous there was another</td></tr>
<tr><td>21</td><td>subpoena earlier that Officer Rasic did not go to on</td></tr>
<tr><td>22</td><td>a robbery case that was a juvenile defendant, and</td></tr>
</table>

06:34PM (line 5)
06:34PM (line 10)
06:35PM (line 15)
06:35PM (line 20)

1    after he did not appear, he had called that juvenile

2    state's attorney at juvenile court in the city, and

3    that attorney allowed him not to come and provide

4    testimony on that, and then called me back at the

06:35PM  5    station that day and asked me by voice mail if he

6    made the right decision.

7            He didn't know.  He felt uncomfortable

8    when Officer Rasic talked to him.  It took me a

9    couple days to get back to him, playing phone tag,

06:35PM  10   and at that time I asked him if it was, you know, if

11   it was a crucial situation that his testimony was not

12   going to be needed and so forth.  He said, well, we

13   are going to do -- we will do the best we can with

14   the thing at that time.

06:36PM  15           Now I knew when we had this other

16   subpoena we already talked in the past with the

17   state's attorney, and with the, I believe the

18   commander if I am not mistaken, the investigating

19   commander to get a continuance on that case past the

06:36PM  20   date that Officer Rasic had initially told us he's

21   going to come back again, and when he made that phone

22   call back that he wasn't coming back on the 23rd, I

1    knew that we had already set another subpoena date

2    for him, and we were trying to continue the case as

3    many times as we could.  The judge had told the

4    state's attorney that is the last continuance.  We

06:36PM    5    are hearing the case or we are dumping the case, and

6    I knew that, and I told him that in that conversation

7    before, that you know, that we needed to get him back

8    there, and that is why I made the order, because I

9    knew the case was going to be dumped at that time.

06:37PM    10        Q.    Do you recall the part of the

11    conversation where Officer Rasic said words to the

12    effect of:  Okay, king?

13        A.    Yes.

14        Q.    Did you consider that to be an act of

06:37PM    15    insubordination?

16        A.    Absolutely.

17        Q.    Why?

18        A.    Just as his whole demeanor through the

19    conversation every time I told him not to call the

06:37PM    20    state's attorney, to honor the subpoena, he would

21    say:  Okay, I will call the state's attorney and get

22    this straightened out.  Every time I told him

00205

1    something, he was smart alecky basically with me,

2    everything that he said.  I kept telling him not to

3    call the state's attorney.  We were embarrassed

4    enough over this whole situation, and he continued.

06:37PM    5    After he would say okay, I will call the state's

6    attorney.

7         Now our policies are not that the

8    officer gets to do that until it is approved by a

9    supervisor or command officer, the Deputy Chief or

06:37PM    10    Chief of Police.  We have got a general order that

11    gives officers leeway in that, but only because it

12    impedes the function of the department if we have to

13    make the phone calls to the state's attorney to get

14    our officers out of court.

06:38PM    15         If they call here and say here is the

16    situation, there is an emergency, fine, we will try

17    to call if we can, but you call too.  That is what

18    the general order is there for and allowed them to do

19    that, not for an officer just to call on his own and

06:38PM    20    decide he's not going to come and adhere to a valid

21    court order.  It is an order by a judge to come to

22    court.

1        Q.    Now Chief, in this proceeding are you

2    seeking to terminate the employment of this Officer?

3        A.    Yes, I am.

4        Q.    Why?

06:38PM    5        A.    His whole demeanor.  His attitude, and

6    his actions are certainly inconsistent with our

7    expectations of an officer for the Northlake Police

8    Department.  Officer Rasic has done this in the past.

9    He's been insubordinate in the past, received

06:38PM    10    suspension time in the past, being insubordinate to

11    command officers, received discipline for missing

12    court on his own in the past, missing training.

13        MS. PARKER:  I am going to object.  This is

14    penalty testimony that should be heard in the penalty

06:39PM    15    phase.

16        MR. MURPHEY:  It goes to state of mind of

17    this Officer why he's asking the Commission to

18    terminate.  I mean, okay, we haven't decided whether

19    the Commission is going to bifurcate the hearing, but

06:39PM    20    the fact of the matter is, I think it is important

21    for the Commission to know why the Chief wants this

22    Officer's job at this point.

```
 1              MR. McGRATH:  The objection --

 2              MR. MURPHEY:  It's not being offered for the

 3        truth of whether there were actual suspensions, but

 4        it is offered for the limited purposes of this man's

 5        state of mind, his intent to seeking the removal.

 6              MR. McGRATH:  For the purpose of bringing the

 7        charges and the discipline that is requested of the

 8        Chief, it will be allowed.  I will state this

 9        Commission is an experienced Commission, and they

10        will be able to separate the issues like they have in

11        the past.

12              MS. PARKER:  Thank you.

13        BY MR. MURPHEY:

14              Q.   Did you become aware that Officer Rasic

15        missed court pursuant to a subpoena on this

16        particular case twice?

17              A.   Yes.

18              Q.   Did you have any conversations with

19        State's Attorney Simpson regarding those misses,

20        these absences, I should say?

21              A.   Yes, I did.

22              Q.   And based on those conversations with
```

06:39PM — line 5

06:39PM — line 10

06:40PM — line 15

06:40PM — line 20