1    State's Attorney Simpson, does that at all play into

2    your recommendation that this Officer's employment be

3    terminated?

4            A.    Yes, it does.

06:40PM   5            Q.    What is the impact of that?

6            A.    The Chief of the Fourth District of Cook

7    County advised this Officer that he could possibly be

8    arrested if he did not come to court per that

9    subpoena, and my Officer as disgraceful as it is in

06:40PM   10   my opinion, just took it upon himself that he wasn't

11   going to pay any attention to one of the most

12   experienced prosecutors in the busiest court system

13   in the United States, and he decided he just wasn't

14   going to adhere to even his request to go to court,

06:41PM   15   let alone even the Chief's wish.

16            I just find that impossible to have an

17   officer like that working for me and working for the

18   City.

19            Q.    On behalf of your City, were you

06:41PM   20   embarrassed at the actions and inactions of Officer

21   Rasic?

22            A.    Absolutely, and I still am.

1        Q.   Why?

2        A.   He just brought this discredit to the

3  entire police department.  He made me call, apologize

4  to the court.  I had to apologize to the state's

06:41PM  5  attorney.  I asked the state's attorney if they were

6  going to arrest him.  They didn't know at that time

7  if they were going to serve him with that.  I

8  certainly didn't want him to be arrested, but if you

9  have to after all these circumstances, then arrest

06:42PM  10  him.

11        Q.   Chief, let me shift gears for a second.

12  You heard testimony at the last session that during

13  this period of time Officer Rasic's father was at a

14  place called Villa Scalabrini.  Do you recall that

06:42PM  15  testimony?

16        A.   Yes.

17        Q.   Now most of us in this room know where

18  that is at, but just in terms of making the record,

19  where is Villa Scalabrini?

06:42PM  20        A.   That's located on Wolf Road in our City

21  here.

22        Q.   Approximately how far is it, if you

00210

1    know, by car from this City Hall?  I don't mean

2    miles, in minutes?

3              A.    Five miles, couple minutes.

4              Q.    In terms of the distance between --

06:42PM   5    strike that.

6                   Do you recall that the subpoena for

7    Officer Rasic called for his appearance in court

8    during the mid day?

9              A.    Yes.

06:43PM   10              Q.    Is that a period of relatively non peak

11    traffic in this area?

12              A.    If there is any such thing, yes, but

13    that would be --

14              Q.    Relatively speaking?

06:43PM   15              A.    Yes.

16              Q.    In the course of your career here at the

17    City of Northlake, have you yourself driven from this

18    station to the Maybrook Courthouse at First Avenue

19    and Jackson Street in Maywood, Illinois?

06:43PM   20              A.    Yes.

21              Q.    Can you estimate in terms of clock

22    hours, clock time, how long it takes you to drive

MARIE L. ROGERS, C.S.R. (708) 430-2520

1    from this City Hall to Maybrook?

2    MS. PARKER:  I am going to object to the

3    relevance of that testimony.

4    MR. MURPHEY:  There was testimony by the

06:43PM    5    Officer that he was caring for his father at Villa

6    Scalabrini.  The purpose of this testimony is to

7    provide information to show that the Officer's

8    ability to drive to Maybrook to handle his duties

9    would not have taken a great deal of time, or

06:44PM    10    whatever the time is, it is up to the Commission to

11    decide whether that is a great deal of time.

12    MR. McGRATH:  It will be overruled.

13    THE WITNESS:  Approximately 20 minutes.

14    MR. MURPHEY:  No further questions, Chief.

06:44PM    15    MS. PARKER:  Can I have just a second please.

16    MS. LARSON:  Certainly.

17    MR. McGRATH:  We will give you a few minutes.

18    We will take a five-minute break, okay.

19    MS. PARKER:  Thank you.  We will take a

06:44PM    20    recess.  Coming back at 6:55.

21    (Recess had.)

22    (Whereupon the following

1                              proceedings were had outside

2                              the presence of the Commission

3                              and parties in a hallway

4                              outside the hearing chamber

5                              with only Counsels for City,

6                              and Officer, and Commission

7                              present.)

8            MR. McGRATH:    I asked you to come back in

9       here at the request of the Chairwoman.    I was not

06:53PM  10       here at the last hearing, but we do have the

11       transcript, and I looked through it, and I just

12       noticed in there at one point Mr. Murphey made a

13       comment that your client was scowling at him, and

14       that just before some of the questions he was like

06:53PM  15       smiling or making some kind of faces at the Chief

16       while the Chief was testifying, and then the Chief in

17       return was staring at him, you know, during some of

18       the questioning by Mr. Murphey.

19            I would ask that you remind your

06:53PM  20       clients, you know, the Commission is the judge and

21       the jury.    That doesn't come on record, but you know,

22       to be making faces at each other, it is a tense

1   situation.

2         MS. PARKER:  I understand.  It is not doing

3   him any good.  I understand that.

4         MR. McGRATH:  And I just bring it up, because

06:54PM  5   I saw it in the transcript before, you know what I

6   mean, so if you want to take a minute to talk about

7   that, so I will put it on the record, you know, and I

8   am sure you know --

9         MR. MURPHEY:  We have had an issue.  I didn't

06:54PM  10   notice because I was concentrating on the Chief.  I

11   didn't see.

12         MR. McGRATH:  It was during the part where

13   he's talking about where his father was at, and you

14   know, right before, and how long it would take to get

06:54PM  15   to the courthouse and what have you.

16         MS. PARKER:  I think he's just frustrated

17   with the situation, and he doesn't mean any, you

18   know, bad -- he has no bad intentions.  It is just --

19   he's just frustrated.

06:54PM  20         MR. McGRATH:  Okay.

21         MS. PARKER:  I will talk to him.

22         MR. McGRATH:  I appreciate that.  The

Case 1:08-cv-00104   Document 20-7   Filed 02/15/2008   Page 7 of 46

1    Commissioners see this.

2         MS. PARKER:  Okay.

3                        (Whereupon the following

4                         proceedings were had in the

06:54PM  5                         presence of the Commission and

6                         parties.)

7         MR. McGRATH:  Back on the record.  Cross?

8         MS. PARKER:  I am ready.

9         MR. McGRATH:  Ms. Parker, set for your cross

06:58PM  10   examination?

11        MS. PARKER:  Yes.

12          C R O S S   E X A M I N A T I O N

13   BY MS. PARKER:

14        Q.    Hello, Chief.

06:58PM  15        A.    Hello.

16        Q.    Now you mentioned in your direct,

17   Officer Rasic would leave cryptic messages on, you

18   know, his reports, his calls at reporting time on

19   Mondays?

06:58PM  20        A.    Yes.

21        Q.    You didn't call him back; did you?

22        A.    No.

1        Q.    To find out what he may have been

2    meaning in his messages that you didn't understand?

3             A.    No.

4        Q.    And you didn't direct anybody in the

06:58PM    5    department to call him back?

6             A.    No.

7        Q.    Now when you returned from -- you

8    returned from vacation the end of July?

9             A.    Yes, it was right at that -- I think

06:58PM    10   that date actually was July 23rd.  I believe it was,

11   yes.

12       Q.    And when you returned from your

13   vacation, you knew about the extension from Deputy

14   Chief Nissen?

06:59PM    15            A.    Correct.

16       Q.    And then you immediately took over the

17   scheduling duties?

18            A.    Well, I would have had to.  I was trying

19   not to.

06:59PM    20       Q.    Okay, and you were aware that Officer

21   Rasic was entitled to 12 weeks' leave?

22            A.    Absolutely.

1    Q.    And he only requested one extension; is

2    that correct?

3    A.    No, I believe he asked for a couple of

4    them during that whole time here.  He was asking for

06:59PM    5    it to be extended -- I would have to go back.  In

6    fact, I don't have any records back on this, but I

7    know on this particular one, that he requested

8    another extension, yes.

9    Q.    Just one extension?

06:59PM    10    A.    Well, when he would call on the whole

11    situation, he was supposed to call and let us know

12    what the status was every Monday, yes, and so on this

13    particular one there was one extension.  I don't know

14    if the other one would be considered what you

07:00PM    15    consider an extension or not, so one official

16    extension that I have in writing here, so yes, one.

17    Q.    Okay, just to clarify, just to clarify

18    the leave.  If you look at Exhibit 14, this was the

19    original F.M.L.A. request; is that correct?

07:00PM    20    A.    Right.

21    Q.    And he requested three weeks for the

22    birth of his child?

1          A.    That is correct.

2          Q.    And you understood that he ultimately

3    ended up taking his leave prior to July 15th?

4          A.    I don't know what time exactly he took

07:00PM    5    it, but I think it was a couple days prior to that,

6    yes.  I don't know what day it was there.

7          Q.    And three weeks from that date was

8    August 11th; are you aware of that?

9          A.    Whatever time it would have been.  I

07:01PM   10    don't really know.

11          Q.    If you look at Exhibit 15.

12          A.    Ah-ha, okay.

13          Q.    This is the extension from the first

14    leave; is that correct?

07:01PM   15          A.    I would believe so.  I don't really --

16    yes, yes.

17          Q.    And there was no other extensions after

18    this one; correct?

19          A.    No, not really, not as a formal

07:01PM   20    extension, no.

21          Q.    Okay, now the defendant in the August

22    7th case, the subpoena for the August 7th court date,

1        the defendant in this case, you mentioned there was a

2        history with him, but there wasn't a driving under

3        the influence history; was there?

4                  A.     I don't have any idea, no.

07:02PM  5                  Q.     And you also mentioned the first

6        subpoena, that August 1st subpoena that was for a

7        juvenile robbery case; is that correct?

8                  A.     Yes, I believe so.

9                  Q.     And are you aware that ultimately

07:02PM  10       Officer Rasic was not needed for that court date?

11                 A.     Yes, they presented the case without

12       him, yes.

13                 Q.     They presented the case?

14                 A.     Yes, the case was heard.

07:02PM  15                 Q.     Isn't it true that the defendant pled

16       guilty in this case?

17                 A.     When I talked to the state's attorney,

18       he said we did the case, so Officer Rasic wasn't

19       needed.  I didn't ask further what the status or

07:02PM  20       whatever the situation was.

21                 Q.     Well, if the defendant had pled guilty,

22       this would have meant Officer Rasic wouldn't have

1    been required to testify; is that correct?

2         A.   Yes, wasn't needed.   I already answered

3    that the state's attorney told me he wasn't needed,

4    that they handled the case without him at the time,

07:03PM    5    yes.

6         Q.   Okay, you heard State's Attorney

7    Simpson's testimony, and I believe the other one --

8         MR. MURPHEY:   O'Callaghan.

9    BY MS. PARKER:

07:03PM    10        Q.   -- o'Callaghan.   They testified it is a

11   common occurrence that officers can't attend court

12   dates.   You heard that testimony?

13        A.   Yes.

14        Q.   And in those instances according to the

07:03PM    15   City of Northlake Police Department procedure, in

16   those instances, the officers are required to contact

17   the state's attorney; correct?

18        A.   They are required to contact us first,

19   the department first.

07:04PM    20        Q.   Yes, contact the department?

21        A.   Right.

22        Q.   And then?

00220

1          A.    And if the watch command officer

2    approves that time, we try to make contact, but then

3    we also allow the officer to make contact. If we

4    know before the officer is going to be off, we

07:04PM    5    contact the clerk's office and get continuances on

6    any case. We have done that for Officer Rasic's

7    traffic court many times also.

8          Q.    In these cases, no discipline is issued

9    when that procedure is followed; is that correct?

07:04PM   10          A.    That's correct.

11          Q.    Now subpoenas are -- when subpoenas are

12    are received by officers in the department, they are

13    sent to the department; is that correct?

14          A.    That's correct.

07:04PM   15          Q.    And the department keeps track of the

16    key date?

17          A.    Yes.

18          Q.    And a subpoena is actually a return to

19    duty; isn't it?

07:04PM   20          A.    Pardon me?

21          Q.    A subpoena is in effect a return to

22    duty? It orders the officer to return to duty?

```
 1              A.    It is a court order.  It is not an order
 2      from the department, so I am not going to answer that
 3      for the semantics of that.  No, it is a court order
 4      demanding the appearance of whoever is named on the
 5      subpoena.
 6              Q.    Isn't there a department order that
 7      states that a subpoena is actually an order to return
 8      to duty?
 9              A.    Return to duty?  No, I don't believe so.
10      Not at all.
11              Q.    Hold on a minute.  I could be wrong, but
12      I just want to check.  I am trying to remember which
13      one.  Sorry.
14              MR. McGRATH:  That's okay.  Take your time.
15              MS. LARSON:  Take your time.
16      BY MS. PARKER:
17              Q.    Okay, it is Chief's Exhibit 12.
18              A.    Okay.
19              Q.    Page 4, Rule 105.
20              A.    Okay.
21              Q.    Could you just read the last sentence
22      there of Rule 105?
```

07:05PM (line 5)
07:05PM (line 10)
07:06PM (line 15)
07:07PM (line 20)

1          A.    Judicial subpoenas and department

2    approved off duty detail shall constitute an order to

3    report for duty under this section.

4          Q.    Okay, so subpoenas are actually an order

07:07PM     5    to report for duty?

6          A.    No, subpoenas are a court order

7    demanding the appearance of whoever the subpoena was

8    issued to.  If the person certainly is not there,

9    they have to come back onto duty in order to do that.

07:07PM    10    That's not a department order.  That is an order from

11    a judge.

12          Q.    But that's what the rule states?

13          A.    That is what the rule says in there,

14    yes.

07:08PM    15          Q.    Okay, the August 1st subpoena, did you

16    receive any complaint from the state's attorney

17    regarding Officer Rasic?

18          A.    The August 1st subpoena?

19          Q.    Yes.

07:08PM    20          A.    State's Attorney Finley?  I received a

21    call regarding the call that he had received from

22    Officer Rasic.

00223

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1      Q.    But he wasn't complaining about Officer

2   Rasic?

3      A.    No, he felt uncomfortable, and he didn't

4   know if he told the Officer the right thing in his

07:08PM   5   words, basically about not coming to work, and he

6   just wanted to make contact with me to find out if

7   that was normal and so forth.

8      Q.    But Officer Rasic wasn't held in

9   contempt of court for missing that court date?

07:09PM   10      A.    No.

11      Q.    And the August 7th subpoena, Officer

12   Rasic wasn't held in contempt of court for missing

13   that?

14      A.    No, August 7th was granted a continuance

07:09PM   15   on our request on this if I am not mistaken.

16      Q.    You didn't advise the state's attorney

17   when you were able to get a continuance for that, you

18   didn't advise the state's attorney that Officer Rasic

19   possibly would be out the entire 12 weeks; did you?

07:09PM   20      A.    I don't do this.  That is not my

21   responsibility as Chief of Police to get involved in

22   the day to day operations of what goes to court.

MARIE L. ROGERS, C.S.R. (708) 430-2520      00224

1    There are commanders and sergeants that take care of

2    that.

3              Q.    You didn't direct any --

4              A.    I do not make these calls personally,

07:09PM    5    no, I do not.

6              Q.    And nobody on your department did that?

7              A.    I don't know if anybody did or they

8    didn't at that time.  I know that we did get a

9    continuance, and I know that one of the commanders

07:09PM   10    that tracks the court cases was involved in that

11    process.  I don't know what the conversations were.

12    I don't have any idea as far as that goes.

13              Q.    But you have taken it upon yourself --

14    you took it upon yourself to get involved in these

07:10PM   15    specific court cases when you talked to the state's

16    attorney; correct?  You talked to the state's

17    attorney with regard to these?

18              A.    Yes, because they had called me.

19              Q.    Did you tell them that you don't get

07:10PM   20    involved in these things?

21              A.    That is not the Chief of Police's

22    function.

1          Q.   Right.

2          A.   To deal in the day to day situation, but

3    when a state's attorney calls me, that's an officer

4    of the court, and when they call for the Chief of

07:10PM   5    Police, I talk to the state's attorney.  That is my

6    duty as the chief executive officer of the police

7    department to make sure when they call me to call

8    them back and find out what is going on, yes.

9          Q.   Did you feel like in your role as Chief,

07:10PM   10   that it is your role to support your officers?

11         A.   I support my officers an awful lot, a

12   great deal.

13         Q.   The D.U.I. incident with this defendant

14   in the August 7th subpoena court date, there has been

07:11PM   15   testimony that an accident was involved; is that

16   correct?

17         A.   I don't know.

18         Q.   You don't know?

19         A.   No.

07:11PM   20         Q.   You were here last week when --

21         A.   I don't recall if there was an accident

22   involved there.  That I don't really know.

1          Q.    Are you aware the driver actually hit a

2     tree?

3          A.    No.

4          Q.    No one was injured in this accident?

07:11PM   5          A.    I am not aware of the circumstances of

6     the arrest, no.

7          Q.    And do you have any knowledge, whether

8     you know --

9          MR. MURPHEY:  We had the discussion.  Can you

07:11PM  10     ask the Officer to stop giving me the hairy eyeball.

11     We have had enough of this.  We talked about this in

12     the stairway.  Would you direct your client to stop

13     with the face, intimidating staring.

14          OFFICER RASIC:  I wasn't at all.

07:12PM  15          MR. MURPHEY:  Just order this man to behave

16     verbally and non verbally like a gentleman.  I am

17     tired of it.

18          MS. PARKER:  I will put on the record that I

19     had a conversation with Officer Rasic.

07:12PM  20          MR. MURPHEY:  Deaf ears.

21          MR. McGRATH:  I would again talk to Counsel,

22     both Counsel.  You know what the purpose of the

1    side-bar was, and I would ask that the Chief, when he

2    is sitting at the table, look out toward the audience

3    or to the Commission, and I would ask for the Officer

4    to look directly at the Commission or out to the

07:12PM   5    audience.  Fair enough?

6              OFFICER RASIC:  Sure.

7              MR. McGRATH:  That should avoid it.  Both of

8    you can look directly across the way at opposing

9    counsel so we can avoid this.

07:12PM  10              OFFICER RASIC:  No problem.

11              MR. McGRATH:  And one other thing for the

12    court reporter's benefit:  It seems like the examiner

13    and the witness, sometimes they are answering or

14    talking at the same time, okay.

07:12PM  15              THE WITNESS:  I apologize.

16    BY MS. PARKER:

17         Q.    Are you aware that the driver, the

18    defendant in this case was just slightly over the

19    legal limit?

07:13PM  20         A.    No, I was not.

21         Q.    Okay, and you were aware of the reasons

22    that Officer Rasic took his leave; is that correct?

1          A.    Yes.

2          Q.    The birth of his child?

3          A.    Yes.

4          Q.    And then the extension was for the birth

07:13PM   5     of his child and the care of his father?

6               MR. MURPHEY:   Objection.   Foundation.

7               MR. McGRATH:   I'm sorry?

8               MR. MURPHEY:   Objection.   Foundation.   There

9     is no evidence, no evidence that an extension was

07:13PM  10     taken for the care of the father.   No testimony of

11     that.   No approved leave for the care of his father.

12               MS. PARKER:   I believe this was testified to

13     last week and the exhibits.

14               MR. McGRATH:   Again, I wasn't here at the

07:14PM  15     last hearing.   I looked briefly at the transcript and

16     looked at the exhibits.   I thought I had seen that

17     the request or the extension was for the care of the

18     infant or the new born baby, I should say.

19               MS. PARKER:   Can we just look at Exhibit 16.

07:14PM  20               MR. McGRATH:   Sure.

21               MS. PARKER:   The second page of the exhibit,

22     the request shows what the leave was taken for there

1    on the second page of Exhibit 16.  The first cover

2    page is a to/ from, and the second page is a

3    handwritten note application which is the extension

4    request.

07:15PM    5        MS. LARSON:  Okay.

6    BY MS. PARKER:

7        Q.   Just for the record, if you can just

8    state, you know, what it says there on the exhibit as

9    to the reason why Officer Rasic was taking the leave?

07:15PM    10       A.   On July 13th, serious health condition

11   affecting -- check off, and I prepared this for a

12   parent which he was saying, but subsequent to that we

13   made contact and looked at the statute and sent him a

14   subsequent letter asking him are you asking for the

07:15PM    15   leave to be for your farther or your child.  We asked

16   him to let us know that, because that would have had

17   to be certified by a medical provider if it was for

18   the father, and under the circumstances at which time

19   Officer Rasic left me a message, he said it is not

07:16PM    20   for his father.  It is for the birth of his child,

21   and it was a memo that was sent to Officer Rasic

22   dated August 31st.  When I first talked to Officer

1       Rasic when we were granting this again for the birth

2       of his child, but then he added that my father is ill

3       and so forth, but when we asked him to verify

4       August 31st, is this for your father, are you asking

07:16PM    5       the extension for your father or the birth of your

6       child, because if it is your father, you are going to

7       have so get that certified by the medical provider.

8       He called back and said no, it is not for my father.

9       It is for the birth of my daughter, and he left that

07:16PM   10       message for me on the phone.

11                    So this particular July 13th, I marked

12       down for a parent because that's what he was telling

13       me, and I believed what he told me, but then when we

14       looked at the statute, and we looked at this, we

07:16PM   15       asked him to verify that he would then have to come

16       back in and get that certified by the medical

17       provider, at which time he decided not to do that and

18       say I am still on leave for the birth of my daughter,

19       not my father.   That's what he told me.

07:17PM   20                    Q.    Okay, but there is nothing in the

21       charges that go to that?  Is there anything?

22                    A.    There is nothing going to the charges

1    going to family medical leave at all.  We are making

2    a family medical leave case over charges of

3    insubordination and disobeying an order.

4         Q.    Are you accusing Officer Rasic of --

07:17PM    5         A.    I am not saying anything.  I am telling

6    you -- you asked me what July 13th was.  That was

7    that, but August 31st when we asked him to verify for

8    us what he is on family medical leave for as he

9    extended this, he notified us it was for the birth of

07:17PM    10   his child and not his father at that time, because

11   under the statute --

12        Q.    He didn't say it is not for my father?

13        A.    Yes, he did.  He told me it was for the

14   birth of his child, because he would have to certify

07:17PM    15   it was for his father at that time.  I don't know why

16   he didn't decide to do that, but he was.

17        Q.    But he was entitled to be off for the

18   birth of his child for 12 weeks?

19        A.    Certainly was, and that's why those

07:18PM    20   documents speak for themselves.  He's entitled to the

21   12 weeks.

22        Q.    Okay, now you had several conversations

1    with -- well, at least two conversations with Officer

2    Rasic in July; correct?

3                A.    Yes.

4                Q.    And one of these was on July 23rd?

07:18PM    5                A.    Yes.

6                Q.    And that was on a taped line?

7                A.    Yes, it was.

8                Q.    And there was a recording made of that?

9                A.    Yes, there was.

07:18PM    10               Q.    I would ask that we listen to that

11    recording and mark it Union Exhibit 9.

12               MR. McGRATH:    Sure.    Everyone had a chance to

13    listen to the tape, I take it?    It has been

14    transcribed.

07:18PM    15               MR. MURPHEY:    Yes.

16               MR. McGRATH:    Everyone has a copy of the

17    transcription.    Would anyone like to review or go

18    through the tape with the transcript?

19               MS. PARKER:    I haven't seen that

07:18PM    20    transcription actually.

21               MR. McGRATH:    I am not using it as an

22    exhibit.    It was part of my production to you.

1            MR. MURPHEY:  Go ahead.

2                          (Whereupon a portion of the

3                           tape recording, cassette

4                           identified as Union

5                           Exhibit 9 was played as

6                           follows:)

7        DEPUTY CHIEF NISSEN:  This call was received

8   on July 23, 2007, at 12:06 p.m. on line 2129.

9        TOM:  Northlake Police.  This is Tom.  Can I

10  help you?

11       OFFICER RASIC:  Hey Tom, this is Dan.  The

12  Chief just called me directly.  Can you transfer me

13  to him directly

14       TOM:  Hang on, pal.  Hang on, Danny.

15       OFFICER RASIC:  Yeah.

16       CHIEF KOLETSOS:  Hey, Dan, it's the Chief.

17  How are you?

18       OFFICER RASIC:  Hey, Chief, how you doing?

19       CHIEF KOLETSOS:  Okay.  Allright.  How's

20  things going?

21       OFFICER RASIC:  Pretty good.

22       CHIEF KOLETSOS:  Okay, what time you -- when

1    do you think you're coming back to work, Dan?

2        OFFICER RASIC:  I'm planning on coming back

3    the 1st of September.

4        CHIEF KOLETSOS:  Yeah, well, we need you back

5    before that, so start making some plans, okay?

6        OFFICER RASIC:  Okay, I'll try and get back

7    as soon as I can.

8        CHIEF KOLETSOS:  All right, I'm not letting

9    you take off the summer anymore like this, Dan, okay.

10   Everybody else has kids.  You need to start making

11   some plans to come back, okay.

12       OFFICER RASIC:  Okay, Chief, I will.

13       CHIEF KOLETSOS:  Okay.

14       OFFICER RASIC:  But like I said, it wasn't

15   just my son too.  It's my father.  He's in a nursing

16   home at Villa Scalabrini.

17       CHIEF KOLETSOS:  Yeah, that's what I heard.

18   I understand that.  Everybody -- you know, a lot of

19   people are dealing with elderly parents that are sick

20   and terminally ill.

21       OFFICER RASIC:  Yeah.

22       CHIEF KOLETSOS:  And everything else, Dan.

```
 1   You got to come to work though, you know.  I mean,

 2   you know, you're going to be off all summer here.

 3   It's a busy summer.  We got a lot of people filling

 4   in for you and stuff.  You got to start thinking of

 5   the department too, you know, okay?

 6           OFFICER RASIC:  Okay, Chief.

 7           CHIEF KOLETSOS:  Do the best you can, would

 8   you please.

 9           OFFICER RASIC:  Okay, I'll try.

10           CHIEF KOLETSOS:  Okay.

11           OFFICER RASIC:  Thank you.

12           CHIEF KOLETSOS:  All right, thanks, bye.

13   BY MS. PARKER:

14           Q.    Were you frustrated after that

15   conversation?

16           A.    After, no.  At the beginning of the

17   conversation, yes.

18           Q.    Okay, and you wanted him to come back to

19   work; correct?

20           A.    I wanted to know what the status was.

21   That is when I came back from my vacation.  My Deputy

22   Chief had let me know he was looking to extend this
```

07:21PM (line 15)

07:21PM (line 20)

1    time, and at that time I was shocked to the fact he

2    wanted to extend as far as he did.  It was like when

3    I come back, and things are stacked all around you,

4    it is like getting hit in the head with a brick.  Now

07:21PM   5    we have got to rework the schedule again for probably

6    the third time cancelling people's days off in order

7    to cover that time.  That was somewhat of a shock.  I

8    didn't expect him to request to be off that length of

9    time.

07:22PM   10         Q.    But you knew he was entitled to

11    12 weeks?

12         A.    I said that before.  He certainly is

13    entitled to 12 weeks which he did have his 12 weeks,

14    and I think a little more than 12 weeks which I

07:22PM   15    continued to pay him for also during that time even

16    after this conversation and so forth.

17         Q.    Now prior to this conversation, there

18    was a July 10th subpoena in the D.U.I. case; is that

19    correct?

07:22PM   20         A.    I would have to go back and look.  I

21    think there was a couple.  I don't really know.

22         MR. McGRATH:  Before we get to that line of

1    questioning, could we just have an agreement -- I

2    asked the court reporter not to try to take down the

3    transcript of the recording from the tape or what was

4    stated from the tape.  Is there an agreement whatever

07:22PM    5    was transcribed accurately reflects what was on the

6    tape?  It was explained before.  If you had a chance

7    to listen to the tape and apparently it was

8    transcribed by Mr. Murphey or Mr. Murphey's office --

9              MS. PARKER:  I have not seen this transcript.

07:23PM   10    I do have something for the --

11              MR. MURPHEY: I thought Marie did.

12              COURT REPORTER:  I never transcribed that

13    one.

14              MR. MURPHEY:  This is the one I am thinking

07:23PM   15    of.  I thought I sent it to you.

16              MR. McGRATH:  When we take a break she will

17    do it again so there is a record of it, or I will

18    give it to you, but certainly if she did it before --

19              MR. MURPHEY:  I think we both agree she

07:23PM   20    didn't do it.

21              MR. McGRATH:  It is difficult.  It is hard to

22    listen to.  You to have listen a couple of times.

MARIE L. ROGERS, C.S.R. (708) 430-2520    00208

1          MS. PARKER:  I want to make sure the content

2     is on the record how ever we do it.

3          MR. MURPHEY:  No objection.

4          MR. McGRATH:  Marie, you will transcribe it

07:23PM   5     into the record?

6          COURT REPORTER:  Yes, I will.

7     BY MS. PARKER:

8          Q.   Okay, you know, I believe O'Callaghan

9     testified that Officer Rasic did receive a July 10th

07:24PM   10    subpoena for the D.U.I. case.  Would you dispute

11    that?

12         A.   I just don't have -- I would have to see

13    what dates and so forth, because like I say, I was

14    not involved from all of that at that time.

07:24PM   15         Q.   Okay, Exhibit 11 --

16         MR. MURPHEY:  Our Exhibit 11?

17         MS. PARKER:  Yes.  Do you have it there?

18         THE WITNESS:  Yes.

19    BY MS. PARKER:

07:25PM   20         Q.   Okay, the second page, the last entry

21    there states July 10, 2007, continued?

22         A.   Yes.  That would be the date.

1          Q.    And you are aware that Officer Rasic

2     didn't go to that date; did he?

3          A.    I believe -- well, I am aware of it now.

4     On that date I was not aware of it, no.

07:26PM   5          Q.    Was he disciplined for not appearing on

6     that date?

7          A.    No.

8          Q.    And then after his failure to appear on

9     July 10th, you contacted him on July 23rd, and that

07:26PM  10     is the tape we just heard?

11          A.    Yes.

12          Q.    And you wanted him to come back to work

13     like you testified to that?

14          A.    As soon as he can.

07:26PM  15          Q.    On July 24th, the very next day after

16     that conversation, you made a couple orders for

17     Officer Rasic to appear in court and not to call the

18     state's attorney; correct?

19          A.    Yes.

07:26PM  20          Q.    And did you do that because you were

21     upset with him for not agreeing to come back to work

22     on July 23rd?

00240

MARIE L. ROGERS, C.S.R. (708) 430-2520

1         A.    No.

2         Q.    Okay, now you charged Officer Rasic with

3    insubordination for saying:  Okay, king?

4         A.    Correct.

07:27PM  5         Q.    And isn't it true that Officer Rasic

6    tried to explain to you that he was referring to his

7    son?

8         A.    Yes.

9         Q.    During this conversation?

07:27PM  10        A.    Yes.

11        Q.    You didn't really allow him to finish

12   his explanation to you?

13        A.    I didn't believe what he was telling me,

14   no.

07:27PM  15        Q.    Are you aware of a department general

16   order that states that an employee is not required to

17   obey an order that's unlawful?

18        A.    That is correct.

19        Q.    Yet you ordered Officer Rasic to go back

07:28PM  20   to work when he was on approved family medical leave?

21        MR. MURPHEY:  Objection.  Calls for legal

22   conclusion.  Argumentative.

MARIE L. ROGERS, C.S.R.  (708) 430-2520

1    BY MS. PARKER:

2         Q.   Well, the question is:  You ordered him

3    back to work?

4         MR. MURPHEY:  Objection.  Objection.  He

07:28PM    5    ordered him to obey a court subpoena.

6         MS. PARKER:  Which we have established is an

7    order to return to duty.

8         MR. MURPHEY:  That is argumentative.

9         MR. McGRATH:  Yes, if you would rephrase the

07:28PM   10    question.

11    BY MS. PARKER:

12         Q.   Okay, you ordered Officer Rasic not to

13    call the state's attorney; correct?

14         A.   That's correct.

07:28PM   15         Q.   Even though Officer Rasic was under

16    threat of penalty for contempt for failing to call

17    the state's attorney?

18         A.   Our policy is that you have to get

19    approval from a command staff member, the Deputy

07:28PM   20    Chief, or Chief of Police.  He did not have that

21    approval from me, plus he was under subpoena.  I did

22    not give him that leeway per our general order to

1    make that contact himself.

2         MS. PARKER:  Okay, I have no further

3    questions.

4         MR. McGRATH:  Any redirect?

07:29PM   5         MR. MURPHEY:  No questions.  We would offer

6    Chief's 12 through 16: 12 being the March 11, 2002,

7    order relative to court appearances; 13, the July 25,

8    2003, order regarding court attendance; 14, the May

9    22, 2007, documentation regarding the leave request

07:29PM  10    by Officer Rasic; Exhibit 15 being the July 13th

11    supplemental memo regarding the same request.  This

12    one to the records supervisor; and Exhibit 16 being

13    the memorandum from the Chief to Rasic approving the

14    extension of the leave.

07:30PM  15         MR. McGRATH:  Any objection to those exhibits

16    being entered into evidence?

17         MS. PARKER:  No objection.

18         MR. McGRATH:  Counsel, you stopped at 16;

19    correct:

07:30PM  20         MR. MURPHEY:  Yes.

21         MR. McGRATH:  As far as 17 and 18, you are

22    not going to admitt at this time?

```
 1              MR. MURPHEY:  17 in rebuttal.

 2              MR. McGRATH:  All right.

 3              MR. MURPHEY:  Anticipated.  I don't think I

 4      have an 18.  Let me see.  May 1st.  Hold on.

 5              MS. PARKER:  There is no testimony regarding

 6      Exhibit 18.

 7              MR. MURPHEY:  Excuse me, 17, we are offering

 8      17.  I take that back.  17 is the Chief's memorandum

 9      to self relative to the conversation he had with

10      Rasic.

11              MR. McGRATH:  I have number 17 appearing to

12      be a message.

13              MR. MURPHEY:  That is the handwritten note.

14      That is his memorandum to self regarding his

15      conversation with Rasic on the 23rd of July.

16              MS. PARKER:  No objection to 17.

17              MR. MURPHEY:  That is the Officer's paid

18      leave time, his balance, his sick time balance to

19      date, so we offer 17 too.  Okay, I was looking

20      through the packet.  18 is the one I didn't use.

21              MR. McGRATH:  So there is no objection 12

22      through 17?
```

07:30PM
07:31PM
07:31PM
07:31PM
07:31PM

00244

1          MS. PARKER:  No objection.

2          MR. McGRATH:  These exhibits will be entered

3     into evidence.  Anything further to be offered on

4     behalf of the Chief?

07:31PM    5          MR. MURPHEY:  No, Chief rests.

6          MR. McGRATH:  Would you like a couple minutes

7     to put on your case on, or like to go right into it?

8          MS. PARKER:  We'd like to go right into it.

9          MR. McGRATH:  You may call your first

07:32PM   10    witness.

11         MS. PARKER:  I call Officer Dan Rasic.

12         MR. McGRATH:  You are still sworn in from the

13    last time.

14              D A N I E L   R A S I C

15    called as a witness by the Union, having been duly

16    sworn, was examined and testified as follows:

17            D I R E C T   E X A M I N A T I O N

18    BY MS. PARKER:

19         Q.    Could you state your name for the

07:32PM   20    record.

21         A.    My name is Daniel Rasic, R-a-s-i-c.

22         Q.    And what is your position?

1            A.     It is officer with the City of

2      Northlake, police officer.

3            Q.     How long have you held that position?

4            A.     Since December 30, '99.

07:33PM    5            Q.     And as a police officer, what are your

6      duties?

7            A.     My duties are to respond to domestics,

8      to assist citizens, to protect the citizens of the

9      City of Northlake from danger, and enforce the laws.

07:33PM   10            Q.     And what languages do you speak?

11            A.     I speak Serbian which helps me with

12      other Slavic languages which is I know Polish, a

13      little bit Polish, Slovak, Bulgarian, Russian.

14            Q.     And why is that important?

07:33PM   15            A.     I feel it is important.  It encompasses

16      all the different nationalities we have in and around

17      the City of Northlake that come through Northlake or

18      reside in Northlake.  It helps me to enforce the laws

19      quicker so there is no communication barrier.  It has

07:33PM   20      been often that I had to translate and do things like

21      that.

22            Q.     How many other officers on the force

1    have that skill?

2           A.    Offhand I think there is like two or

3    three that have that skill, not fluently with that

4    many languages, Spanish or just one language other

07:34PM    5    than English.

6           Q.    Now as an officer you received

7    subpoenas?

8           A.    Yes.

9           Q.    And why did you get subpoenas?

07:34PM   10           A.    I guess so that is to testify to a

11    certain arrest to what I witnessed.

12           Q.    How many subpoenas a month would you

13    estimate that you receive?

14           A.    Well, being on the day shift it is a

07:34PM   15    little bit less than midnights or something.  I used

16    to get a lot of D.U.I.s on midnights.  On the average

17    one or two a month.

18           Q.    So in eight years, how many subpoenas

19    have you missed?

07:34PM   20           A.    In the beginning of my career I missed

21    about two of them for illness, and then this one, so

22    all together about three that I can recall in eight

1   years.

2       Q.   And can you calculate in eight years if

3   you did one to two subpoenas a month how many

4   subpoenas over eight years would that be?

07:35PM  5       A.   It is -- I don't know.  Rough amount

6   would be 60 give or take, you know.  I am not sure.

7       Q.   Have you ever been unable to attend

8   subpoenas in the past?

9       A.   Yes.

07:35PM  10       Q.   And what have you done?

11       A.   I have called the department and called

12   the state's attorney to let them know why I can't

13   come for the subpoena.

14       Q.   And when you have done that, what sort

07:35PM  15   of discipline did you receive?

16       A.   If I followed those orders, I never

17   received discipline for following those orders.

18       Q.   Prior to your suspension that you are

19   currently on, what was your employment status?

07:36PM  20       A.   Prior to my suspension I was on leave,

21   family medical leave.

22       Q.   And when did that begin?

1      A.    That began July 6th in the morning.    My

2  daughter was born at 5:54 at Lutheran General

3  Hospital.

4      Q.    Could you look at Union Exhibit 5.    It

07:36PM    5  should be here.

6      A.    Okay.

7      Q.    Can you tell me what that is?

8      A.    It is an application for leave usually

9  done for vacation or sick time or any other reasons

07:36PM   10  for not being at my job.

11      Q.    And what does it indicate what is the

12  date that you started your leave?

13      A.    Here it indicates 7/6/07 at 6:45 a.m.

14      Q.    And what response did you get to your

07:37PM   15  request for the leave?

16      A.    I had a written okay basically from the

17  Labor Department sheet that was okayed by the leave.

18      Q.    And then what happened after that with

19  regard to your leave?

07:37PM   20      A.    I found out that my father was in

21  critical condition over his numerous surgeries, and

22  that he was supposed to have another surgery, and I

1  called my employer right away after I talked to the

2  surgeon, that there was a possibility of another

3  surgery, and the danger involved, to let my employer

4  know of my extension.

07:36PM    5      Q.    What was the response from the

6  department?

7      A.    The response was it was okay at that

8  time.

9      MR. MURPHEY:  Objection.  Foundation.  You

07:38PM    10  know, human beings.  Who did you have a conversation

11  with?  Where?  When?

12      MR. McGRATH:  Can you follow up and clear

13  that up a little bit.

14      MS. PARKER:  Sorry.

07:38PM    15  BY MS. PARKER:

16      Q.    Okay, so you requested an extension.

17  Who did you talk to when you requested that

18  extension?

19      A.    The Chief, Chief Koletsos.

07:38PM    20      Q.    And do you remember what day that was?

21      A.    Offhand I don't know.  I would have to

22  look at the exhibit.

GG:50

1    Q.    Okay, could you look at the Chief's

2    Exhibit 16.

3           A.    Okay.

4           Q.    What was the Chief's response to your

07:39PM  5    extension request?

6           A.    It was granted.

7           Q.    When was your return date from your

8    family medical leave?

9           A.    It was unknown at that time.

07:39PM  10    Q.    Did you inform the department of your

11    return date at some point?

12           A.    I informed -- at that time I don't

13    remember exactly, but I did want to come back around

14    the 1st depending on the situation of the

07:39PM  15    circumstances of my family.

16           Q.    So around September 1st what happened

17    then?

18           A.    I wanted to come back around September

19    3rd, but because of the deteriorating situation with

07:39PM  20    my father, I decided to extend it, but the whole time

21    I did explain that it was unknown, but I would like

22    to come back the 3rd, but it not for sure.

00251

MARIE L. ROGERS, C.S.R. (708) 430-2520

1          Q.    And what date did you end up informing

2      the department that you would come back?

3                A.    The final date I was going to come back?

4                Q.    Yes.

07:40PM    5                A.    I spoke -- I left messages that I was

6      going to come back about three weeks ago, because my

7      leave ended September 28th, so that was about two,

8      three weeks before that I let them know finally that

9      I was extending to the maximum 12 weeks.

07:40PM    10               Q.    Okay, you received a subpoena to attend

11     court on July 10th?

12               A.    Yes.

13               Q.    And what did you do when you received

14     that or when did you receive that subpoena?

07:40PM    15               A.    I received that approximately like at

16     the end of May before I went on my leave.

17               Q.    And what did you do in response to this

18     subpoena?

19               A.    What I did was as soon as the birth of

07:41PM    20     my daughter occurred, I let the state's attorney know

21     that I was unable to attend court because of the

22     birth of my daughter which was July 6th.

GG252

MARIE L. ROGERS, C.S.R.  (708) 430-2520

Case 1:08-cv-00104   Document 20-7   Filed 02/15/2008   Page 45 of 46

1          Q.    Who else did you notify?

2          A.    I did not notify the department because

3    they were already aware of my leave, so I figured I

4    didn't have to call them at that time because they

07:41PM    5    already new of my leave status.

6          Q.    What was your discipline as a result of

7    that failure to appear?

8          A.    There was no discipline.

9          Q.    Now you had a series of conversations or

07:41PM   10    there were a series of events in the end of June and

11    July of '07.  Can you tell us what those

12    conversations were?

13          A.    In July?

14          Q.    Yes.

07:42PM   15          A.    With the department?

16          Q.    Yes.

17          A.    Yes, I received a phone call from the

18    Chief on the 23rd, and there was a message left, so I

19    called back the Chief.

07:42PM   20          Q.    Okay, and what was your sense of the

21    Chief's intent in calling you?  What was your sense

22    after you talked to the Chief?  How did that make you

00253

1    feel?

2              A.    After the July 23rd conversation?

3              Q.    Yes.

4              A.    It made me feel basically harassed to

07:42PM    5    come back to work.

6              Q.    And what happened after that?

7              A.    After that I received a call in the

8    morning from Sergeant Tzinis that I would have to

9    attend court on a subpoena that was ordered by Chief

07:43PM   10    Koletsos.

11             Q.    And what did you think was going on with

12    that order?

13             A.    It with very shocking to me.  As we

14    already knew, July 10th nothing occurred, so after

07:43PM   15    the conversation of the 23rd, I thought it was very

16    unusual for me to receive a call right away on the

17    24th ordering me to report for duty.

18             Q.    Now you heard, we all heard the tape of

19    the July 24th conversation, and you made a series of

07:43PM   20    comments and one of them was:  Okay, king.  Could you

21    explain that.

22             A.    Yes, I said:  Okay, king, because that

MARIE L. ROGERS, C.S.R.  (708) 430-2520