|  |  |  |
|---|---|---|
| **DANIEL RASIC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 08 C 104** |
| **v.** | ) | |
| | ) | **Magistrate Judge Sidney I. Schenkier** |
| **CITY OF NORTHLAKE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Daniel Rasic, brought this action against the City of Northlake, Northlake Police Chief Dennis A. Koletsos, the Northlake Police Commission, and Commissioners Roberta Larson, Manuel Ferra and Gary Merchant (doc. # 1). Plaintiff complains that Northlake and Chief Koletsos violated the Family Medical Leave Act ("FMLA") by interfering with his rights under the FMLA and by retaliating against him for exercising those rights (*id.*). Plaintiff also seeks administrative review of the termination decision of the Northlake Police Commission (*id.*). By consent of the parties and pursuant to 28 U.S.C. § 636(c) (2005), the case was assigned to this Court for all proceedings, including the entry of final judgment (doc. # 26).

Mr. Rasic has moved for summary judgment against Northlake and Chief Koletsos as to liability on his FMLA counts (doc. # 63); Northlake and Chief Koletsos have moved for summary judgment in their favor on the same counts, and have further requested that if the Court grant their motion, it also decline to exercise supplemental jurisdiction over the administrative review action

1

or it affirm the Commission's decision (doc. # 60).[1] Mr. Rasic objected to certain portions of defendants' statement of material facts and asked that they be disregarded though he did not separately move to strike them (Pl.'s Resp. to DSOF at 2 (doc. # 69)).[2] Defendants, in turn, filed a motion to strike certain portions of plaintiff's response to their statement of material facts (doc. # 71).

For the following reasons, plaintiff's motion to strike and motion for summary judgment are denied. Defendants' motion to strike is granted in part and denied in part. Defendants' motion for summary judgment is granted as to Count I (the FMLA interference claim), and denied as to Count II (the FMLA retaliation claim). To the extent that defendants seek dismissal of Count III (the administrative review claim) for lack of supplemental jurisdiction, we deny that request as there remains in the case a primary federal law claim. We defer consideration of the administrative review claim until resolution of all federal claims.

**I.**

We begin with the well-established legal standards governing summary judgment motions. Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law of the

---

[1] Plaintiff's summary judgment memorandum is cited as "Pl.'s Mem." (doc. # 64); defendants' memorandum in opposition is cited as "Defs.' Opp. Mem." (doc. # 68); defendants' summary judgment memorandum is cited as "Defs.' Mem." (doc. # 62); plaintiff's memorandum in opposition is cited as "Pl.'s Opp. Mem." (doc. # 66).

[2] Plaintiff's response to defendants' statement of material facts is cited as "Pl.'s Resp. to DSOF" (doc. # 69); defendants' response to plaintiff's statement of material facts is cited as "Defs.' Resp. to PSOF" (doc. # 67).

claims at issue determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The party seeking summary judgment bears the burden of establishing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To withstand a motion for summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case. *Id.* at 323. If there is no triable issue of fact on even one essential element of the nonmoving party's case, summary judgment is appropriate. *Id.* In ruling on a summary judgment motion, a court must construe all facts in a light most favorable to the nonmoving party, drawing all legitimate inferences and resolving all doubts in favor of that party. *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999). Summary judgment must be denied where the nonmoving party identifies facts that are both material and genuinely disputed. *Celotex*, 477 U.S. at 324.

## II.

As a preliminary matter, we consider the parties' respective motions to strike. We begin with plaintiff's objections to defendants' statement of material facts, which we consider as a motion to strike. For the reasons that follow, we deny plaintiff's motion to strike.

Plaintiff argues that defendants' statement of undisputed facts exceeds the limit imposed by local rule (Pl.'s Resp. to DSOF at 2). Northern District of Illinois Local Rule 56.1 provides in pertinent part that "a movant shall not file more than 80 separately-numbered statements of undisputed material fact." N.D. Ill. Local R. 56.1(a), available at

3

http://www.ilnd.uscourts.gov/home/LocalRules.aspx?rtab=localrule (follow Rule "56.1" hyperlink). Defendants' Rule 56.1 statement of facts contains 79 numbered paragraphs. However, plaintiff essentially argues that each of defendants' multiple factual assertions within a numbered paragraph should be considered a discrete "factual statement." From that premise, plaintiff argues that by paragraph 33 of their statement defendants reached the limit of 80, and that we therefore should disregard defendants' statements of fact contained in paragraphs 34-79 (Pl.'s Resp. to DSOF at ¶ 2).

Although this Court is entitled to demand strict compliance with its Local Rules, whether to do so is entrusted to the Court's discretion. *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). We decline to interpret the limitation in Rule 56.1 in the technical fashion that plaintiff urges, and instead interpret it more consistently with its application in practice. *See e.g., Hall v. Aurora*, No. 06 C 6011, 2008 WL 4877156, *7 (N.D. Ill., June 13, 2008). We have reviewed defendants' statement of facts, and we do not consider their numbered fact statements to combine so many unconnected facts that disregarding 46 of defendants' 79 statements is warranted.

Plaintiff also seeks to strike certain of defendants' asserted facts on the ground that they are argumentative and/or state legal conclusions (Pl.'s Resp. to DSOF at 2). We agree that certain of defendants' asserted facts contain legal conclusions. However, we decline to strike those statements in their entirety. In reaching our determinations, we have focused on the facts defendants have asserted, and not on their legal conclusions and characterization of those facts.

We next turn to defendants' motion to strike. *First*, defendants assert that certain paragraphs of plaintiff's response violate Local Rule 56.1(b)(3)(B) and this Court's Case Management Procedures insofar as plaintiff admitted certain facts asserted by defendants but then added additional facts in his response (Defs.' Mot. to Strike at ¶ 10). Plaintiff argues that while his responses to

defendants' statement of facts may contain certain assertions of additional facts, he did so only to provide context or to correct the false implications of defendants' arguments and statements. We agree with defendants that plaintiff should not have included additional facts in his response. The place to challenge the meaning of asserted facts is respondent's memorandum of law. Case Mgmt. Procedures, available at http://www.ilnd.uscourts.gov/home/Judges.aspx?get=magistrate (follow "Presiding Magistrate Sidney I. Schenkier" hyperlink; then follow "Motions for Summary Judgment" hyperlink). That said, we note that many of plaintiff's asserted facts contained in his response to defendants' submission also are set forth in his own statement of material facts supporting his cross motion for summary judgment as to the same issues – indeed, some of plaintiff's responses duplicate facts contained in the fact statement he filed in support of his motion for summary judgment, and thus are before the Court in any event. We decline to strike the responses on this ground.

*Second*, defendants argue that certain paragraphs of plaintiff's response are improper because they contain legal objections (Defs.' Mot. to Strike at ¶ 11). We see nothing wrong with setting forth legal objections to fact statements, which serves the same purpose as a motion to strike: identifying factual assertions that a party argues the Court should not consider in deciding a summary judgment motion. Moreover, despite his objections, plaintiff responded to each of defendants' asserted facts. We decline to strike plaintiff's responses on this ground.

*Third*, defendants argue that certain paragraphs of plaintiff's response are improper because they are overly lengthy (Defs.' Mot. to Strike at ¶ 12). Plaintiff argues that his responses are lengthy because defendants' asserted facts themselves are too lengthy (Pl.'s Opp. Mot. to Strike at 4). We agree that certain of plaintiff's responses to defendants' asserted facts are lengthy because they are line-by-line responses to lengthy paragraphs presented by the defendants. Still others, however, are

5

lengthy for no good reason. For example, plaintiff included in his response to three of defendants' asserted facts quotes from transcripts that were submitted as part of the record (*see* Pl.'s Resp. to DSOF at ¶¶ 23, 24, 25). However, we do not find the violation to be of a sufficient magnitude to warrant striking the responses.

*Fourth*, defendants argue that certain of plaintiff's responses are improper because they are argumentative and/or contain legal argument (Defs.' Mot. to Strike at ¶ 13). Plaintiff asserts that he was compelled to include legal argument in order to put defendants' assertions of fact in the proper context for the court (Pl.'s Opp. Mot. to Strike at 4). We agree that some of the responses about which defendants complain (specifically, paragraphs 36 and 75) contain legal arguments which, in accordance with our rules, should be presented in the memorandum of law. We strike as improper argument the last statement of plaintiff's response to defendants' statement of material facts paragraph 36, and the second and third to last statements of plaintiff's response to paragraph 75 (which argument, we note, is repeated anyway in plaintiff's memorandum of law (Pl.'s Opp. Mem. at 8-9)). However, we decline to strike the other challenged responses; instead, we focus on the factual assertions contained in plaintiff's responses, and not the plaintiff's characterization of them.

### III.

We set forth the material facts that are relevant to the cross motions for summary judgment and taken from plaintiff's statement of material facts ("PSOF") (docs. #65, 69) and defendants' statement of material facts ("DSOF") (doc. # 61).[3] Many of the facts are undisputed. Where a fact

---

[3] In responding to each other's summary judgment motions, the parties each submitted Local Rule 56.1(b)(3) statements of additional facts (doc. ## 69, 70). Neither side responded to the other's additional statements. In the ordinary course, this would mean that any well-supported statement would be deemed admitted. Fed. R. Civ. P. 56(e). We decline to do that here, where the statements of additional facts substantially repeat the asserted facts set forth in each side's own Local Rule 56.1(a) statements of fact supporting each cross motion for summary judgment.

has been genuinely disputed and is material, that is noted. Where a fact has been disputed, but the dispute is immaterial or not genuine, that too is noted.

Mr. Rasic was employed by the Northlake Police Department from 1999 until approximately November 2007 (DSOF ¶ 1; PSOF ¶ 3). During the events at issue here, Dennis A. Koletsos was the Chief of Northlake Police Department (DSOF ¶ 3; PSOF ¶ 5) and Norman A. Nissen, Jr., was the Deputy Chief of the Northlake Police Department (DSOF ¶ 9).

In anticipation of the birth of his daughter, on May 14, 2007, Mr. Rasic requested FMLA leave to begin approximately July 15, 2007 (DSOF ¶ 9; PSOF ¶ 6). His request was granted by Deputy Chief Nissen the next day (*id.*). On the morning of his daughter's birth, July 6, 2007, Mr. Rasic called the Northlake Police Department to give notice that he was beginning the anticipated FMLA leave immediately (DSOF ¶¶ 10, 12). The delivery involved complications as the baby was born with the umbilical cord wrapped around her neck (PSOF ¶ 8). Mr. Rasic's daughter remained in the hospital for several days after her birth (*id.*).

In the year prior to the birth of his daughter, Mr. Rasic had arrested Jean Paul Galvez for driving under the influence of alcohol after a caller reported to the police that a car had struck a tree (DSOF ¶ 4). Mr. Rasic had been subpoenaed to appear in court with respect to the Galvez case on November 28, 2006, December 19, 2006 and April 17, 2007, and he estimates that he appeared in court on the Galvez matter three or four times before taking his FMLA leave (DSOF ¶ 7, citing Defs.' Group Ex. 2, Defs.' Ex. 36 at 27-30). When Mr. Rasic requested his FMLA leave, the Galvez case was still pending and Mr. Rasic still was under subpoena to appear in court for it; he also was still under subpoena for a pending juvenile case (DSOF ¶ 12). Pursuant to Northlake Police Department Rules of Conduct, a subpoena constitutes "an order to report for duty" (Pl.'s Ex. H;

Defs.' Ex. 23). With respect to the Galvez case, Mr. Rasic acknowledges that as the arresting officer, he was an important witness in its prosecution (DSOF ¶ 8, citing Defs.' Ex. 36 at 26-27).

A subpoena was issued for Mr. Rasic to appear in court on the Galvez matter on July 10, 2007, just four days after the birth of his daughter (DSOF ¶ 14). He did not appear in court that day, and he did not contact the police department regarding the Galvez case between his daughter's birth and the July 10, 2007 court date (DSOF ¶¶ 12, 16). The assistant state's attorney ("ASA") handling the matter, Sean O'Callaghan, began the trial anyway, calling other witnesses to testify (DSOF ¶ 17). Upon the state's request that day, the trial was continued until August 7, 2007 (DSOF ¶ 18).

On July 13, 2007, Mr. Rasic left a voice-mail for Chief Koletsos requesting an extension of his FMLA leave (DSOF ¶ 19, citing Defs.' Ex. 7). Mr. Rasic explained on the message that he needed additional time to care for his daughter as well as his father, who had suffered complications from a surgery during the same time period (Defs.' Ex. 7). Chief Koletsos granted the request by return voice-mail the same day (DSOF ¶ 20, citing Defs.' Ex. 8). Chief Koletsos also followed up the same day with a memorandum and completed U.S. Department of Labor Form entitled "Employer Response to Employee Request for Family or Medical Leave" confirming the extension of Mr. Rasic's FMLA leave (DSOF ¶ 20; Defs.' Ex. 9; Pl.'s Ex. D). The form acknowledged that Mr. Rasic had notified his employer that day of the need for additional leave of unknown duration beginning on August 11, 2007 (the original leave expiration date) due both to the birth of a child and a parent's serious health condition for which he was needed to provide care (Defs.' Ex. 9; Pl.'s Ex. D).[4] The form stated that Mr. Rasic was eligible for FMLA leave, and that he would "not be required

<hr />

[4] The parties dispute, however, the basis upon which Rasic's extension of FMLA leave was allowed. *See e.g.*, Defs.' Resp. to PSOF ¶ 7.)

8

to furnish medical certification of a serious health condition" (*id.*) As had been the case with his initial period of FMLA leave, the form also advised Mr. Rasic that he was obligated to provide reports every Monday of his status and intent to return to work (*id.*). Mr. Rasic did so by calling the Northlake Police Department every Monday during his leave (PSOF ¶ 10).

On July 23, 2007, Mr. Rasic and Chief Koletsos spoke by telephone about Mr. Rasic's FMLA leave (PSOF ¶ 11; Pl.'s Ex. E). Though the import of the July 23, 2007 telephone conversation is disputed amongst the parties, it's recorded content is not (Defs.' Ex. 11 ; Pl.'s Ex. E).[5] During the call, Mr. Rasic told Chief Koletsos that he was planning on returning from FMLA leave on September 1, 2007, to which Chief Koletsos responded: "Yeah, well, we need you back before that, so start making some plans, okay?" (Defs.' Ex. 11 at 2; Pl.'s Ex. E at 2). Mr. Rasic replied, "Okay, I'll try and get back as soon as I can." Chief Koletsos then said, "All right, I'm not letting you take off the summer anymore like this, Dan, okay. Everybody else has kids. You need to start making some plans to come back, okay" (*id.*). Mr. Rasic replied that he would, and then added, "But like I said, it wasn't just my son too. It's my father. He's in a nursing home at Villa Scalabrini" (*id.*) Chief Koletsos said that he understood, but that "[e]verybody – you know, a lot of people are dealing with elderly parents that are sick and terminally ill . . . You got to come back to work though, you know. I mean, you know, you're going to be off all summer here. It's a busy summer. We got a lot of people filling in for you and stuff. You got to start thinking of the department too, you know, okay?" (Defs.' Ex. 11 at 2-3; Pl.'s Ex. E at 2-3). Chief Koletsos asked Mr. Rasic to do the best he could to return earlier, and Mr. Rasic responded, "Okay, I'll try" (*id.*).

---

[5] Calls on the Northlake Police Department telephone lines are recorded, and several of the relevant conversations in this case later were transcribed. The parties each submitted transcripts of those calls, and unless otherwise noted, the parties do not dispute their substance.

9

The call ended with no change in Mr. Rasic's return date. Chief Koletsos placed a note in the file stating that he had "advised [Mr. Rasic] to do the best he can to come back" (Pl.'s Ex. F).

The next day, July 24, 2007, Mr. Rasic spoke with Sargent James Tzinis regarding a subpoena commanding Mr. Rasic's appearance in court on the Galvez matter on August 7, 2007 (DSOF ¶ 26). The conversation was recorded. Mr. Rasic told Sargent Tzinis that he needed to talk to Chief Koletsos about the Galvez case because Chief Koletsos was "pursuing" that Mr. Rasic attend the Galvez court date despite that he would still be on FMLA leave at that time (Pl.'s Ex. O at 6; Defs.' Ex. 12 at 6). Sargent Tzinis responded that he had told Chief Koletsos of the date conflict, and that Chief Koletsos had said that Mr. Rasic still would have to go to court (*id.*) Sargent Tzinis also told Mr. Rasic that "the last time I talked to [Chief Koletsos] was last week sometime about this, so if anything happened, hopefully give him another ring and ask him about the subpoena if you're not going to be able to make it" (Pl.'s Ex. O at 11; Defs.' Ex. 12 at 11).

Mr. Rasic then tried to call Chief Koletsos, but since he was not yet in the office, Mr. Rasic spoke briefly with Deputy Chief Nissen (Pl.'s Ex. J; Defs.' Ex. 13). Mr. Rasic asked Deputy Chief Nissen if he knew anything about the Galvez subpoena (Pl.'s Ex. J at 3; Defs. Ex. 13 at 3). Deputy Chief Nissen stated that he did not, but that if Chief Koletsos had told Mr. Rasic to go to court, there was nothing he could do to change it (*id.*).

Later that day, Mr. Rasic and Chief Koletsos had a conversation about the Galvez subpoena that forms a focal point of this case (DSOF ¶ 32, citing Defs.' Ex. 14; Pl.'s Ex. K). The conversation began with Mr. Rasic asking Chief Koletsos about his position that Mr. Rasic was required to attend the Galvez court date (Defs.' Ex. 14 at 1-2; Pl.'s Ex. K at 1-2). Chief Koletsos explained, "You have to go to court, Dan. I'm ordering you to go to court that day, okay" (*id.* at 2). Chief Koletsos added,

10

"I'm ordering you. You cannot violate a subpoena whether you are on family medical leave or not. We've tried to get it continued and it's not being continued" (*id.*). Mr. Rasic told Chief Koletsos that he was "making a big deal" out of the subpoena issue, and Chief Koletsos responded by stating that Mr. Rasic was out of line (*id.* at 3-4). Mr. Rasic said, "Of course I'm always out of line" (*id.* at 4). Chief Koletsos responded "You certainly are out of line, okay" to which Mr. Rasic replied, "You're harassing me, Chief" (*id.*).

Mr. Rasic then said he would "call the court" to request a change in the subpoenaed date. In response, Chief Koletsos ordered him not to do so, and to go to court on August 7 as required by the subpoena (*id.*). Chief Koletsos asked whether Mr. Rasic understood his "direct order to go to court," and Mr. Rasic said, "Okay, fine, then I will call the court and find out what is going on" (*id.*). Chief Koletsos repeated his order that Mr. Rasic go to court that day (*id.* at 5). Mr. Rasic said "okay," Chief Koletsos said "okay," and Mr. Rasic said "okay King" (*id.*). When Chief Koletsos asked him what he had just said, Mr. Rasic said that his last comment had been directed to his son (*id.*). Chief Koletsos rejected the explanation and said that he would charge Mr. Rasic with insubordination (*id.*). Mr. Rasic responded, "Of course you are. Of course you are, Chief. You're harassing me. I'll see you in federal court" (*id.*) Mr. Rasic again said that the comment had been directed to his son, but when Chief Koletsos said, "All right, Dan," Mr. Rasic added, "God, you're out of control" (*id.*). The call ended shortly thereafter.

Meanwhile, that same day, another subpoena commanding Mr. Rasic's appearance in court in a juvenile matter was issued (Defs.' Ex. 15). It commanded Mr. Rasic's appearance in court on August 1, 2007 (*id.*).

On July 25, 2007, in violation of Chief Koletsos' order, Mr. Rasic contacted ASA

11

O'Callaghan and asked to be released from the August 7, 2007 subpoena in the Galvez case (DSOF ¶ 36, citing Defs.' Ex. 36 at 77-78 and Ex. 31 at 28-29). ASA O'Callaghan told Mr. Rasic that the subpoena date had been extended to August 7 so that Mr. Rasic could appear, and that ASA O'Callaghan needed him to testify on that date (DSOF ¶ 37). Mr. Rasic said that he would be on FMLA leave then and that he would not be in court that day (*id.*). The parties dispute whether ASA O'Callaghan told Mr. Rasic that he would be forced to dismiss the case if Mr. Rasic did not appear in court (Pl.'s Resp. to DSOF ¶ 38).

Two days later, on July 27, 2007, Mr. Rasic received the subpoenas for the Galvez and the juvenile case by certified mail at his home (DSOF ¶ 44; Defs.' Ex. 15, 16). The subpoenas had been sent from the Northlake Police Department on July 24, 2007, the day of Mr. Rasic's exchange with Chief Koletsos about his FMLA leave (Defs.' Ex. 15, 16). The Galvez subpoena was dated July 16, 2007 and commanded Mr. Rasic to appear in court on August 7, 2007 (Defs.' Ex. 16); the subpoena in the juvenile matter was dated July 24, 2007 and commanded Mr. Rasic to appear in court on August 1, 2007 (Defs.' Ex. 15). On or about the same day, Mr. Rasic called ASA Finley about the subpoena in the juvenile matter (DSOF ¶ 42). Mr. Rasic told ASA P. Finley that he was not going to go to court because he was on FMLA leave (*id.*). A few days later, ASA Finley spoke with Chief Koletsos about his conversation with Mr. Rasic (DSOF ¶¶ 41, 42). Chief Koletsos asked ASA Finley whether he could get the case continued (*id.*). ASA Finley informed him that the case already had been continued and the judge wanted the case to proceed (DSOF ¶ 42).

Mr. Rasic also called the Fourth Municipal District supervising state's attorney, Colin Simpson, on July 27, 2007, to request a continuance of the August 7, 2007 court date in the Galvez case (DSOF ¶¶ 43, 44). ASA Simpson told Mr. Rasic that the case already had been continued for

12

him and that he had to appear as scheduled (DSOF ¶ 45). ASA Simpson said that the state would have to dismiss the Galvez case if Mr. Rasic did not appear (*id.*). ASA Simpson further told Mr. Rasic that his FMLA leave was an issue between Mr. Rasic and Northlake, and that Mr. Rasic must comply with the subpoena (DSOF ¶ 46). ASA Simpson also advised Mr. Rasic of childcare options available to him while he testified (*id.*). After the call, ASA Simpson advised ASA O'Callaghan and Deputy Chief Nissen of Mr. Rasic's call (DSOF ¶¶ 48, 49). ASA Simpson also told Chief Koletsos that Mr. Rasic had called him about the subpoenas, and that he had instructed Mr. Rasic that he must comply with them (DSOF ¶ 50).

Despite the subpoenas and his conversations with his supervisors and the ASA's, Mr. Rasic did not appear in court on August 1 for the juvenile matter or on August 7 for the Galvez case (DSOF ¶¶ 52, 55). The Galvez trial resumed on August 7 in Mr. Rasic's absence (DSOF ¶ 58). Deputy Chief Nissen went to court that day and asked ASA O'Callaghan if he could get a two-month continuance so that Mr. Rasic could testify after his FMLA leave (DSOF ¶¶ 53, 56). ASA O'Callaghan obtained a one-month extension to September 4, 2007 (DSOF ¶ 58).

On August 27, 2007, while Mr. Rasic was still on FMLA leave, Chief Koletsos instituted termination proceedings against him by filing a document entitled "Charges and Specifications" with the Northlake Police Commission (DSOF ¶ 60, citing Defs.' Ex. 21; PSOF ¶ 31, citing Pl.'s Ex. M). In the document, Chief Koletsos alleged that Mr. Rasic had committed twelve violations of the Northlake Police Department's Rules and Regulations by his comments to Chief Koletsos during the July 24, 2007 call, by disobeying Chief Koletsos's order not to call the ASA's, and by failing to appear for the subpoenaed court dates in the Galvez case and the juvenile matter (PSOF ¶ 32, citing Pl.'s Ex. M; Defs.' Ex. 21). Among the items of insubordination that Chief Koletsos charged were

13

Mr. Rasic's assertion that the chief was harassing him, and his statement that he would see the Chief Koletsos in court (*id.*)

Meanwhile, another subpoena was issued the next day for Mr. Rasic to appear in court for the Galvez matter on September 4, 2007 (DSOF ¶ 62, citing Defs.' Ex. 18). Shortly thereafter, Mr. Rasic left a voice-mail for ASA O'Callaghan stating that his father was still ill and he would not appear for the September 4 court date (DSOF ¶ 63). ASA O'Callaghan informed Deputy Chief Nissen and ASA Simpson of Mr. Rasic's message (*id.*). On August 31, 2007, Deputy Chief Nissen issued a memorandum to Mr. Rasic stating that his FMLA leave had been extended to October 22, 2007 (DSOF ¶ 64). Deputy Chief Nissen also asked Mr. Rasic to clarify whether his leave from work was to care for his daughter or his father; if the leave was to care for his father, then Mr. Rasic would need to submit additional paperwork supporting it (*id.*). Defendants had not requested additional information regarding Mr. Rasic's father's condition when they had approved his FMLA leave extension request the month earlier, and indeed, had advised that no further medical certification was necessary (Pl.'s Ex. D; Defs.' Ex.9).

Mr. Rasic did not appear in court pursuant to subpoena on September 4, 2007 for the Galvez case (DSOF ¶ 65). Deputy Chief Nissen again went to court that day and spoke to ASA O'Callaghan about Mr. Rasic's FMLA leave (*id.*) ASA O'Callaghan did not seek another continuance but instead dismissed the case (DSOF ¶ 66). Later that evening, Mr. Rasic left a voice-mail for Deputy Chief Nissen in response to his memorandum and said that he was on leave to care for his daughter (DSOF ¶ 67).[6]

The Northake Police Commission conducted hearings regarding Chief Koletsos' charges

---

[6] The parties dispute the import – but not the fact – of that call (*see e.g.,* Pl.'s Resp. to DSOF ¶ 67).

14

against Mr. Rasic on September 27, 2007, October 4, 2007, October 23, 2007 and November 13, 2007 (Pl.'s Ex. A at ¶ 69; Defs.' Ex. 27). The hearing was held in front of chairperson Roberta Larson and members Manuel Ferra and Gary Merchant (*id.*). Both Mr. Rasic and Chief Koletsos were represented in the proceedings by counsel (Pl.'s Ex. A at ¶ 70; PSOF ¶ 39). At the start of the proceedings, the Commission granted Chief Koletsos's request that upon the conclusion of his FMLA leave on October 22, 2007, Mr. Rasic be suspended without pay pending the Commission's decision as to the charges against him (PSOF ¶ 38, citing Pl.'s Ex. Q at 8-11).[7] During the course of the hearing, the Commission received testimony from Mr. Rasic, Chief Koletsos, Deputy Chief Nissen, ASA O'Callaghan and ASA Simpson (DSOF, Ex. 27).

On December 17, 2007, the Commission found Rasic guilty of all of the charges against him and terminated him from the police force (DSOF ¶ 69). This action followed.

## IV.

In his complaint, Mr. Rasic asserts three claims. *First*, he alleges that Chief Koletsos and Northlake interfered with his FMLA rights. *Second*, Mr. Rasic claims that Chief Koletsos and Northlake violated the FMLA by terminating Mr. Rasic in retaliation for the exercise of his FMLA rights. *Third*, Mr. Rasic seeks review and reversal of the termination decision by the Northlake Police Commission. We address each of these claims in turn.

## A.

Mr. Rasic argues that the defendants interfered with his rights under the FMLA by "deny[ing Mr.] Rasic the benefit of taking FMLA leave without being discouraged from doing so" (Pl.'s Mem.

---

[7] The parties dispute why Koletsos filed the suspension motion, but not whether it was filed (*see* Defs.' Resp. to PSOF ¶ 38).

at 5). Specifically, Mr. Rasic argues that during the July 23, 2007 telephone conversation, Chief Koletsos (acting on behalf of Northlake) discouraged him from taking his full FMLA leave by prevailing on him to return to work before he wished to do so (*id.* at 5-6). Mr. Rasic also claims that Chief Koletsos interfered with his FMLA rights during the July 24, 2007 telephone conversation, by ordering him to refrain from contacting an assistant state's attorney to try to reschedule a court date so he would not have to attend court while on FMLA leave, even though it was customary for police officers to contact assistant state's attorneys to reschedule court dates (*id.* at 7). Finally, Mr. Rasic says that Chief Koletsos also interfered with his FMLA rights during the July 24 conversation by ordering Mr. Rasic to honor the subpoena and to attend the Galvez trial during his FMLA leave, an order that Mr. Rasic claims constituted an order to return to work (and thus to cut short his FMLA leave) (*id.*). For their part, defendants argue that the undisputed evidence establishes that notwithstanding this alleged interference, Mr. Rasic in fact received the full 12 weeks of leave available to him under the FMLA. Defendants argue that because Mr. Rasic cannot point to any FMLA entitlement which he was denied as a result of the alleged interference, defendants are entitled to summary judgment on the interference claim (Defs.' Mem. at 8-9; Defs.' Opp. Mem. at 1-5).

As plaintiff recognizes (Pl.'s Mem. at 7), this case presents the issue of whether a plaintiff can establish an FMLA interference claim without proving that the alleged interference in fact succeeded in depriving plaintiff of FMLA rights. Put another way, this case requires us to consider whether a claim for "attempted interference" that was unsuccessful is cognizable under the FMLA. For the reasons that follow, we hold that it is not.

The FMLA provides an eligible employee up to 12 weeks of leave during a 12-month period

16

for certain enumerated reasons including, among other things, to provide care to the employee's child because of the birth of the child, and to provide care to the employee's parent if the parent has a serious health condition. 29 U.S.C. § 2612(a). After the expiration of FMLA leave, the employee is entitled (subject to certain exceptions not applicable here) to be reinstated to his or her former position or an equivalent one with the same pay, benefits and other conditions and terms of employment that existed prior to the exercise of the leave. 29 U.S.C. § 2614(a). To ensure the availability of these rights, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. §2615(a)(1). Employees who qualify for FMLA rights (those who are "eligible employees") may sue for a violation of Section 2615 to recover damages and to seek equitable relief. 29 U.S.C. § 2617(a)(1).

To prevail on an FMLA interference claim, an employee must show that his employer deprived him of an FMLA entitlement. *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (citing *Hoge v. Honda Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). In order to do so, "the employee must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Id.*

There is no dispute that the first four elements of an interference claim are satisfied in this case (PSOF ¶¶ 1-7; Defs.' Opp. Mem. at 1-5). There is also no genuine dispute that Mr. Rasic

received the full measure of the FMLA leave time that was available to him: 12 weeks.[8] Mr. Rasic cannot show that his ability to exercise his FMLA leave was compromised, and that dooms his interference claim. We find that Mr. Rasic's theory that he was deprived of "the benefit of taking FMLA leave without being discouraged from doing so" (Pl.'s Mem. at 5) fails to satisfy the fifth element of an FMLA interference claim.

In *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002), the Supreme Court considered a claim that the defendant had interfered with plaintiff's FMLA rights by failing to inform her that a 30-week leave of absence would count against her 12-week leave entitlement under the FMLA. To support her claim, plaintiff relied upon a Department of Labor regulation that required the company to grant an employee additional FMLA leave upon a failure to notify the employee that a leave of absence would count against FMLA leave. *Ragsdale*, 535 U.S. at 85-86. The district court granted defendant summary judgment on the ground that defendant had complied with the FMLA by granting plaintiff more than twice the amount of leave required by the FMLA, and that the regulation conflicted with the statute by requiring an employer to provide more than 12 weeks of FMLA leave in a 12-month period. *Id.* The Eight Circuit affirmed, as did the Supreme Court. *Id.* at 86.

The Supreme Court explained that to prevail on a claim of interference, an employee must prove that the employer violated Section 2615 "by interfering with, restraining, or denying his or her exercise of FMLA rights." 535 U.S. at 89. The Supreme Court added that "[e]ven then, § 2617

---

[8] In opposing defendants' summary judgment motion, Rasic briefly asserts that the extension of his leave beyond his anticipated September 1, 2007 return date was in effect an unpaid suspension, and not an extension to 12 weeks of FMLA leave (Pl.'s Opp. Mem. at 11-12). Rasic does not dispute, however, defendants' assertions of fact that Rasic recieved 12 weeks of FMLA leave (*see* Pl.'s Resp. to DSOF ¶¶ 9, 10, 19, 20, 64, 74), nor does he argue in support of his summary judgment motion that he recieved less than his full FMLA leave (Pl.'s Mem. at 4-8).

18

provides no relief unless the employee has been prejudiced by the violation. . . . The remedy is tailored to the harm suffered." *Id.* The Supreme Court found that the regulation on which plaintiff relied to establish her interference claim was invalid "because it alters the FMLA's cause of action in a fundamental way: It relieves employees of the burden of proving any real impairment of their rights and resulting prejudice." *Id.* at 90. The Supreme Court noted that the regulation, as plaintiff in *Ragsdale* sought to apply it, would give her an additional 12 weeks of FMLA leave even after she already had enjoyed 30 weeks of leave – which already was more than the FMLA requires. *Id.* at 94. "By mandating these results absent a showing of consequential harm, the regulation worked an end run around important limitations of the statute's remedial scheme." *Id.* at 91.

In line with *Ragsdale*, the Seventh Circuit has repeatedly held that "section 2617 provides no relief unless the plaintiff can prove that he was prejudiced by the violation." *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir. 2008); *see also Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 761 (7th Cir. 2008) ("To prevail on an FMLA interference claim, an employee must show that her employer deprived her of an FMLA entitlement"); *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (same). In *Franzen*, for example, the employer had denied plaintiff FMLA leave. The district court conducted a jury trial on the sole question of whether plaintiff had provided his employer with the documentation needed to obtain FMLA leave. 543 F.3d at 423. The jury concluded that he had provided the notice. *Id.* at 423-424. However, in a subsequent bench proceeding on damages, the district court found that plaintiff had failed to show that he was able to return to work at the time an FMLA leave would have ended, and thus had failed to prove damages. *Id.* at 424. As a result, the district court dismissed the case. *Id.*

The Seventh Circuit affirmed. The appeals court explained that "if [plaintiff] was either

19

unwilling or unable to return to work at the expiration of his FMLA leave, [defendant] lawfully could have terminated his employment, and he would not be entitled to damages resulting from this termination." *Franzen*, 543 F.3d at 426. The Seventh Circuit found no error in the district court's finding that plaintiff was unwilling or unable to return to work, *id.* at 427-28, and no error in the dismissal of the FMLA claim. *Id.* at 430.

These foregoing cases all stand for the proposition that for an interference claim to succeed, an employee must show that the alleged interference had real consequences; attempted, but unsuccessful, interference will not suffice. That proposition is fatal to plaintiff's interference claim in this case. Even if Mr. Rasic could show that Chief Koletsos attempted to interfere with his FMLA rights by trying to persuade him to shorten his leave during the July 23 call, or by ordering him to refrain from contacting the assistant state's attorney to reschedule a court date during the July 24 call, Mr. Rasic cannot show any prejudice from that conduct. Mr. Rasic did not shorten his FMLA leave (to the contrary, it was extended from September 1 – the date which he had indicated he would return – to October 22 (Defs.'s Ex. 17)); Mr. Rasic in fact contacted assistant state's attorneys on multiple occasions to try to adjust the court dates; and Mr. Rasic took his full twelve weeks of FMLA leave. *See e.g., Golden v. Chautauqua Airlines, Inc.*, No. 1:05-cv-786-RLY-TAB, 2007 WL 925020 (S.D. Ind. March 26, 2007) (finding interference claim fails as a matter of law where there is no evidence of harm resulting from employer's comments expressing displeasure at employee's use of FMLA leave); *Garcia v. Crown Servs., Inc.*, No. 04-CV-879, 2006 WL 2381786 (E.D. Wis. Aug 15, 2006) (finding no interference where employee was "permitted to fully exercise all the rights she had under §2612(a)").

To support his interference claim, Mr. Rasic relies principally on *Jennings v. Ford Motor*

20

*Co.*, No. 1:06-cv-0877-SEB-TAB, 2008 WL 3853369 (S.D. Ind. Aug. 15, 2008) (Pl.'s Mem. at 5-8; Pl.'s Opp. Mem. at 7-8, 11-12).[9] In *Jennings*, the trial court interpreted the fifth element of an interference claim as set forth by the Seventh Circuit in *Barnett* – that the employer denied the employee FMLA benefits to which he was entitled – to require an employee to show "either the flat denial of FMLA benefits or the interference or discouragement of his FMLA rights." 2008 WL 3853369, at * 4. In reaching that conclusion, the *Jennings* court placed weight on a Department of Labor regulation stating that an employer interferes with FMLA rights, "not only [by] refusing to authorize FMLA leave, but [also by] discouraging an employee from using such leave." *Id.* (quoting 29 C.F.R. § 825.220(b)). The *Jennings* court reasoned that there was no reason to believe that the Seventh Circuit in *Barnett* intended to adopt a definition of interference that was more stringent than the regulation, or one that was more stringent than the definition adopted by the Sixth Circuit decision – *Hoge*, 384 F.3d 238 – that *Barnett* cited as support for the elements of an interference claim. 2008 WL 3853369, at *4. The *Jennings* court also noted that this element of an interference claim was not a matter of contention in *Barnett*, as a further reason for the conclusion that *Barnett* did not intend to interpret interference claims under the FMLA more narrowly than did the regulation. *Id. Jennings* therefore held that the plaintiff could meet this element by demonstrating that that the employer had interfered with the employee's FMLA leave by discouraging it, even though the employer had been unsuccessful in that regard. *Id.* at *5.

With respect, we disagree with this analysis. The *Jennings* court appears to have placed

---

[9] The district court overruled objections to the report and recommendation, and adopted it. *Jennings v. Ford Motor Co.*, No. 1:06-cv-0877-SEB-TAB, 2008 WL 4452390 (S.D. Ind. Sept. 30, 2008). However, defendant did not object to (and the district judge thus did not address) the aspect of the report and recommendation concerning the interference claim.

weight on the proposition that *Hoge* supports the broader interpretation of the fifth element of an FMLA interference analysis that it embraced to allow for an attempted interference claim. But, the *Hoge* court, like the *Barnett* court, did not specifically address attempted interference because it was not presented with that specific question. *See Hoge*, 384 F.3d 238. More important, unlike the *Jennings* court, we have the benefit of the Seventh Circuit's decision in *Franzen*, 543 F.3d 420, which issued shortly after the *Jennings* report and recommendation. *Franzen* directly answered the question of whether an interference claim may lie in the absence of proof of prejudice: *Franzen* held that it cannot.[10]

Plaintiff also tries to salvage his interference claim by arguing that defendants successfully interfered with his FMLA leave by suspending him without pay and by failing to reinstate him to after his FMLA leave ended (Pl.'s Mem. at 8.) That theory is not what Mr. Rasic alleged in his complaint: there, he asserted that defendants tried to persuade him to cut short his leave and demanded that he return to duty early by "pretextually asking him to appear in court for a subpoena" (Compl. ¶¶ 41, 43), and "[i]n this manner, . . . interfered with [Mr.] Rasic's entitlement to leave under the Family and Medical Leave Act" (*id.* at ¶ 44). The complaint does not allege that his suspension and termination were acts of interference. In his summary judgment memorandum, plaintiff raises this argument only in a cursory fashion, and offers no basis to permit him to seek

---

[10] *Franzen* did not address the Department of Labor regulation. However, we find the analysis in *Ragsdale*, in which the Supreme Court refused to give effect to a regulation that it found inconsistent with limitations in the FMLA's remedial scheme, fully applicable to the Department of Labor regulation invoked in *Jennings*. That regulation would allow an interference claim to proceed on a mere showing of "discouragement" of the exercise of FMLA rights, even if the acts of discouragement did not succeed and the employee suffered no loss of FMLA rights. As was true with the regulation discussed in *Ragsdale*, this regulation would expand the scope of FMLA interference claims, which both the Supreme Court and the Seventh Circuit have limited to situations of actual prejudice. We are not required to defer to a regulation that "is inconsistent with the administrative structure that Congress enacted into law." *Ragsdale*, 535 U.S. at 91 (quotations and citations omitted).

summary judgment based on a theory not asserted in the complaint. In his complaint, Mr. Rasic did specifically assert his termination as a basis for an FMLA claim – but not for his interference claim. Rather, Mr. Rasic asserted that his termination "was in retaliation for [Mr.] Rasic having exercised his rights under the FMLA" (*id.* ¶ 59). We see no reason to permit Mr. Rasic, at this late date, to engraft onto his interference claim a termination allegation that will be presently in any event in his retaliation claim.

We therefore grant defendants' motion for summary judgment on Count I, the interference claim, and deny plaintiff's motion for summary judgment on that claim.

### B.

Mr. Rasic also seeks summary judgment on his claim in Count II that defendants retaliated against him for taking his FMLA leave and asserting his FMLA rights, by terminating him from his position as a police officer (Pl.'s Mem. at 8-12). Mr. Rasic argues that since each of the acts of insubordination for which he ultimately was terminated arose in the context of his assertion of FMLA rights, "the only reasonable inference a jury could make is that [Mr.] Rasic's termination was a direct result of his FMLA leave and assertion of FMLA rights" (*id.* at 8). Defendants argue, on the other hand, that they are entitled to summary judgment on Mr. Rasic's retaliation claim since Rasic has failed to present evidence of retaliatory intent (Defs.' Mem. at 9-13), and there are "multiple legitimate non-discriminatory reasons for plaintiff's termination" (*id.* at 13). We find both motions misguided, as they confuse what inferences and conclusions a jury *may* reasonably draw from the evidence what inferences and conclusions a jury *must* draw.

The FMLA makes it unlawful to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. §2615 (a)(2).

In particular, an employer is prohibited "from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c) Moreover, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *Id.*

The Seventh Circuit has held that an FMLA retaliation claim can proceed through the direct or indirect method of proof. *Ridings*, 537 F.3d at 771. Because Mr. Rasic has not identified a similarly situated employee who did not request FMLA leave and who was treated more favorably, he must proceed under the direct method of proof. *See Mitchell v. Dutchmen Mfg., Inc.*, 389 F.3d 746, 750 (7th Cir. 2004) (finding the "[f]ailure to satisfy any one element of the prima facie case dooms an employee's retaliation claim"). Under the direct method, a plaintiff must present evidence of: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008).

"A plaintiff can prevail under the direct method by showing [direct evidence such as] an admission of discrimination or by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Ridings*, 537 F.3d 771(internal quotations omitted). Once the plaintiff has made a *prima facie* case, the burden of production shifts to the employer to prove by a preponderance of the evidence that the same action would have occurred even without the protected conduct. *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). "The persuasiveness of the [employer's] explanation is normally for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point. Summary judgment should be granted only

if the defendant presents unrebutted evidence that [it] would have taken the adverse employment action against the plaintiff even if [it] had no retaliatory motive." *Id.* (internal quotations and citations omitted).

For purposes of the present motions, there is no dispute that Mr. Rasic engaged in a statutorily protected activity and that his employer took a materially adverse action against him by suspending and terminating him (PSOF ¶¶ 7, 40; DSOF 69, 74). The dispute thus focuses on whether the evidence establishes a causal connection between the two established elements: Mr. Rasic claims that it does, and defendants claim that is does not. Our review leads us to conclude that the record does not permit summary judgment for either side.

For example, there is the document that began Mr. Rasic's termination, the Charges and Specifications prepared by Chief Koletsos (Pl.'s Ex. M; Defs.' Ex. 21). In it, Chief Koletsos specifically alleges as insubordination Mr. Rasic's statements that Chief Koletsos was harassing Mr. Rasic (by insisting that he comply with the subpoena and not contact the assistant state's attorney to try to reschedule the court date so it would come after his FMLA leave ended), and Mr. Rasic's statement that he would see Chief Koletsos in federal court (*id*). Upon determining that Mr. Rasic was guilty of all of the charges Chief Koletsos had brought, the Northlake Police Commission terminated Rasic's employment (DSOF ¶ 69; Defs.' Ex. 27). While Chief Koletsos's charges also included Mr. Rasic's failure to attend court as required by subpoena, Chief Koletsos testified that he did not deem those to be terminable offenses (Defs.' Ex. 35, at 45). This allows Mr. Rasic to argue – as he does – that the termination decision was the direct result of his assertion of FMLA

rights.[11]

On the other hand, there is plainly another way to view the evidence. It is undisputed that officers in the Northlake Police Department have been disciplined for failing to appear in court (Defts.' Resp. to PSOF ¶ 41, citing Pl.'s Ex. P). One issue here is whether Mr. Rasic's failures to appear in court warranted the ultimate discipline of termination (or whether he was treated severely because he asserted FMLA rights). On that question, the Northlake Police Commission was not bound by Chief Koletsos's view of what constitutes a terminable offense. In its findings, the Northlake Police Commission based six of the 12 violations in whole or part on Mr. Rasic's failure to honor the subpoenas (Defs.' Ex. 27 at 12-14). Further, Mr. Rasic understood that the subpoenas issued upon him did not come from Chief Koletsos or Deputy Chief Nissen (Defs.' Ex. 36 at 14). He likewise understood that the subpoenas were orders of a court compelling his appearance (*id.*) The Supreme Court long ago declared that "[it] is . . . beyond controversy that one of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned." *Blackmer v. United States*, 284 U.S. 421, 438 (1932). A jury reasonably may conclude that this duty is even greater when a subpoena is directed to a law enforcement officer, who initiated the proceedings that brought a

---

[11] We are not persuaded by defendants' argument that the Northlake Police Commission's hearing process and determination automatically insulate Northlake from any retaliatory intent that Chief Koletsos allegedly harbored. Defendants rely on *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908 (7th Cir. 2007), to argue that since Chief Koletsos was not the ultimate decision-maker, Mr. Rasic must demonstrate that he was the functional decision-maker for the Commission in order for liability to be imposed (Defs.' Opp. Mem. at 7). However, the Northlake Police Commission expressly incorporated into its decision a determination that Mr. Rasic was insubordinate when he told Chief Koletsos that he felt harassed that he would see him in court (Defs' Ex. 27 at 17). In the context of the case, as further discussed below, a finder of fact could conclude that there is a nexus between Mr. Rasic's assertion of FMLA rights and the Commission's decision to terminate him. *Cf. Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785-786 (7th Cir. 2008) (affirming summary judgment for defendant on Title VII retaliation claim where employer's merit board made ultimate decision, and noting plaintiffs could not establish nexus between discrimination complaints and board's decision where plaintiffs failed to present any evidence to impugn the board's credibility or motivation).

defendant into the criminal justice system.

Plaintiff cites no authority for the proposition that his FMLA leave relieved him of the obligation to comply with lawful subpoenas issued by a court and not by his employer; nor are we aware of any such authority. To be sure, the FMLA does not relieve one of the duty to comply with legal requirements not imposed by the employer. A jury may conclude that the refusal to appear in court on multiple occasions, without good reason, upped the ante and was worthy of termination.[12]

As to two other violations, the Commission found Mr. Rasic had been insubordinate in saying to Chief Koletsos "Okay, King" and "God, you are out of control." In so finding, the Commission considered, among other things, the tone of Mr. Rasic's voice on the tape recording of the July 24 telephone call (Defs.' Ex. 27 at 10). Upon listening to the tape recording, a jury will decide whether those comments and his tone of voice constituted insubordination which could warrant termination, even if they occurred during a conversation in which Mr. Rasic also asserted FMLA rights. The FMLA authorizes an employee to assert FMLA rights without retaliation; but, whether it empowers an employee to do so in a demeaning and disrespectful fashion is another question. See Jennings v. Tinley Park Cmty. Consol. School Dist. No. 146, 864 F.2d 1368, (7th Cir. 1988) (adopting a reasonableness test in a Title VII retaliation case to determine whether employee's manner of protesting alleged discrimination gave rise to legitimate nondiscriminatory reason for her discharge, noting that "courts have held that a decision to discipline an employee whose conduct is unreasonable, even though borne of legitimate protest, does not violate Title VII").

---

[12] The Northlake Police Commission determination cited three failures by Mr. Rasic to appear in response to subpoenas; that he was aware of the subpoenas before he took FMLA leave; that Mr. Rasic "knowingly and willfully disobeyed the subpoenas" by failing to appear; and that he had no good reason for failing to appear (Defs.' Ex., Ex. 27 at 9-12). The Commission noted Chief Koletsos' testimony that it would have been very embarrassing for an officer to be held in contempt of court for failing to honor a subpoena, and further stated that had Mr. Rasic honored the subpoena in the Galvez case, "a criminal defendant would have been convicted" (Id. at 11).

Moreover, in its termination decision, the Commission did not identify which of the 12 violations formed the basis of the decision; to the contrary, the Commission's decision stated that "[a] single episode of misconduct may be sufficient to establish cause" for termination (Defs' Ex. 27 at 18). Thus, a jury might conclude that the repeated failures to attend court – which lead to the dismissal of the Galvez case – or an insubordinate tone of voice and language by Mr. Rasic was the determining factor in the termination decision, and that the assertion of FMLA rights was not a substantial or motivating factor. *Lewis v. School Dist. No. 70*, 523 F.3d 730, 741-742 (7th Cir. 2008) (quoting *Culver*, 416 F.3d at 545) ("A motivating factor does not amount to a but-for factor or the only factor, but is rather a factor that motivated the defendant's actions").

Mr. Rasic also argues that there is circumstantial evidence of retaliatory intent. Mr. Rasic argues that Chief Koletsos only raised the subpoena at all during the July 24 conversation because Mr. Rasic had withstood the pressure that Chief Koletsos had exerted during the July 23 conversation to end his FMLA leave early (Pl.'s Opp. Mem at 3). However, there is conflicting evidence as to when Chief Koletsos knew of the Galvez subpoena.[13] Moreover, the undisputed facts show that during the July 23 conversation, Mr. Rasic did not refuse the request to return to work early, but instead said: "Okay, I'll try and get back as soon as I can" (Defs.' Ex. 11 at 2; Pl.'s Ex. E at 2). A jury may conclude that as of the beginning of the July 24 telephone call, Chief Koletsos did not know that Mr. Rasic would not return to work early, and that without that knowledge, there was no reason to believe that Chief Koletsos harbored any retaliatory motive against Mr. Rasic. A

---

[13] The Galvez subpoena had issued on July 16, 2007, and the record does not establish when the Northlake Police Department received it (Defs.' Ex. 16). Chief Koletsos testified that he only learned of the subpoena on July 24 (Defs.' Ex. 35 at 12). However, during Mr. Rasic's July 24 phone conversation with Sargent Tzinis about responding to the Galvez subpoena, Sargent Tzinis suggested that he had last spoken to Chief Koletsos about it about a week earlier (Pl.'s Ex. O at 11; Defs.' Ex. 12 at 11).

jury also may view as significant on the issue of retaliatory intent the fact that on July 27 (after the July 24 telephone call), Chief Koletsos asked ASA Finley to continue the juvenile matter so that Mr. Rasic would not have to appear in court on that matter on August 1 (DSOF ¶¶ 41-42).

Mr. Rasic further argues that when the issue of the subpoena was raised, Chief Koletsos's order to refrain from contacting the ASA's was contrary to departmental practice (Pl.'s Opp. Mem. at 3-4). There is evidence in the record to support this claim. Northlake Police Department General Order 13-10, issued by Koletsos in 2002 to all Northlake Police Department personnel, directs that, at least in the case of illness, officers under subpoena are "required to contact the Cook County State's Attorney's Office" when they can not attend the scheduled date (Pl.'s Ex. I; Defs.' Ex. 25). The Order expressly states in several places that only an ASA may excuse an officer from a court date (*id.*). Further, Chief Koletsos testified that no other officer had ever been disciplined for calling an ASA's to reschedule a court date but rather only for simply not responding to a subpoena at all (Pl.'s Ex. N at 27). To the extent that a jury concludes that the order not to contact the ASA's was contrary to the Northlake Police Department's standard procedures, that could suggest a discriminatory motive. *See Lewis,* 523 F.3d at 743.[14]

But, there is evidence on the other side of this ledger as well. Deputy Chief Nissen testified that the Galvez case was especially important to the department because taking away driving privileges was "one of the best tools" police have in combating gang crime, and Mr. Galvez was a known gang member facing a DUI charge that could have resulted in him losing his driver's

---

[14] Defendants argue that plaintiff's retaliation theory requires acceptance of the premise that Chief Koletsos knew in advance of his directives that Mr. Rasic would ignore them and therefore create a basis to institute termination proceedings (Defs.' Mem. at 3). We disagree. The issue is not what Chief Koletsos predicted at the time of his July 24 conversation with Mr. Rasic, but rather, whether a causal connection exists between Mr. Rasic's assertion of his FMLA rights and his suspension and termination from the Northlake police force. *See Caskey,* 535 F.3d at 593.

privilege (Defs.' Ex. 34 at 25.) In deciding whether Chief Koletsos's order was contrary to standard practice, a jury may consider whether the particular circumstances involved in the Galvez situation – a subpoena to appear at a trial that already had commenced, that already had been continued, and a subsequent dismissal of the criminal case as a result of Mr. Rasic's failure to appear – presented a standard or an unusual situation.

Mr. Rasic also ascribes retaliatory motive to defendants' belated request for additional documentation supporting his second request to extended his FMLA leave. Defendants argue that Mr. Rasic's FMLA leave wasn't even to care for his father, while Rasic asserts that his extended leave had been approved both to care for both his daughter and his father (Defs.' Resp. to PSOF ¶ 7). There is evidence in the record to support Mr. Rasic's position: Chief Koletsos specifically noted both reasons when he approved Mr. Rasic's extension request (Pl.'s Ex. D; Defs.' Ex. 9). It was nearly two months later, and only after Chief Koletsos sought Mr. Rasic's termination, that Mr. Rasic was asked to provide additional information if his FMLA leave was based on a need to care for his father (Defs.' Ex. 17). But, a jury may conclude that the request for additional information was not born of a retaliatory motive, but was appropriate in light Mr. Rasic being granted a second extension of his leave. In determining whether that was the case, a jury may consider the fact that Mr. Rasic was, indeed, given a further extension of leave, and that the request for additional information was made by Deputy Chief Nissen: plaintiff offers no evidence that Deputy Chief Nissen harbored the same retaliatory motive that Mr. Rasic attributes to Chief Koletsos.

There is other evidence that the parties cite in support of their respective contentions, which we find unnecessary to address in light of our foregoing analysis. That analysis explains our conclusion that on the present record, there is a triable issue on the question of whether Mr. Rasic's

30

exercise of his FMLA rights was a substantial or motivating factor in his termination.

That conclusion is premised on the proposition that to prove FMLA retaliation, a plaintiff need prove only that protected conduct was a substantial or motivating factor in his termination, and not that it was the "but for" or sole reason for the termination. That mixed-motive theory of retaliation is permissible under the current state of FMLA law in the Seventh Circuit. *Lewis*, 523 F.3d at 741-42. But, there is a serious question as to whether the mixed-motive theory of FMLA retaliation survives the Supreme Court's recent decision in *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343 (2009).

In *Gross*, the Supreme Court held that the plain language of the ADEA does not authorize mixed-motive age discrimination claims. 129 S.Ct. at 2348. The Seventh Circuit has not had occasion to consider whether the mixed-motive theory remains viable in FMLA retaliation claims in the wake of the *Gross* decision. At least one circuit court has employed the *Gross* analysis to find mixed motive retaliation claims still viable under the FMLA. *See Hunter v. Valley View Schools*, No. 08-4109, __ F.3d __, 2009 WL 2601863 (6th Cir. Aug. 26, 2009). But, recent Seventh Circuit decisions have signaled that the continued viability of this mixed motive theory in FMLA retaliation cases is less than certain.

In *Fairley v. Andrews*, No. 07-3343, __ F.3d __, 2009 WL 2525564, *7 (7th Cir. Aug. 20, 2009), the Seventh Circuit applied the *Gross* decision to hold that but-for causation must be shown to establish a claim of retaliation for the assertion of first amendment rights. The Seventh Circuit stated that first amendment retaliation cases applying a motivating factor analysis "do not survive *Gross*, which holds that, unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law." *Id.*

*See also Waters v. City of Chicago*, Nos. 08-1583, 08-2493, ___ F.3d ___, 2009 WL 2767141, *9 (7th Cir. Sept. 2, 2009) (citations omitted) (holding that in a first amendment retaliation case, a plaintiff must prove that speech "was the 'reason' that the employer decided to act," and citing *Fairley* for the proposition that "decisions which say that a plaintiff need only prove that his speech was *a* motivating factor in the defendant's decision do not survive *Gross*") (emphasis in original).

In *Gross*, the Supreme Court held that the ADEA anti-retaliation provision prohibiting discharge or discrimination "because of" age requires proof of but-for causation. 129 S. Ct. at 2350. In that same opinion, the Supreme Court reaffirmed that the Title VII permits retaliation claims on a mixed-motive theory based on the statutory language that allows such a claim to be established where retaliation was "a motivating factor" for the decision. *Id.* at 2349. The anti-retaliation provision of the FMLA prohibits discharging or discriminating against any person "for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). We suspect that there is more than a passing chance that if presented with the question, the Seventh Circuit would find that this statutory formulation ("for opposing") is not distinguishable in any meaningful way from the ADEA formulation ("because of") that *Gross* held requires proof of but-for causation.[15]

But, this Court is not empowered to predict whether the Seventh Circuit's will overrule its earlier opinions on mixed-motive FMLA retaliation claims in light of *Gross*. *See e.g., Agostini v. Felton*, 521 U.S. 203, 237 (1997) (noting that lower courts must leave to the Supreme Court "the

---

[15] In finding that the mixed motive theory in FMLA retaliation cases survives the *Gross* decision, the Sixth Circuit in *Hunter* placed great weight on Department of Labor regulations that interpret Section 2615(a)(2) to prohibit an employer from treating an employee's decision to take FMLA leave as "a negative factor in employment actions." 2009 WL 2601863, *4. However, as discussed in Sect. IV. A. above, *Ragsdale*, 535 U.S. 81, teaches that an interpretive regulation is only as good as its faithfulness to the statutory language. And, we question whether interpreting "for opposing any practice made unlawful by this subchapter" to mean something other than but-for causation is a reasonable interpretation, instead of an expansion of the statutory language of the type that led the Supreme Court to invalidate the regulation at issue in *Ragsdale*.

prerogative of overruling its own decisions") (internal quotations omitted). Rather, we must base our decision on established precedent. Binding Seventh Circuit precedent provides for the use of a mixed-motive standard for proving FMLA retaliation, and under that standard, there is a triable issue for the jury. We therefore deny both plaintiff's and defendants' motions for summary judgment on Count II.

## C.

Plaintiff does not seek summary judgment on Count III, his administrative review claim. In their summary judgment motion, defendants argue that "[i]n the event this Court grants the motion for summary judgment the Court should follow the directive of the Seventh Circuit and decline to exercise supplemental jurisdiction" over that claim (Defs.' Mem. at 15). Since we have not granted summary judgment on all federal claims, we are not authorized to decline to exercise supplemental jurisdiction.

Defendants alternatively argue that "[i]n the event this Court chooses to review the transcript of the hearing before the Police Commission, the decision of the Board should be affirmed" because it is not contrary to the manifest weight of the evidence (Defs.' Mem. at 15). Perhaps this is a request for summary judgment; but, perhaps it is not. Plaintiff must not have considered this to be a request for summary judgment, as he failed to address this point at all – which he did at his peril. In any event, the four sentences that defendants devote to this issue do not adequately develop an argument about why the decision should be affirmed; indeed, the movants on the motion do not even include the Northlake Police Commission and its Commissioners, who are defendants on that claim (Compl. ¶¶ 11-13).

In these circumstances, we conclude that the best course is to treat this portion of defendants'

33

memorandum not as a request for summary judgment, but instead as a request for affirmance if and when – down the road – the Court finds it necessary to address the administrative review claim.

Mr. Rasic's administrative review claim would a question for the Court, and would not be a matter for a jury. *See* 735 ILL. COMP. STAT. 5/3-101 (no right to a jury set forth in the statutory language).; *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 753 (Ill. 1994) (quotations and citations omitted) (while the legislature may create a statutory right to a jury trial, the Illinois constitutional right to a jury trial "was not intended to guarantee trial by jury in special or statutory proceedings unknown to the common law"). Accordingly, we will defer further consideration of this state law claim until disposition on the merits of the federal law retaliation claim in Count II.[16]

---

[16] In their summary judgment motion, defendants briefly – and without development – renew Chief Koletsos' previously unsuccessful assertion of qualified immunity (Defs.' Mem. at 13-14). "[T]he defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) (internal quotations omitted). As we explained in denying Chief Koletsos's earlier motion to dismiss on this ground, "[a] qualified immunity inquiry is focused on 'the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." *Rasic v. City of Northlake*, 563 F. Supp. 2d 885, 892-93 (N.D. Ill. 2008) (quoting *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996)).

Chief Koletsos' earlier motion to dismiss failed to focus on whether plaintiff had alleged a violation of a clearly establish right, and focused instead on whether it was clearly established at the time of the alleged violation that a person in his position could be personally liable for an FMLA violation (Defs.' Mem. in Supp. Mot. to Dis. at 5-7 (doc. # 18)). In denying that motion, we noted that it would be a "misuse of qualified immunity to apply the doctrine to insulate a public employee from suit where he does not dispute that his acts (if proven) would violate a clearly established right, but only quarrels about whether he should have to answer for his conduct personally or whether instead that responsibility should be borne by his employer." *Rasic*, 563 F. Supp. 2d at 893. Defendants' renewed argument fails for similar reasons. Mr. Rasic's surviving claim alleges that he was denied the exercise of his FMLA rights free from retaliation. Defendants do not meaningfully argue that this that right was not clearly established at the time of the alleged violations. Thus, we see no reason to depart from our earlier ruling. Defendants' assertion of qualified immunity is denied.

34

## CONCLUSION

For the foregoing reasons, therefore, plaintiff's motions to strike (doc. # 69) and for summary judgment on Counts I and II of the complaint (doc. # 63) are denied. Defendants' motion to strike (doc. # 71) is granted in part and denied in part. Defendants' motion for summary judgment (doc. # 60) is granted as to Count I and denied as to Count II. The case is set for a status hearing on October 13, 2009 at 9:00 a.m.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: September 25, 2009**

35